IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JAMES J. "JIM" BELLER, as Personal Representative of
LARRY BELLER and RITA BELLER, deceased,
and TERRY PFEIFER, as Personal Representative of
EDWARD RAMAEKERS and ALICE RAMAEKERS,
deceased,
          Plaintiffs,

vs.                                      No. CIV 02-1368 WPJ/LFG

The UNITED STATES OF AMERICA, and
AURENE M. MARTIN, Acting Assistant Secretary
of Indian Affairs,

          Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING WITNESS ETTALINE PERRY'S MOTION FOR PROTECTIVE ORDER

This matter comes before the Court on Witness Ettaline Perry's Motion for Protective Order [Doc. 124]. Plaintiff Terry Pfeifer[1] opposes the motion and filed a Response [Doc. 143]. Defendants take no position on the motion, but they filed a Response which sets forth certain factual information bearing on the motion [Doc. 138]. Perry filed a Reply [Doc. 180]. No oral argument is necessary. For the reasons given below, the Court finds that Perry's motion is well taken and will be granted.

---

[1]Although the only Plaintiff responding this motion is Plaintiff Terry Pfeifer, throughout his briefing he refers to himself as "Plaintiffs." The Court will adopt this terminology.

**Background**

Plaintiffs' suit against the United States and Defendant Martin seeks damages and injunctive relief for wrongful death.[2] Plaintiffs allege that their decedents were killed in a collision in January 2002 with a government truck driven by Bureau of Indian Affairs employee Lloyd Larson ("Larson"), who was drunk at the time of the collision. Larson is currently incarcerated at a federal correctional facility as a result of a criminal conviction arising from this incident.

Plaintiffs contend that Defendants, as Larson's employers, were aware of his long history of arrests and convictions for driving while intoxicated and of the suspension and revocation of his driver's license, but they nevertheless continued to allow him to drive a government vehicle in the course of his employment. Liability is asserted under theories of *respondeat superior*, negligent entrustment, and negligent hiring, training and supervision. *See*, Plaintiff's Second Amended Complaint [Doc. 30].

On June 24, 2003, Plaintiff Pfeifer took the deposition of Ettaline Perry ("Perry"), who is not a party to this suit. Perry was asked several questions about statements Larson made to her, or conversations she had with Larson. She was instructed by her attorney not to answer these questions on grounds of marital communication privilege.

Although it is normally improper for an attorney to instruct the client to refuse to answer a question put at a deposition, such instruction is allowed "when necessary to preserve a privilege." Fed. R. Civ. P. 30(d)(1); American Hangar, Inc. v. Basic Line, Inc., 105 F.R.D. 173, 174 (D. Mass. 1985). The person from whom discovery is sought must thereafter file a motion for protective order

---

[2]The claim for injunctive relief was dismissed by order of the District Judge [Doc. 172] on August 14, 2003.

and seek a court ruling on the propriety of the refusal to answer. American Hangar, *supra*; Fed. R. Civ. P. 26(c). Perry did not answer certain questions at the deposition, as instructed by her attorney, and she then brought this motion for a protective order as contemplated in Federal Rules.

## **Applicable Law**

The existence of a privilege is a matter to be determined by reference to federal common law, except in cases where state law supplies the rule of decision with respect to an element of the claim or defense. Fed. R. Evid. 501. Although in cases brought under the Federal Tort Claims Act (FTCA), liability is determined "in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1), it is generally held that the existence of a privilege in FTCA cases is, nevertheless, to be determined according to federal common law.

> On its face, it would seem that the obvious result in applying Rule 501 in the context of the FTCA would be that state law supplies the rule of decision . . . However, such a literal application of Rule 501 is inconsistent with the legislative history of Rule 501, which supports a finding that Congress intended federal privilege law to apply in FTCA cases.

