IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JAMES J. "JIM" BELLER, as
Personal Representative of the
Estates of Larry Beller and Rita
Beller; and TERRY PFEIFER,
as Personal Representative of the
Estates of Edward Ramaekers
and Alice Ramaekers,

        Plaintiffs,

  vs.                                  CIVIL NO.  02-1368 WPJ/LFG

UNITED STATES OF AMERICA ,

        Defendant.

**MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANT'S MOTION TO STRIKE
UNTIMELY SUPPLEMENTAL RULE 26 EXPERT REPORT
BY PLAINTIFF'S EXPERT WITNESS GENEVIEVE AMES, Ph.D**

THIS MATTER is before the Court on Defendant's Motion to Strike Untimely Supplemental Rule 26 Expert Report by Plaintiffs' Expert Witness Genevieve Ames, Ph.D. [Doc. 224].  The Court has considered the motion, response and reply, and determines that oral argument is not necessary.

**Background**

On March 5, 2003, the Court issued a scheduling order requiring Plaintiffs to make their mandatory Fed. R. Civ. P. 26(a)(2) expert witness disclosures and submit their reports no later than June 5, 2003.  In accord with the Court's directive, Plaintiffs provided the Defendant United States of America ("USA") with notice of the experts and produced expert reports, including one for

Genevieve Ames, Ph.D., identified as Plaintiff Pfeifer's liability expert. Pfeifer represented that he would rely on Dr. Ames' testimony at the time of trial. With Dr. Ames' expert report in hand, USA took her deposition on July 24, 2003 in San Francisco, California.

Save for some narrowly tailored, specific exceptions not applicable here, all discovery in this case terminated by the Court-imposed deadline of August 5, 2003 [Doc. 36]. After the close of discovery and without seeking or obtaining the Court's permission to allow out-of-time expert reports, Pfeifer delivered two supplemental expert reports to USA on September 29, 2003, one from Dr. Ames, and another from Pfeifer's economic expert, Dwight Grant, Ph.D.[1]

Pfeifer provided Dr. Ames' supplemental report to USA more than three months after the June 5, 2003 expert witness disclosure deadlines, six weeks after the August 5, 2003 discovery termination date, and after Dr. Ames had been deposed. Clearly, USA was unable to question Dr. Ames on the new opinions she proposed to offer or the opinions based on expanded information and matters not considered at the time she initially formulated her opinions and offered her deposition testimony.

### Dr. Ames' Supplemental Opinion

Dr. Ames disclosed four opinions about BIA's acts and omissions in her original report. She stated the basis of her opinion. Since issuing her opinion, she subsequently considered and relied on the following additional information:

    (a) Lloyd Larson's deposition taken August 26-27, 2003

    (b) Elouise Chicharello's deposition taken August 4, 2003

---

[1] USA has filed a separate motion [Doc. 232] seeking to have Dr. Grant's supplemental report stricken as well. That motion is dealt with in a separate order, filed on this date.

  (c) Alfred Abeita's deposition taken August 20, 2003

  (d) Paula Puente's deposition taken August 20, 2003

  (e) 1998 Bureau Driver License Policy

  (f) Motor Vehicle Operator Policy (1989-94)

  (g) August 27, 1990 memo regarding DWIs in Tribal Court

  (h) March 30, 1994 memorandum abolishing government driver's licenses

  (i) Driver's license check records

  (j) April 3, 1984 memo regarding problems with BIA cars at bars

  (k) Larson driving record

  (l) Post-collision survey of BIA employee driving records

  (m) Documents restricting Lloyd Larson's driving in 1987-88

Plaintiff contends that Dr. Ames did not espouse new theories in her supplemental report but rather "expanded upon her original report by providing additional information and factual support. In her supplemental report, Dr. Ames provided additional support for her first opinion . . ." (Response in opposition, p. 8). Pfeifer further argues that Dr. Ames' supplemental report merely "fleshes out the original opinions" (Response in opposition, p. 7).

