IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JAMES J. "JIM" BELLER, as
Personal Representative of the
Estates of Larry Beller and Rita
Beller; and TERRY PFEIFER,
as Personal Representative of the
Estates of Edward Ramaekers
and Alice Ramaekers,

           Plaintiffs,

vs.                                       CIVIL NO.  02-1368 WPJ/LFG

UNITED STATES OF AMERICA ,

           Defendant.

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANT'S MOTION TO STRIKE
## UNTIMELY REVISED RULE 26 EXPERT REPORT BY
## PLAINTIFF'S ECONOMIC EXPERT DWIGHT GRANT, Ph.D.

THIS MATTER is before the Court on Defendant's Motion to Strike Untimely Revised Rule

26 Expert Report by Plaintiff Pfeifer's Economic Expert Dwight Grant, Ph.D. [Doc. 232].  The Court

has considered the motion, response and reply, and determines that oral argument is not necessary.

### Background

On March 5, 2003, the Court issued a scheduling order requiring Plaintiffs to make their

mandatory Fed. R. Civ. P. 26(a)(2) expert witness disclosures and submit their reports no later than

June 5, 2003.  In accord with the Court's directive, Plaintiffs provided the Defendant United States

of America ("USA") with notice of the experts and produced expert reports, including one for

Dwight Grant, Ph.D, who was identified as Plaintiff Pfeifer's economic expert.  Pfeifer represented

that he would rely on Dr. Grant's testimony at the time of trial.  With Dr. Grant's expert report in hand, USA took his deposition on July 31, 2003.

Save for some narrowly tailored, specific exceptions not applicable here, all discovery in this case terminated by the Court-imposed deadline of August 5, 2003 [Doc. 36].  After the close of discovery and without seeking or obtaining the Court's permission to allow out-of-time expert reports, Pfeifer delivered two supplemental expert reports to USA on September 29, 2003, one from Dr. Grant, and another from Pfeifer's liability expert, Dr. Genevieve Ames.[1]

Pfeifer provided Dr. Grant's supplemental report to USA more than three months after the June 5, 2003 expert witness disclosure deadlines, six weeks after the August 5, 2003 discovery termination date, and after Dr. Grant had been deposed.  Clearly, USA was unable to question Dr. Dr. Grant on the new opinions he proposed to offer or the opinions based on expanded information and matters not considered at the time he initially formulated his opinions and offered his deposition testimony.

### Comparison

A side-by-side comparison of Dr. Grant's two reports shows that overall higher damage opinions will be offered at trial than were set forth in the June report, and demonstrates that Dr. Grant made changes to his opinions without explaining the basis.  In addition, Plaintiff fails to explain why information which was readily available prior to Dr. Grant's June 5 report was not considered or utilized in that original report.

Pfeifer takes a "no harm, no foul" approach in his argument saying, if anything, "the

---

[1]USA has filed a separate motion [Doc. 224], seeking to have Dr. Ames' supplemental report stricken as well.  That motion is dealt with in a separate order, filed on this date.

supplemental report reduces some of the original damage numbers for benefits . . . " (Response in opposition, p. 1), and arguing that these corrections are necessary to resolve "inaccurate and higher lost income figures in his original report."  (Response in opposition, p. 2).  Pfeifer also argues "Dr. Grant's revised report does not set forth new opinions," but rather "corrects some inaccuracies," and that  "the calculations in Dr. Grant's supplemental report actually reduced the amount of damages-- providing a lower amount of damages for the government to pay." (Response in opposition, pp. 6-7).  Pfeifer therefore concludes that the government is not prejudiced by permitting the supplemental report, because the total amount of damages sought is actually lower, based on the revised report.

The Court rejects this contention.  The following specific comparisons demonstrate why.