Tucker v. United States, 143 F. Supp. 2d 619, 622 (S.D.W.Va. 2001); *accord*, Syposs v. United States, 179 F.R.D. 406 (W.D.N.Y. 1998); Menses v. United States Postal Serv., 942 F. Supp. 1320 (D. Nev. 1996); Young v. United States, 149 F.R.D. 199 (S.D. Cal. 1993). Although the courts are not unanimous on this issue, *see*, *e.g.*, Ellis v. United States, 922 F. Supp. 539, 540 (D. Utah 1996), the Court finds that, in the absence of a definitive ruling by the Tenth Circuit, it will follow the reasoning of the above-cited cases and rely on federal common law.

The parties are in accord that the privilege at issue here is the privilege for confidential marital communications. *See*, Wolfle v. United States, 291 U.S. 7, 54 S. Ct. 279 (1934); Blau v. United

3

States, 340 U.S. 332, 71 S. Ct. 301 (1951). Although it is true, as Plaintiff points out, that the party seeking to assert a privilege has the burden of establishing its applicability, Motley v. Marathon Oil Co., 71 F.3d 1547, 1550 (10th Cir. 1995), it is also true that "marital communications are presumptively confidential." Blau v. United States, *supra*, 340 U.S. at 333.

### Discussion

> The marital communications privilege is a highly regarded and well established privilege. [In Trammel v. United States, 445 U.S. 40, 100 S. Ct. 906 (1980)], the Court reaffirmed the significance of the confidential marital communications privilege and its important role in protecting the marital relationship, "the best solace of human existence" . . . As the Supreme Court observed on an earlier occasion, "[t]he basis of the immunity given to communications between husband and wife is the protection of marital confidences, regarded as so essential to the preservation of the marriage relationship as to outweigh the disadvantages to the administration of justice which the privilege entails."

SEC v. Lavin, 111 F.3d 921, 925 (D.C. Cir. 1997).

Perry asserts that she is entitled to a protective order because she was asked at her deposition to reveal certain privileged conversations she had with Larson who, she contends, is her common law husband under Navajo law. She asks the Court to recognize the validity of her common law marriage under Navajo law and to uphold her claim of privilege.

Plaintiffs, on the other hand, ask the Court to order a continuation of Perry's deposition and to direct her to answer the questions to which she previously objected. Plaintiffs contend that: (1) Larson and Perry are not legally husband and wife; and (2) even if they are deemed legally married, Perry waived the marital privilege by disclosing the communications to a third party.

The Court rejects Plaintiffs' arguments and finds that a valid marriage does exist and that Perry did not waive her privilege against disclosure of confidential marital communications. Perry's

4

motion for a protective order will therefore be granted.

## Existence of a Common Law Marriage

Application of the marital communication privilege depends upon the existence, at the time of the communication in question, of a valid marriage. United States v. Staggs, 881 F.2d 1546, 1549 (10th Cir. 1989). Perry does not claim that she and Larson were married in a church or civil ceremony, or even in a traditional Navajo marriage ceremony. Rather, she claims a common law marital relationship recognized by Navajo law which gives rise to the privilege.

Perry and Larson are both Navajo Indians; both are members of the Navajo Tribe; and both reside within the exterior boundaries of the Navajo Nation. An Indian tribe retains the sovereign authority to regulate the internal domestic relations of its members. Montana v. United States, 450 U.S. 544, 563-64, 101 S. Ct. 1245, 1257 (1981). Perry and Larson have spent most of their lives residing on the Navajo Reservation and are subject to Navajo Nation laws regarding marriage and domestic relations. Marris v. Sockey, 170 F.2d 599 (10th Cir. 1948).

The Navajo Nation Code sets forth the laws under which tribal members may contract a marriage. The statutory sections at issue herein, set forth in Title 9 Navajo Nation Code (NCC), provide as follows:

> **§ 1. Validity generally**
> ***
> B. Marriages may be validly contracted within Navajo Indian Country by meeting the requirements of 9 NNC §§ 3 and 4.
>
> **§ 2. Plural marriages void**
> All plural marriages contracted, whether or not in accordance with Navajo custom, shall be void.
>
> **§ 3. Methods of contracting marriage**
> A marriage may be contracted within the Navajo Nation by any of the

5

following procedures:

***

E. The contracting parties establish a common-law marriage having the following features:
1. Present intention of the parties to be husband and wife;
2. Present consent between the parties to be husband and wife;
3. Actual cohabitation;
4. Actual holding out of the parties within their community to be married.