## **Comparison**

A side-by-side comparison of the original and supplemental reports submitted by Dr. Ames demonstrates that the second report is not simply a supplement to the first.

In her original report, submitted in June, Dr. Ames expressed four opinions concerning USA's liability. Her opinions were based in large part upon a belief that the BIA had not implemented any policy or procedure concerning alcohol abuse or use of government vehicles by intoxicated

3

employees. Dr. Ames stated in June:

> It is my understanding that at the time of the collision in this case, the BIA had in place none of the basic procedures listed above and utilized by reasonable businesses in this country to prevent employees from driving company vehicles while intoxicated. In January, 2002 and continuing through the present, all a BIA employee had to do was show a document that looked like a driver's license to get a government vehicle, no matter how many DWI arrests or convictions he/she had or whether he/she was a alcoholic or had a history of undesirable drinking behavior. No one checked to see if the driver's license was valid. The unofficial policy appeared to be a "don't ask, don't tell" policy on driving histories of employees. A check of the driving history of persons who obtain government vehicles was not required or carried out. This failure on the part of the BIA to enact any of the policies that were standard in all transportation industries, and where employees drive company vehicles, is inexplicable, especially given its direct notice of the problem, i.e., that BIA employees and supervisors were driving while intoxicated in government vehicles.

The supplemental report seeks to buttress the opinion and shore up problems that may well have occurred, given Dr. Ames' lack of knowledge that the BIA and Department of Interior had departmental motor vehicle policies in place since at least 1989. Defendant provided copies of these policies to Plaintiffs in discovery, and they were in possession of Plaintiff's counsel at the time Dr. Ames prepared her original report. *See*, Defendant's Reply Brief [Doc. 294], at 6. Thus, Dr. Ames could have reviewed them and included them in her analysis from the beginning, but apparently they were not provided to her and she formulated her original opinions on the assumption that there were no policies at all. Thus, the thrust of her earlier report was that the *absence* of policies and procedures to address governmental employees' use of vehicles when they had a history of alcoholism or prior DWI's constituted a breach of the employer's duty of reasonable care.

However, after she learned that the BIA and the Department of Interior did in fact have

4

policies and procedures in place since as early as 1989, Dr. Ames changed the thrust of her opinion. In the September report, Dr. Ames states that it was the violation of the BIA's policies that demonstrate blatant irresponsibility in continuing to employ Lloyd Larson and allowing him to drive a government vehicle.

To bolster her opinion, Dr. Ames asserts:

(a) that allowing Lloyd Larson to have a government vehicle violated the Department of Interior driving policy in effect from May 31, 1989 through March 30, 1994;

(b) that failing to revoke Lloyd Larson's driving privileges and prosecute adverse actions against him was a violation of the Department of Interior driving policy in effect from May 31, 1989 to March 30, 1994;

(c) that allowing Lloyd Larson to have access to a government vehicle at a time when a BIA policy required supervisors to ensure that operators could safely operate their vehicles, had a valid driver license and maintain a safe driving record violated the Bureau's policy from March 30, 1994 to March 12, 1999; and

(d) that the government violated its own rules and policies by allowing Lloyd Larson access to a government vehicle at a time when its policy required him to possess a valid driver license, required his driving record to be validated by the State, and required his supervisor to establish that he had the ability to safely operate a vehicle.

Dr. Ames' opinion has been broadened in other ways. From the prior criticisms based on lack of policies and procedures, Dr. Ames opines in September:

> The BIA has been aware of problems in drinking and driving
> government vehicles since at least April 3, 1984, when it put out a
> memo expressing concern about such behavior. Ex. 52. The BIA was

5

>aware of Lloyd Larson's bad driving since at least 1987 and 1988 when he was disqualified from having a government license. pp. 5277-5278. During the entire period of Mr. Larson's employment, the BIA and the Department of the Interior had Departmental Motor Vehicle policies in place which should have resulted in the termination of Mr. Larson's employment or, at the very least, the failure to authorize or the revocation of his privilege to drive a government vehicle. Although the policies changed over the years, the goal of those driving policies – to ensure the safe operation of government vehicles – should have mandated that Mr. Larson never got behind the wheel of a government vehicle.