<u>Lost Earnings</u>

In the June report, Dr. Grant calculates the present value of Alice's[2] lost Social Security earnings at $77,000.  Using the exact same figures and factors in his September calculation, he comes up with a figure of  $70,000.   Similarly, the June figure for the present value of Edward's Social Security earnings is $168,000, whereas the September figure, using the exact same data, comes to $177,000.

These differences are not explained.  In Alice's case, the figure went down by $7,000, and in Edward's, it went up by $3,000.  Was there a mathematical error in the earlier calculations?   Why did one figure go up and the other go down?  Why would either figure change, since the expert is using the same background data and assumptions?  It is unknown whether these are simply new opinions, or whether the original amounts were typographical or calculation errors.

Pfeifer's argument that there is no prejudice, because the figure for Alice's lost earnings is

_____

[2]Alice Ramaekers will be referred to hereinafter as "Alice," and Edward Ramaekers as "Edward."

3

lower, misses the mark.  An examination of the expert concerning the accuracy of the calculations would have been an appropriate area of questioning at the doctor's deposition.  USA will not have answers to any of those questions because discovery is closed.

Furthermore, in addition to the $3,000 bump in the value of Edwards' lost earnings, Dr. Grant offers a new opinion concerning additional lost earnings which were never included in the original opinion.  The September opinion notes that Mr. Ramaekers worked for his son and provided 150 hours per year at $15 per hour as a welder, and 600 hours per year at $10 per hour as a farmer for a 10-year period, and calculated the present value of those damages for lost earnings at $59,000.  These are not mentioned in the June report, except tangentially in the segment concerning the loss to beneficiaries, as discussed next.

<u>Loss to Beneficiaries</u>

In the June report, Dr. Grant stated that Alice provided office and bookkeeping support to the family business, and that she provided childcare assistance to the family, and that these services constituted part of the loss to her beneficiaries.  The present value of the two losses, bookkeeping and childcare, was set at $248,000.

These figures are changed considerably in the supplemental report, which simply does not mention the bookkeeping services.  Is there a reason these services were considered in the June report, but are no longer important enough to list in the September report?  There may well be a legitimate answer to this question, but the USA will not have an opportunity before trial to ask it, because discovery is closed.

There are also discrepancies between the two reports in connection with the loss of Edward's services to his beneficiaries.  In the June report, Dr. Grant calculated the loss of the value of

Edward's services to his son's business in providing advice, developing devices for use in the shop, sales, welding, etc. at $500 per year at $30 per hour.  In addition, Dr. Grant opined in June that Edward provided child care services and that the total present value of the two categories of lost benefits was $385,000.

In the September report, however, the value of the welding was changed.  That item is now included in lost earnings and calculated on a $15 per hour basis, rather than the prior $30 per hour appearing in the June report; in addition, the September report assumes that Edward worked 150 hours per year as a welder, whereas the June report combined his business advice and product development and welding services and found he spent 500 hours per year on these.

Dr. Grant's September opinion is that the overall value of benefits lost to Edward's beneficiaries is $154,000 rather than the prior $385,000, with some of the difference apparently having been shifted into the lost earnings category.

It is clear that these different opinions would have provided significant areas of inquiry Dr. Grant's deposition as to why the figures changed, the hourly rates changed, certain services were left out and others added in, why the total number of hours expended changed, and why the overall value to the beneficiaries changed.  Again, these items obviously could not be explored at deposition, and now discovery is closed.

<u>Personal Maintenance Expenses</u>

In both the June and September reports, Dr. Grant calculates the personal maintenance expenses for both Alice and Edward, and deducts these from the overall compensatory damages.  A comparison of the two reports shows a change of opinion concerning these expenses.

In June, Dr. Grant opined that Alice would have incurred personal maintenance expenses of

$8,000 per year, and calculated the present value of those expenses at $144,000. In the supplemental report, however, he amends the $8,000 a year to $13,000 per year and increases the present value of those expenses to $233,000. He makes the same change for Edward, from $8,000 a year to $13,000, and now calculates the present value of Edward's expenses as $200,000, up from the figure of $123,000 which he had set in June.