**§ 4. Requirements generally**

In order to contract a Navajo Nation marriage, the following requirement must be fulfilled:

A. Both parties must be unmarried. If either party has been previously married, the marriage must have been dissolved by death of the spouse or by a valid decree of divorce.

***

The Court finds that Perry presents sufficient evidence to establish all elements of a common law marriage under 9 NCC § 3(E).

A. <u>Factual Background</u>[3]

Perry and Larson are both enrolled members of the Navajo Tribe and have lived within the Navajo Nation nearly all of their lives. Larson's family resides near Klagetoh, Arizona, and Perry's family is from the Crownpoint, New Mexico area. [Perry Dec. I, at ¶ 4].

Perry first met Larson in 1990, when they were both working for the Bureau of Indian Affairs ("BIA") Branch of Roads. [Perry Dec. 1, at ¶ 7]. Perry became romantically involved with Larson

---

[3]Perry submitted two separate declarations in connection with this motion. The first declaration was attached to her initial memorandum in support of the motion. *See*, Exhibits in Support of Witness Ettaline Perry's Motion for Protective Order [Doc. 126], Ex. 2, "Declaration of Ettaline Perry." This document will be referred to hereinafter as "Perry Dec. I." The second declaration was attached to her reply memorandum. *See*, Materials Submitted With Ettaline Perry's Reply Brief [Doc. 181], Ex. 3, "Second Declaration of Ettaline Perry." This document will be referred to hereinafter as "Perry Dec. II."

in June 1990. [Perry Dec. 2, at ¶ 3; Perry Deposition, Doc. 144, Ex. B, at 27-29, 57, as corrected, *see* Doc. 181, Ex. 8]. She was living in a BIA apartment in Crownpoint at the time. By December 1990, she and Larson were living together. [Perry Dec. 2, at ¶ 3]. A former neighbor, Deanne Seumptewa, confirmed in her deposition that, in the period between 1991 and 1994, Larson spent "90 percent of his time" at Perry's apartment. [Doc. 138, Ex. B, at 20]. Larson and Perry continued to live together until the date of the accident which resulted in Larson's arrest, in January 2002. [Perry Dec. I, at ¶ 12]. Perry states that, from the time they first began living together, they "consented and agreed to live as husband and wife, and we intended to be married as common law spouses." [Perry Dec. I, at ¶ 10].

Larson was previously married to Alberta J. Larson, from 1982 until they were divorced by the Navajo Tribal Court on January 2, 1992. They had two sons during this marriage. [Doc. 181, Ex. 1]. Larson states that he first met Perry in 1990, and that their relationship became intimate after his divorce was finalized. [Lloyd Larson's Declaration, submitted with Perry's Reply Brief, Doc. 181, Ex. 2, at ¶ 3; hereinafter referred to as "Larson Dec."].[4]

As an attachment to their Response, Plaintiffs submitted the affidavit of Alberta Larson. In this affidavit, Alberta states that she believes she is still married to Lloyd Larson, because she has a marriage certificate issued by the state of New Mexico, and the couple's divorce decree is from the Navajo court, not from the state court. She says she wants to remain married to Larson, that Larson has always told her he still considers her his wife, that he would never marry anyone else, and that Larson continued to co-habit with her and to have sexual relations with her, up to the time of the

---

[4]The copy of the Larson Declaration submitted with Perry's reply brief has not yet been signed or notarized. Perry's counsel represents that a signed copy will be filed once it has been forwarded by Larson's attorney.

accident in January 2002. She also states that Larson told her he was not married to Ettaline Perry and that he never intended to marry Perry. [Alberta Larson Affidavit, Doc. 143, Ex. A].

Larson contradicts these statements. He states that he separated from Alberta in 1989, and that he has stayed overnight with Alberta only 2 or 3 times "for casual intimacy" between the time of their separation and their divorce in tribal court in 1992. Any other visits he made to her home were for the purpose of seeing his two sons. He says further that there was never a re-commitment between himself and Alberta, although there was still communication "and a little friendship" between them after the divorce, related to the children. [Larson Dec. at ¶¶ 6, 11-14].