Dr. Ames' supplemental report recognizes the existence of policies and procedures in effect, in various forms, from May 31, 1989 through January 25, 2002. No mention of these policies and procedures, or acts or omissions relating to USA's conduct, appears in the June report simply because the expert was unaware of the existence of the policies. The policies and procedures were apparently not provided her, even though the policies' existence was disclosed in discovery prior to the date of the original report. In sum, the June report finds fault because policies did not exist; the September report finds fault, among other things, because policies were not enforced.

Plaintiffs argue that Dr. Ames does not offer new opinions. This is simply not the case. New opinions are offered, and those opinions did not appear in the June expert report. This is not a case where the doctor has retracted an opinion previously offered, or set out to correct an error; rather, as Pfeifer argues, Dr. Ames' opinions have simply been "strengthened," "broadened" and "expanded."

## **Analysis**

In the decades of the 70's and 80's, the nations federal courts were faced with a near-crisis. Widespread discovery abuses, escalating costs of litigation and resulting delays in the final disposition of cases compelled Congress to take prompt and decisive action to curb litigation excesses and to improve the just, speedy and economical disposition of cases in the nation's federal courts. Congress

adopted the Civil Justice Reform Act, 28 U.S.C. § 471 *et seq.* ("CJRA"), and shortly thereafter, the Federal Rules Committee revised the Federal Rules of Civil Procedure to work hand-in-glove with the CJRA. Both the CJRA and the rules revisions were intended to address the dual problems of cost and delay. Rather than allowing the parties, on their own, to engage in carte blanche discovery, the CJRA and revised rules of procedure imposed a requirement that the court oversee and strictly control the discovery and case management process. Districts throughout the United States created and implemented their own expense and delay reduction plans intended to put into effect the congressional goals as voiced in the CJRA.

To ensure that cases move economically and expeditiously through the federal system, courts are required to consult with parties, and after considering their specific needs in a case, establish appropriate case management plans, impose limits on discovery and establish firm case management deadlines to ensure that cases can be properly, but quickly and economically, presented. The revised Federal Rules now impose limits on the numbers of depositions authorized in litigation, Rule 30(a)(2)(A); the numbers of interrogatories which can be served, Rule 33(a); the length of depositions, Rule 30(d)(2); and the requirement that the court impose appropriate case management plans, Rule 16. These rule revisions are based on the recognition that cases can move efficiently through the federal system only when courts take the initiative to impose and enforce deadlines. *See*, Advisory Committee Notes to Fed. R. Civ. P. Rules 16, 26.

The rules of discovery applicable to civil proceedings were dramatically changed as a result of the CJRA. The most significant changes occurred in Rule 26. These changes required automatic disclosure of specific information without the opposing party having to make a discovery demand. The disclosures included mandatory initial disclosures, Rule 26(a)(1); disclosure of expert testimony

and expert reports, Rule 26(a)(2); and disclosure of trial evidence, Rule 26(a)(3).

The expert witness disclosure and report production requirement of Rule 26(a)(2) is specific. The rule mandates disclosure of the identity of a party's expert, together with disclosure of the expert's detailed report. The written report requirements "shall contain" the following six items:

1. a complete statement of all opinions to be expressed and the basis and reasons therefor;

2. the data or other information considered by the witness in forming the opinions;

3. any exhibit to be used as a summary of or support for the opinions;

4. the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years;

5. the compensation to be paid for the study and testimony; and

6. a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

These mandatory disclosure obligations are intended to further the salutary purposes of the CJRA. Advance knowledge of an opponent's proof on a claim or defense is an invaluable aid in deciding whether to settle or litigate. If a party is better able to evaluate the strength and weakness of the case, settlement is more likely. On the other hand, if the case is one that must be tried, advance knowledge of the opponent's evidence assists in preparing to meet the proofs at trial. The case can be presented more efficiently, expeditiously and economically, thus fulfilling the purposes of the CJRA.