Pfeifer argues that the change is of no consequence because it actually results in a lower damage claim against the government. Again, the argument misses the mark. What is interesting in the supplemental report is that Dr. Grant modifies the opinion not because of any change in the maintenance expenses relating to the Ramaekers, but based on another expert's opinion – Dr. McDonald's – concerning maintenance expenses for the Bellers, the other set of plaintiffs in this action. Why the Bellers' maintenance expenses would have any bearing on the Ramaekers' maintenance expenses is not explained. What likely occurred is that subsequent to Dr. Grant's June report, he learned that another expert would offer an opinion substantially higher for the clients he was evaluating, and, thus, Dr. Grant then changed his figures. In any event, the reason for the change of figures cannot be explored, because the new opinion was not before the parties at the time of Dr. Grant's deposition.

<u>Loss of Household Services</u>

In June, Dr. Grant did not mention household services for either Alice or Edward, and apparently Plaintiffs were not claiming this element of damages at that time. However, in the September report, Dr. Grant estimates a loss of Alice's household services on the basis of a 1,000 hours per year at a rate of $10, and concludes that there is a present value of this loss of $179,000; he estimates a loss of Edward's household services on the basis of 500 hours per year, also at a rate

6

of $10, for a present value of $77,000.

The fact that these opinions are offered in a supplemental report and were never offered in the original report belies Pfeifer's protestations that the government is not prejudiced by the late revisions, that no new opinions are being offered, and that the damages sought are actually less than those originally sought.

Loss of Enjoyment of Life

Further conflicts appear in Dr. Grant's opinions concerning the value of the loss of enjoyment of life element as it relates to Alice.[3]  Using the same assumptions and the same figures, Dr. Grant reaches a total value for this element of damage, in June, of $4,900,000, whereas in September the figure is $4,930,000.  Under certain assumptions, Dr. Grant said in June, this figure could be increased to $6,127,000; in September, under the same assumptions, he set the increased figure at $6,170,000.

Thus, Dr. Grant's opinion on the statistical value of Alice's loss of enjoyment of life increased by $30,000 to $43,000 between June and September, without explanation.  Is the change due to a calculation or typographical error, which Dr. Grant is entitled to change or, on the other hand, is it a new opinion?  If it is an error, the doctor could have been examined at his deposition concerning the accuracy of his calculations.  A fact finder may well determine, for example, that if the reports were based on misinformation or flaws due to calculation and computation errors, the witness should not be given the same credence as another witness who did not make errors.  USA has been denied the opportunity to explore that in a pretrial deposition, because the supplemental report was

---

[3]Dr. Grant's June calculations for Edward's loss of enjoyment of life are the same as those in the September report, except for a change in one figure which is clearly a typographical error.

7

submitted after the close of discovery.

<u>Total Economic Loss Tables</u>

A result of the changes discussed above is that the two tables Dr. Grant prepared, showing the total economic losses for the wrongful deaths of Alice and Edward, also changed between the June and September reports, with the top-end value of overall damages increasing for both decedents. Dr. Grant opined, based on his chart in June that the economic loss from Alice's death ranged between $5,083,675 to $6,961,545. The revised opinions set that range higher at $5,129,138 to $7,083,085. For Edward, Dr. Grant set the range in June between $4,669,693 and $6,245,042; by September, those figures changed to a range between $4,491,999 to a top end of $6,255,007.[4]

This side-by-side comparison of the two reports makes it abundantly clear that the opinions which were offered to USA in the June report are not the same opinions that Plaintiff now seeks to offer. The Plaintiffs' protestations to the contrary are simply not supported by a comparison of the record.

## **<u>Analysis</u>**

As noted above in footnote 1, the Court has filed on this date an order granting Defendants' motion to strike the supplemental expert report of Genevieve Ames. That ruling is grounded on the same considerations as this ruling, and the parties are referred to the analysis set forth in that order, which will only briefly be repeated here.