Perry worked for the BIA Branch of Roads until a reduction in force in 1995 [Perry Dec. 1, at ¶ 7], as a result of which she lost her job and was no longer entitled to a BIA apartment (although she was rehired by the BIA in 1996-97 and has been working for the BIA Real Estate Services since 1997; Perry Dec. I, at ¶ 7). After Perry was let go, Larson was still employed with the BIA and the couple continued to live in Perry's former apartment, with Larson taking over as renter of that apartment. [Perry Dec. I, at ¶ 13]. The couple made several moves between 1997 and 2000, but continued to live in BIA housing, with the rent deducted from Larson's paycheck and with Perry listed on the lease as a spouse. [Perry Dec. I, at ¶ 14; Doc. 181, Exs. 5, 7; Perry Deposition, Doc. 144, Ex. B, at 58-61]. On a housing application dated May 26, 2000, Larson listed Perry as his spouse. [Doc. 181, Ex. 5].

In an employment security clearance investigation conducted on Perry in June - July 2001, Perry told an interviewer that she was living with Larson in a common law marriage, and that they had been living together in BIA housing since June 1990. Larson was also interviewed in connection

8

with this investigation. He told the interviewer that the couple's "entire social life revolves around each other," that there had been no breaks in their relationship, and that "they are not legally married but consider their relationship a common-law marriage." [Doc. 181, Ex. 3A]. On a form entitled Questionnaire for Public Trust Positions (SF 85P), which Larson filled out in August 2001, he initially identified Perry as his spouse but later deleted this information. He did this on the advice of Michele Justice, a security specialist employed at the time by the BIA Security Office, who told Larson that he could not identify himself as "divorced" and also list Perry as his spouse; rather, Ms. Justice said, it had to be one or the other. Larson told Justice that he lived with a woman whom he considered his spouse; Justice advised him that unless it was "an actual legal marriage," he was not considered to have a spouse. Larson therefore removed Perry's name. [Doc. 138, Ex. E; Doc. 137, Exs. F,G,H].

Larson and Perry have a child, Lynette Larson, born October 23, 1999. [Perry Dec. I, at ¶ 3]. Larson worked as a civil engineering technician on road construction projects and was often away from home at job sites for much of the week. [Perry Dec. I, at ¶ 8]. Indeed, for the three years prior to the accident, Larson was home only on the weekends, from Friday evening through Sunday. Typically, Larson would call Perry on Friday, at the end of the work week, to tell her what time he would be back and to ask whether he could pick up anything for Perry or the baby on his way home. [Perry Deposition, Doc. 181, Ex. 8, at 156-67, 169-70, 182; and Doc. 144, Ex. B, at 135].

Larson and Perry considered having a marriage ceremony but never did so, mainly because of the cost. [Perry Dec. I, at ¶ 15; Perry Deposition, Doc. 144, Ex. B, at 40-54; Larson Dec. at ¶ 4-5]. In spite of the lack of a ceremony, Perry states, "We did consider ourselves married by common law" [Perry Dec. I, at ¶ 15], and Larson states:

9

> Ettaline Perry and I did intend and started to live together as common-law husband and wife since 1993 . . . We made a commitment to make the relationship permanent . . . I told my family, relatives, co-workers and friends that I had found a new spouse back in 1993 and just waiting for the right time to get remarried again . . . I am and want to continue to be common-law husband and wife with Ettaline Perry . . . I give the courts my consent as the common-law husband to Ettaline Perry and that we both hold ourselves out as being married since 1993 officially."

[Larson Dec. at ¶¶3, 4, 6, 15, 16]. In addition, on May 23, 2003, Larson filed a Notice of Witness of His Intention Not to Waive the Marital Privilege in this case. In that document, Larson's criminal defense attorney notified the Court that Larson "will not waive the marital privilege arising from his marriage to Ettaline Perry." [Doc. 68].