The Advisory Committee Commentary (1993) to Rule 26 provides:

> [T]his subdivision [26(a)] imposes on parties a duty to disclose, without awaiting formal discovery requests, certain basic information that is needed in most cases to prepare for trial or to make an

informed decision about settlement.

The revised rules eliminate the former process of "trial by ambush," and mandate full disclosure of relevant information necessary to evaluate the case or to prepare for trial at an early stage of the proceedings. Disclosure of all opinions and the basis of the opinions is consistent with the broad and liberal discovery contemplated under the federal rules. United States v. Procter & Gamble Co., 356 U.S. 677, 78 S. Ct. 983 (1958).

As noted in the scheduling history, Dr. Ames' supplemental expert report was submitted long after the deadline imposed by the Court and after discovery was closed. While Pfeifer argues that USA is not prejudiced as a result of the untimely expert report and is willing to open discovery to allow USA to re-depose Dr. Ames, that proposal does not cure the problem. In Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277 (8th Cir. 1995), the same proposal was presented. The plaintiff argued that its expert was available for deposition and thus the opposing party could discover the full extent of the opinion. The court rejected the argument and found that sanctions were appropriate. The failure to comply with the scheduling order was not excused simply because the expert was available for a deposition. The court held that to rule otherwise would frustrate the purpose of the new rule, which is the "elimination of unfair surprise to the opposing party and the conservation of resources." Id. at 284. So, too, in Aircraft Gear Corp. v. Kaman Aerospace Corp., 1995 WL 571431 at *1 (N.D. Ill. Sept. 25, 1995), the court stated:

> Anyone who has any familiarity with the 1993 Rule amendment [to expert reports], including familiarity with the notes of the Advisory Committee on Rules, is well aware that its requirements were geared to provide the opposing party with "a reasonable opportunity to prepare for effective cross-examination," (Committee Notes) and, in accordance with the Rules' fundamental principal of eliminating any vestiges of the "sporting" or "fox-hunt" theory of litigation, to provide

9

>            the opposing party with a comparable opportunity to prepare for
>            examination of experts via depositions in advance of trial.

Thus, it is not sufficient that opposing parties have the supplemental report in hand now before trial. The intent of the rule is to ensure that deposition testimony can proceed with parties already armed with the expert's report so as to be able to evaluate the opinions to be offered.

The 1993 Advisory Committee Notes to Rule 26 warn litigants, "revised Rule 37(c)(1) provides an incentive for full disclosure; namely, that a party will not ordinarily be permitted to use on direct examination any expert testimony not so disclosed."

The Court recognizes that the burdens imposed on experts to disclose the opinions they will offer, and the basis for the opinions, are onerous. But, both the Advisory Committee comments as well as court decisions warn of the consequences of non-compliance. In Nguyen v. IBP, Inc., 162 F.R.D. 675, 681 (D. Kan. 1995), the court held, "The requirements of the Rule 26(a) are mandatory as to any expert retained to testify. If the expert is unable or unwilling to make the disclosures he [or she] should be excluded as a possibility for retention as an expert witness in the case."

Reopening discovery will not cure the problem. Trial is set for February 2, 2004. Should the Court allow the supplemental expert report, it would be bound to reopen discovery to allow USA time for its own expert to review the new report and formulate new opinions. Additionally, because Dr. Ames offers new opinions in her supplemental report, or at least suggests new bases for her opinions, USA would have a right to take a new deposition of this expert. The new deposition testimony might well lead to USA having to modify its prior report or retain a new expert or experts to counter the opinion testimony being offered in Dr. Ames' revised report.