In 1990, Congress passed the Civil Justice Reform Act, 28 U.S.C. § 47I *et seq.* ("CJRA"), to curb the problem of discovery abuse, escalating litigation costs, and resulting delays. In 1993, the Federal Rules of Civil Procedure were revised, with the intention of implementing the cost and delay-

---

[4]This top-end figure may not be exact as the Court's photocopy is blurred on that column.

reducing principles of the CJRA by requiring the court to oversee and strictly control the discovery and case management process.  The revised Rules require that courts consult with parties, establish case management plans for each litigation, and set firm deadlines and limitations on discovery, including limits on such things as the numbers and length of depositions and numbers of interrogatories.

Revised Rule 26 also requires automatic disclosure of specific information early in the litigation, to enable the parties to assess the possibilities of settlement and/or prepare for trial.  Rule 26(a)(2) specifically requires each party to make early disclosure of the identity of any expert witness the party plans to use, along with the expert's detailed report.  This expert report is mandatory, and the rules provides that it "shall contain" such information as a complete statement of all opinions to be expressed and the reasons therefor, along with the data or other information considered by the expert in forming the opinions.  Also required is a statement of the witness's qualifications, including a publication list, the compensation to be paid the expert, and a listing of other cases in the preceding four years in which the witness has testified as an expert.

These revised rules eliminate the former process of "trial by ambush" and mandate full disclosure of relevant information necessary to evaluate the case or to prepare for trial at an early stage of the proceedings.  Disclosure of all opinions and the basis of the opinions is consistent with the broad and liberal discovery contemplated under the federal rules.  United States v. Procter & Gamble Co., 356 U.S. 677, 78 S. Ct. 983 (1958).

In this case, Dr. Grant's supplemental report was submitted long after the deadline imposed by the Court and after discovery was closed.  While Pfeifer argues that USA is not prejudiced as a result of Dr. Grant's untimely expert report and is willing to open discovery to allow USA to re-

depose him, that proposal does not cure the problem.  Such a proposal was rejected by the court in

Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277 (8th Cir. 1995), the court holding that to

rule otherwise would frustrate the purpose of the new rule, which is the "elimination of unfair surprise

to the opposing party and the conservation of resources."  Id. at 284.  *See also*, Aircraft Gear Corp.

v. Kaman Aerospace Corp., 1995 WL 571431 at *1 (N.D. Ill. Sept. 25, 1995):

> Anyone who has any familiarity with the 1993 Rule amendment [to
> expert reports], including familiarity with the notes of the Advisory
> Committee on Rules, is well aware that its requirements were geared
> to provide the opposing party with "a reasonable opportunity to
> prepare for effective cross-examination," (Committee Notes) and, in
> accordance with the Rules' fundamental principal of eliminating any
> vestiges of the "sporting" or "fox-hunt" theory of litigation, to provide
> the opposing party with a comparable opportunity to prepare for
> examination of experts via depositions in advance of trial.

Thus, it is not sufficient that opposing parties have the supplemental report in hand now

before trial.  The intent of the rule is to ensure that deposition testimony can proceed with parties

already armed with the expert's report, so as to be able to evaluate the opinions to be offered.  The

1993 Advisory Committee Notes to Rule 26 warn litigants, "revised Rule 37(c)(1) provides an

incentive for full disclosure; namely, that a party will not ordinarily be permitted to use on direct

examination any expert testimony not so disclosed."

The Court recognizes that the burdens imposed on experts to disclose the opinions they will

offer, and the basis for the opinions, are onerous.  But, both the Advisory Committee comments as

well as court decisions warn of the consequences of non-compliance.  In Nguyen v. IBP, Inc., 162

F.R.D. 675, 681 (D. Kan. 1995), the court held, "The requirements of the Rule 26(a) are mandatory

as to any expert retained to testify.  If the expert is unable or unwilling to make the disclosures he [or

she] should be excluded as a possibility for retention as an expert witness in the case."