Perry says that she referred to Larson as her husband when speaking to friends and relatives and she introduced him as her husband, and that Larson referred to Perry as his wife and introduced her as his wife. [Perry Dec. I, at ¶¶ 16-17; Perry Deposition, at 81]. The Navajo word that Perry used when introducing Larson to her relatives is "bil shighandi," which translates as "the spouse that I'm living with." This word is distinct, both from the Navajo word for a spouse to whom one has been formally married, and the Navajo word for "the person I'm living with." [Perry Deposition, at 81-82].

Perry states that she and Larson held themselves out in the community as husband and wife since 1993, and she believes they have been regarded that way in the community. [Perry Dec. I, at ¶¶ 16-17]. The first time they held themselves out as husband and wife was at a family reunion in Arizona in May 1993. It was at this reunion that Larson introduced Perry as his wife to his family members, and from that time, Larson and Perry continued to introduce themselves as husband and wife. [Perry Dec. II, at ¶ 4 and Attachment D thereto]. Larson states in his declaration that he and

10

Perry intended to live together as common-law husband and wife as of 1993. [Larson Dec., at ¶ 3].

Perry and Larson attended pow-wows, fundraisers, sporting events and rodeos as a couple, approximately three times a month. At fundraisers, they gave joint donations. They regularly attended church and Chapter meetings as husband and wife and were regarded by other Chapter members, and members of the church congregation as husband and wife. [Perry Dec. I, at ¶ 18-20]. Perry and Larson bought and insured a vehicle together and were co-owners of some cattle. They regarded the offspring of the cattle as being jointly owned by them as husband and wife. [Perry Dec. I, at ¶¶ 21-22; Doc. 181, Ex. 6].

Neighbors and co-workers of Larson and Perry considered them to be husband and wife. *See*, deposition of David E. Jones, Larson's former supervisor [Doc. 138, Ex. A, at 167]; deposition of Bobby Pablo, another former supervisor [Doc. 138, Ex. C, at 7]; statement of Johnnie B. Peshlakai, a former neighbor of Perry and Larson [Doc. 181, Ex. 3A]; statement of Watson Gibson, Jr., a former co-worker of Larson [Doc. 126, Ex. 11]. Larson's sisters considered Perry to be Larson's wife. *See*, declaration of Rosaline Begay, M.D. [Doc. 181, Ex. 4];[5] letter from Nora Alice Jim dated July 17, 2002 to Hon. C. LeRoy Hansen [Doc. 126, Ex. 7].

Perry's relatives also considered Perry and Larson to be married. *See*, Doc. 126, Exs. 3-6, 8-9]. When Larson was scheduled to be sentenced in connection with the criminal prosecution arising from the accident of January 2002, a number of Perry's relatives sent letters in support of Larson to the sentencing judge, Hon. C. LeRoy Hansen. In these letters, they consistently referred to Larson as their in-law, or to Perry and Larson as spouses. Perry attached six such letters to her motion.

---

[5]Dr. Begay discussed her declaration and agreed to it by phone with Perry's counsel, who represents that an executed copy will be submitted as soon as it is received.

[Doc. 126, Exs. 3-6, 8-9].

Following the accident of January 2002 which gave rise to this lawsuit, the Albuquerque Journal published an article about Larson, referring to his "common law wife of 11 years, Ettaline Perry." [Doc. 126, Ex. 10].

B. <u>Perry has established all elements of a common law marriage under Navajo law</u>.

Perry contends, and the Court finds, that the above facts are sufficient to satisfy the four elements necessary for a common law marriage under Navajo law. Although it is probable that not all of the evidence submitted in connection with this motion would necessarily be admissible at trial, that is not necessary. Fed. R. Evid. 104(a); <u>United States v. Zolin</u>, 491 U.S. 554, 109 S. Ct. 2619 (1989).

> If the question is factual in nature, the judge will of necessity receive evidence pro and con on the issue. The rule provides that the rules of evidence in general do not apply to this process. McCormick § 53, p. 123, n. 8, points out that the authorities are "scattered and inconclusive," and observes: "Should the exclusionary law of evidence, 'the child of the jury system' in Thayer's phrase, be applied to this hearing before the judge? Sound sense backs the view that it should not, and that the judge should be empowered to hear any relevant evidence, such as affidavits or other reliable hearsay."