New government experts would, in turn, allow Pfeifer an opportunity to take new depositions

to examine the revised opinions that USA's experts may offer. All of this would contribute to delay in the ultimate disposition of this case, would thwart the Court's case management plan, and might even threaten the existing trial date.

Pfeifer argues that these are not new opinions, and that Pfeifer was obligated to supplement Dr. Ames' opinions because of new information. Indeed, a party is under a duty to supplement at appropriate intervals any disclosures made if it learns that in some material respect the information previously disclosed was incomplete or incorrect, and if the additional or corrected information has not otherwise been disclosed to the parties during the discovery process. Fed. R. Civ. P. 26(e). However, Pfeifer does not contend that Dr. Ames' original report contained errors that needed to be corrected, nor does he seek to withdraw any prior opinions submitted. This is not a situation where, subsequent to the preparation of the original report, new information was discovered which required that the original report be supplemented because the original opinion was no longer correct.

In Council 31 AFL-CIO v. Ward, 1995 WL 549022 (N.D. Ill. Sept. 12, 1995), the court rejected an attempt to file new expert reports. There, defendants argued that new reports were substantially different from the earlier reports, used different data and analysis, and, in effect, changed the theory of the case. Plaintiffs contended they were entitled to supplement their reports under the rule. The court rejected plaintiffs' arguments, stating that the plaintiffs failed to contradict defendants' assertion that the reports were significantly different from the original reports and, in effect, altered their theories.

In fact, the supplemental report argument was specifically rejected in this district in Resolution Trust Corp. v. Gregory, D.N.M. No. CIV 94-0052. There, Circuit Judge Paul Kelly, sitting by designation, rejected RTC's argument that it could file "supplements" intended to "deepen" and

11

"strengthen" its own expert's prior report. Judge Kelly wrote:

> Fed. R. Civ. P. 26(a)(2)(B) requires that an expert witness report "contain a complete statement of all opinions to be expressed and the basis and the reasons therefor" to facilitate discovery. Although Fed. R. Civ. P. 26(e) requires a party to "supplement or correct" disclosure upon information later acquired, that provision does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report (indeed, the lawsuit from the outset).

To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could "supplement" existing reports and modify opinions previously given. This practice would surely circumvent the full disclosure requirement implicit in Rule 26 and would interfere with the Court's ability to set case management deadlines, because new reports and opinions would warrant further consultation with one's own expert and virtually require new rounds of depositions. That process would hinder rather than facilitate settlement and the final disposition of the case.

In this case, Pfeifer concedes that the opinions proposed by Dr. Ames in her supplement were intended to strengthen, broaden and deepen the earlier opinions. That is precisely the argument that was rejected as impermissible by Judge Kelly in RTC v. Gregory.

## **Conclusion**

The Court concludes that Dr. Ames' supplemental report was filed beyond the dates imposed by the Court's deadline; it was filed without Pfeifer having sought or obtained leave of the Court to modify case management deadlines; the opinions expressed in the supplemental report are broader and deeper than the opinions previously offered; and, in some instances, the opinions offered are

different than the opinions contained in the Dr. Ames' June report. The Court finds good cause to strike the supplemental report.

## **Order**

IT IS THEREFORE ORDERED that Defendant's Motion to Strike Untimely Supplemental Rule 26 Expert Report by Plaintiff's Expert Witness Genevieve Ames, Ph.D. [Doc. 224] is granted;

IT IS FURTHER ORDERED that Dr. Ames will not be permitted to testify as to matters contained in the supplemental report, but, rather, her opinions at the time of trial should be limited to the opinions timely offered in the June 2003 expert report.

                                                                                                                                                         */s/ Lorenzo F. Garcia*
                                                                                                                                                         Lorenzo F. Garcia
                                                                                                                                                         Chief United States Magistrate Judge