Reopening discovery will not cure the problem.  Trial is set for February 2, 2004.  Should the Court allow the supplemental expert report, it would be bound to reopen discovery to allow USA time for its own experts to review the new reports and formulate new opinions.  Additionally, because Dr. Grant offers new opinions in his report, or at least new bases for his opinions, USA would have a right to take a new deposition of this expert.  The new deposition testimony might well lead to USA having to modify its prior reports or retain new experts to counter the opinion testimony being offered in Dr. Grant's revised report.

New government experts would, in turn, allow Pfeifer an opportunity to take new depositions to examine the revised opinions that USA's experts may offer.  All of this would contribute to delay in the ultimate disposition of this case, would thwart the Court's case management plan, and might even threaten the existing trial date.

Pfeifer argues that these are not new opinions, and that Pfeifer was obligated to supplement Dr. Grant's opinions because of new information.  Indeed, a party is under a duty to supplement at appropriate intervals any disclosures made if it learns that in some material respect the information previously disclosed was incomplete or incorrect, and if the additional or corrected information has not otherwise been disclosed to the parties during the discovery process.  Fed. R. Civ. P. 26(e).  but Pfeifer does not contend that subsequent to the preparation of the original report, new information was discovered which required that the original report be supplemented because the original opinion was no longer correct.

In Council 31 AFL-CIO v. Ward, 1995 WL 549022 (N.D. Ill. Sept. 12, 1995), the court rejected an attempt to file new expert reports.  There, defendants argued that new reports were substantially different from the earlier reports, used different data and analysis, and, in effect, changed

11

the theory of the case.  Plaintiffs contended they were entitled to supplement their reports under the rule.  The court rejected plaintiffs' arguments, stating that the plaintiffs failed to contradict defendants' assertion that the reports were significantly different from the original reports and, in effect, altered their theories.

In fact, the supplemental report argument was specifically rejected in this district in <u>Resolution Trust Corp. v. Gregory</u>, D.N.M. No. CIV 94-0052.  There, Circuit Judge Paul Kelly, sitting by designation, rejected RTC's argument that it could file "supplements" intended to "deepen" and "strengthen" its own expert's prior report.  Judge Kelly wrote:

> Fed. R. Civ. P. 26(a)(2)(B) requires that an expert witness report "contain a complete statement of all opinions to be expressed and the basis and the reasons therefor" to facilitate discovery.  Although Fed. R. Civ. P. 26(e) requires a party to "supplement or correct" disclosure upon information later acquired, that provision does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report (indeed, the lawsuit from the outset).

To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could "supplement" existing reports and modify opinions previously given.  This practice would surely circumvent the full disclosure requirement implicit in Rule 26 and would interfere with the Court's ability to set case management deadlines, because new reports and opinions would warrant a new round of consultation with one's own expert and virtually require new rounds of depositions.  That process would hinder rather than facilitate settlement and the final disposition of the case.

**Conclusion**

The Court concludes that Dr. Grant's supplemental report was filed beyond the dates imposed by the Court's deadline; it was filed without Pfeifer having sought or obtained leave of the Court to modify case management deadlines; and the opinions expressed in the supplemental report are different than the opinions contained in Dr. Grant's June report.  The Court finds good cause to strike the revised report.

**Order**

IT IS THEREFORE ORDERED that Defendant's Motion to Strike Untimely Revised Rule 26 Expert Report by Plaintiff Pfeifer's Economic Expert Dwight Grant, Ph.D. [Doc. 232] is granted;

IT IS FURTHER ORDERED that Dr. Grant will not be permitted to testify as to matters contained in the revised report, but, rather, his opinions at the time of trial should be limited to the opinions timely offered in the June 2003 expert report.

_____
Lorenzo F. Garcia
Chief United States Magistrate Judge

13