Fed. R. Evid. 104, Advisory Committee Note to subsection (a), 1972. The Court will consider all of the evidence submitted, by all parties and the movant.

The four elements necessary to establish a common law marriage under Navajo law are: (1) present intention to be husband and wife; (2) present consent to be husband and wife; (3) actual cohabitation; and (4) actual holding out within the community as spouses. 9 NCC § 3(E).

With regard to the first and second elements, the parties expressed an intention and mutual consent to be husband and wife, as of 1993. Both Perry and Larson stated as much, unequivocally,

12

in their respective declarations. They introduced each other as spouses at a family gathering in May 1993, and have done so ever since. The Navajo word Perry has used to refer to Larson is "bil shighandi," meaning "the spouse that I'm living with."

In May 2000, Larson listed Perry as his spouse on a housing application, and in an interview with a security clearance investigator in the summer of 2001, he said that his entire social life revolves around Perry and vice versa, that there have been no breaks in their relationship, and that they consider their relationship to be a common law marriage. In August 2001, Larson listed Perry as his spouse on an employment form and told an interviewer that she was his common law wife. He removed Perry's name from the form only after being told by the interviewer that he could not list a common law spouse on the form, because he also stated he was divorced. If federal government forms do not allow a listing for common law spouse, a question the Court does not determine, that does not alter Larson's intention or consent to enter into a common law marriage, valid under tribal law.

The parties never conducted a formal wedding ceremony, nor did they seek a validation order from the tribal court for their marriage. But neither of these actions is necessary for a valid common law marriage, nor necessary to establish the element of consent. *See*, 9 NCC § 3(E); In the Matter of the Estate of Tsosie, 5 Nav. R. 261, 264, 5 N.L.R. 134. 136 (Window Rock Dist. Ct. 1987) ("The consent to be married is often a private matter between husband and wife. There may be no witnesses").

As noted above, Plaintiffs submitted the affidavit of Larson's former wife, Alberta Larson. In the affidavit, she states that she still considers Larson to be her husband for several reasons, in spite of the 1992 divorce decree. Plaintiffs argue from this that Larson has demonstrated an intention not

13

to be married to Perry. The Court rejects this argument. Larson and Perry were divorced by formal decree of the tribal court, and nothing further is needed from any other court to end the marriage. Begay v. Miller, 70 Ariz. 380, 387, 222 P.2d 624, 629 (1950). If Alberta erroneously believed that she was not legally divorced from Larson, that belief has no effect on the question of his intention.

The Court does not find it necessary to resolve the factual dispute as to how many nights a month, if any, Larson spent with Alberta after their divorce or whether they continued to engage in a sexual relationship. Larson states that, although the divorce was difficult, he and Alberta continued to communicate and to maintain something of a friendship, and that he visited her house from time to time, primarily to see his sons. The Alberta Larson affidavit does not alter the overwhelming weight of the evidence to the effect that Larson and Perry intended and consented to a common law marriage, each with the other, as of and after 1993.

The Court finds also that Larson and Perry meet the "actual cohabitation" requirement of the tribal code. Although Perry's memory was initially faulty on this point, it is apparent from the documentation she uncovered, and from other evidence, that the couple began living together sometime in 1990, and that they lived together continuously until the incident of January 2002 which resulted in Larson's arrest. Any cohabitation time prior to Larson's 1992 divorce from Alberta Larson would not, of course, count as establishing a common law marriage; but this is irrelevant, as the evidence shows that Larson and Perry continuously cohabited for the ten years between his divorce from Alberta and his arrest in 2002.

Perry states in her declaration that she became romantically involved with Larson in June 1990 and, by December of that year, they were living together. The first time they says they held themselves out as spouses was at the 1993 family reunion; however, the cohabitation began earlier.

14

Larson states in his declaration that he and Perry "did intend and started to live together as common-law husband and wife since 1993 to the present." Deanne Seumptewa, a neighbor at the time, testified that Larson and Perry were living together between 1991 and 1994.

In 1995, Perry's name came off the lease for BIA housing because she lost her BIA job; however, the couple remained in her apartment under Larson's name, and continued to live in BIA housing until the time of Larson's arrest. On at least one occasion, Larson listed Perry on a housing application as his spouse. In 2001, Perry told an interviewer that she lived with Larson in a common law marriage and had been cohabiting since 1990. A former neighbor who was interviewed about Perry in the same 2001 employment security investigation testified that Perry and Larson lived together in BIA housing next door to him until they moved out in 2000; he also referred to Larson as Perry's husband.

Larson was away from home a great deal due to the nature of his job, but this does not establish a lack of cohabitation. During the last few years before the accident, Larson was away at construction sites during the week, but he returned to the home he shared with Perry and their child each Friday when his work week was finished. Alberta Larson states that Larson was cohabiting with her continuously since their divorce, but this statement is contradicted by the overwhelming weight of evidence that Perry and Larson lived together since 1990.

Finally, the Court finds that Perry and Larson held themselves out as a married couple in the community beginning with the family reunion in May 1993, when they introduced each other to their respective families as husband and wife. They lived together, had a child together, attended church together as a couple, went to Chapter meetings as a couple, jointly owned a vehicle and some cattle, and their social lives revolved around each other.

Their families, co-workers, and neighbors considered them to be husband and wife. After the accident in February 2002, a newspaper journalist reported that Perry was Larson's common law wife of 11 years, indicating that someone gave the reporter this information and considered it to be true. Many of Perry's relatives wrote letters in support of Larson to the federal judge who sentenced him, referring to their brother-in-law, or son-in-law.

There is no similar evidence regarding Larson's holding himself out as the husband of Alberta Larson at any time after their separation and divorce.

It is true that, on occasion, Larson referred to Perry as his "girlfriend" or "fiancée." *See, e.g.*, Doc. 143, Exs. D,E,F. This terminology does not undermine the fact that Perry and Larson held themselves out as a married couple. The Court finds persuasive Perry's argument on this point:

> In assessing the proof, it must be kept in mind that Navajo law on marriage reflects some tension between Navajo customs on the one hand and the formalities (license, etc.) typical of the surrounding state legal systems on the other hand. [*Citing*, A. Sedillo Lopez, Evolving Indigenous Law: Navajo Marriage-Cultural Traditions and Modern Challenges, 17 Ariz. J. of Int'l and Comp. L. 283, 285-86, 293 (2000)] . . . Further, Navajo people are generally aware that the laws and customs of the surrounding jurisdictions are in some respects different. With respect to common law marriage, Navajo individuals who are aware that their marriage would not be recognized under state law will for that reason sometimes self-report as unmarried, or be advised to do so, especially when speaking or submitting forms to off-Reservation authorities.

[Doc. 180, at 4]. The Court finds that the evidence submitted is sufficient to satisfy the "holding out" requirement for a common law marriage under Navajo law.

Furthermore, it is apparent that Larson did not violate the "plural marriage" prohibition; he was validly divorced from Alberta Larson in 1992, and there is insufficient evidence to show that he met the requirements for a common law marriage with Alberta at any time thereafter. Plaintiffs have

16

presented no evidence, other than Alberta's affidavit, that Larson intended, consented, or considered himself still married to Alberta, once they were divorced. There is no document in which Larson lists Alberta as a beneficiary or spouse, no statements from neighbors that they were living together or participated in social occasions together, and no testimony that Larson introduced Alberta as a wife or otherwise held himself out as her spouse during the relevant period.

The elements of a common law marriage having been established, and no other impediments to the Perry-Larson marriage having been shown, the Court now turns to Plaintiff's argument that Perry waived her right to assert the marital privilege.

### Waiver of the Privilege

Plaintiff contends that, even if Perry is validly married to Larson and the privilege for marital communications is otherwise applicable, Perry nevertheless waived her right to assert the privilege when she met with a government attorney, Traci Colquette ("Colquette"), in April 2003, and voluntarily disclosed to Colquette the substance of various conversations between herself and Larson.

In her deposition, Perry said that she did talk to Colquette in April 2003 for about two hours. They talked about Perry's current job situation, how she first met Larson, and how she found out about the January 2002 accident. She also discussed with Colquette what she knew about Larson's DWI arrests, and her knowledge of Larson's drinking habits. She answered Colquette's questions about things that happened in the week before the accident, and about conversations she had with Larson both during that week, and on January 11 and 12, 2002. Perry told Colquette that she was Larson's common law wife, but she did not assert a marital communications privilege during her conversations with Colquette. [Perry Deposition, Dock. 144, Ex. B, at 92-94].

Perry points out that, when she was being deposed, she did not claim a privilege as to any

17

matter that she had disclosed to Colquette, nor did she object to any questions which called for facts as opposed to the content of private discussions. The record bears this out. [*See*, Doc. 181, Ex. 8]. Thus, to the extent Perry may have disclosed to Colquette any confidential communications between herself and Larson, she does not assert the privilege at all.

In any event, the Court finds that the marital communications privilege cannot be waived unless both spouses agree to the waiver, and it is clear in this case that Lloyd Larson has not concurred in any waiver which Ettaline Perry might have effected in speaking with Colquette. [*See*, Doc. 68]. This issue has not been definitely resolved by the federal courts, but the weight of authority appears to be that both spouses must participate in the waiver. *See, e.g.,* United States v. Neal, 532 F. Supp. 942, 947 (D. Colo. 1982), *aff'd*, 743 F.2d 1441 (10th Cir. 1984) ("as to his statements, the defendant as the communicator is the holder of the privilege, and . . . his wife's willingness to testify does not, by itself, abrogate his privilege"); United States v. Wood, 924 F.2d 399, 401-02 (1st Cir. 1991) ("But the government cites no case holding that the privilege barring disclosure of confidential communications between spouses may be waived over the objection of the non-testifying spouse"); Procter & Gamble Co. v. Bankers Trust Co., 909 F. Supp. 525, 528 (S.D. Ohio 1995) ("If a spouse desires to disclose confidential marital communications without the consent of the other spouse, the privilege can still be asserted by the non-waiving spouse," *citing* United States v. Neal, *supra*); United States v. McCollum, 58 M.J. 323, 339 (Ct. App. Armed Forces 2003) ("Courts have regularly held that the unauthorized disclosure of privileged information by one spouse does not constitute waiver of the privilege. In such cases, the nondisclosing spouse can still assert the privilege and prevent the use of the confidential information in a legal proceeding," again *citing* United States v. Neal, *supra*); United States v. Sheets, 125 F.R.D. 172, (D. Utah 1989) (husband waived his own privilege as to

18

confidential marital communications contained in his deceased wife's diary and, "as the surviving successor to the communication waived that of Kathleen Sheets [the wife] . . . This is not to suggest that defendant [the husband] could claim Mrs. Sheets' privilege in his behalf. He has no such standing").

It is apparent that Perry was cooperative at her deposition, and that her attorney instructed her to refrain from answering only in very limited instances. She answered all questions that did not involve marital communications, and she even answered some questions regarding her communications with Larson where it was clear that she had already revealed the information to Colquette, or where the questions went to underlying facts, rather than communications. *See*, Upjohn Co. v. United States, 449 U.S. 383, 395, 101 S. Ct. 677 (1981). Perry did not invoke a blanket exception to being deposed, and the objections she did raise were narrowly fashioned and justified by federal privilege law. In addition, Larson has made clear that he has not waived his marital communications privilege. The Court finds that there was no waiver as to any of the specific questions to which Perry asserted a marital communications privilege at her deposition. In summary, the Court finds that Lloyd Larson and Ettaline Perry are common law husband and wife under Navajo law, and concludes that the federal privilege for marital communications applies in this case and that the privilege has not been waived.

**Order**

IT IS THEREFORE ORDERED that Witness Ettaline Perry's Motion for Protective Order [Doc. 124] is GRANTED, and her deposition may not be reopened for the purpose of asking any further questions regarding communications between herself and Lloyd Larson; her deposition however may be reopened for the purpose of asking about relevant, non-privileged matters.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
Chief United States Magistrate Judge