## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

––––––––––––––––––

JAMES J. "JIM" BELLER, as
Personal Representative of LARRY BELLER
and RITA BELLER, deceased, and TERRY
PFEIFER, as Personal Representative of
EDWARD RAMAEKERS and ALICE
RAMAEKERS, deceased,

       Plaintiffs,

v.                                Civil No. 02-1368 WPJ/LFJ (ACE)

UNITED STATES OF AMERICA, and
the BUREAU OF INDIAN AFFAIRS,

       Defendants.

### MEMORANDUM OPINION AND ORDER DENYING
### DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

       THIS MATTER comes before the Court upon Defendants' Motion for Partial Summary

Judgment Dismissing Plaintiffs' Claims of Negligent Entrustment (Count II) and Negligent Hiring,

Retention, Training, and Supervision (Count III) for Lack of Subject Matter Jurisdiction Pursuant

to the Federal Tort Claims Act's Discretionary Function Exception, filed September 30, 2003

(**Doc. 219**). Having considered all the pleadings, memoranda and other materials submitted by the

parties, as well as the applicable law, I find that Defendants' motion is not well-taken and shall be

denied.

### BACKGROUND[1]

       This civil action arises from a fatal "head-on" vehicular collision which occurred on

––––––––––––––––––

      [1] The facts are collected from the undisputed facts, and Plaintiffs' material facts, viewing
the inferences in Plaintiffs' favor.

January 25, 2003, involving a Cadillac sedan driven by Larry Beller and occupied by Rita Beller, Edward Ramaekers and Alice Ramaekers, and a United States Government-owned Dodge Dakota pickup truck driven by Lloyd Larson ("Larson").  Larson was employed as a Civil Engineering Technician by BIA's Eastern Navajo Agency, Branch of Roads ("ENA-BOR") since 1987 and up until the accident in January of 2003.  Larson was required to travel on a weekly basis to the job, and was authorized to use a Government vehicle to drive from the ENA-BOR's office in Crownpoint to the job site located near Alamo, New Mexico.

During Larson's employment with BIA from 1987 to 2002, he had at least nine arrests and four convictions for driving while intoxicated ("DWI"). At certain times during this period, Larson's state driver's license was suspended or revoked.  When Larson was first employed by BIA in 1987, he applied for a Government Motor Vehicle Operator's Identification Card (which BIA policy required at that time in order to operate a Government-owned motor vehicle), indicating in his application that his state driver's license was valid.  Larson also disclosed on the application that he had been arrested for DWI in 1986 and had also run into a building with his car. On September 29, 1987, BIA issued him authorization to operate Government vehicles. The following month, the issuing official notified Larson that his authorization was revoked because of his past driving record.

When a BIA Safety Officer performed semi-annual checks on Larson's driving record in 1991, 1992, and 1993, it was determined that Larson's driver's license remained suspended. Larson was arrested at least twice for driving while intoxicated ("DWI") in 1988, was cited in August 1990 and December 1991 for driving without a valid state driver's license, and was arrested and convicted for DWI in June 1990. Pltffs' Mat'l Fact No. 10, Deft's Mat'l Fact 13, n.8,

Exs.13C and 13D. In March, 1993, Larson was arrested and charged with DWI. He was ordered

to complete DWI school and prosecution was deferred. Ex. 13E.

On August 13, 1993, Larson applied for and was issued a new driver's license by the State

of New Mexico. He then reapplied to BIA for authorization to operate Government vehicles,

which he obtained on August 16, 1993.

In January, 1994, Larson was arrested and convicted of DWI. Larson sent BIA supervisor

Harold Slim a letter on January 24, 1994, stating that he had lost his license as a result of that

DWI conviction. Ex. T. He was again arrested for drinking while intoxicated one month later, in

February 1994. Ex. U, Ex. 13G. Larson pled guilty and was sentenced to 90 days in jail (87

deferred), unsupervised probation, and DWI school. Ex. U.  The following month, while Larson's

license was still revoked, his supervisor Jimmy Martinez signed off on Larson's application to

obtain a temporary driver's license, stating in the application that it was "necessary for [Larson] to

drive out to these locations to work." Pltff's Ex. V; Ex. A at 42. Larson was issued a limited

driver's license on March 21, 1994.

On April 16, 1995, Larson was in a roll-over car crash on I-40. He fled the scene, and

later admitted to having been intoxicated at the time of the roll-over. Ex. A at 100-01, Ex. X.

Four days later, Larson was again arrested for driving under the influence, having an open

container, careless driving, and driving without a state license. Larson's license was again revoked

from May 1995 to May 1996. BIA conducted semi-annual checks in 1995 and 1996 which

reflected that Larson's license was suspended during this time. His license was reinstated in June,

1996.

On July 13, 1997, Larson was arrested in Arizona and convicted of DWI. Ex. Y.  It

3

appears that this last conviction did not result in a revocation of his driver's license.  Larson's driver's license was suspended in December 1997 for failure to make required child support payments, but was reinstated on January 2, 1998 and was renewed in June 2000.  This license was valid and in effect on January 25, 2003, the date of the collision.

On May 16, 2001, Larson was arrested and charged, but not convicted, of driving under the influence. He admitted to drinking a six-pack of beer within the hour before being stopped, and he failed sobriety tests. Ex. Z. Larson notified a supervisor, Bobby Pablo, about this DWI arrest. Pablo had seen Larson's name on the DWI list in the newspaper and sent Larson a letter stating that he was "most confident that this type of behavior will not be repeated in the future." Exs. AA, BB. On August 11, 2001, Larson was again arrested and charged with driving under the influence of alcohol. Larson pleaded guilty, and prosecution was deferred on the condition that he attend DWI school. Ex. CC.  Larson's driver's license was not revoked as a result of this arrest. On January 25, 2002, Larson was driving a Government-owned pickup truck the wrong way on Interstate 40 and crashed into the Cadillac sedan driven by Larry Beller.

**Legal Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. Universal Money Ctrs. v. AT & T, 22 F.3d 1527, 1529 (10th Cir.1994).

4

**DISCUSSION**

The Federal Tort Claims Act ("FTCA"), 28 U.S.C.§§ 1346(b), 2671-2680 provides a broad waiver of sovereign immunity for "the negligent or wrongful act or omission" of any government employee acting in the scope of his or her employment to the extent that a private person would be liable in similar circumstances under state law. See 28 U.S.C. § 1346(b). This waiver of immunity is limited, however, because the government is not liable for [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance, or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused. Id. § 2680(a).[2]  It is this exception which Defendants contend bars Plaintiffs' claims of negligent entrustment (Count II) and negligent hiring, retention, training and supervision (Count III).

The Supreme Court in Berkovitz v. United States, 486 U.S. 531 (1988), set out a two-step test to determine when the discretionary function exception applies. The first step of the Berkovitz test requires this court to determine whether the challenged conduct "involves an element of judgment or choice," in which case it is discretionary and falls within the language of the exception, or whether it involves "a federal statute, regulation, or policy [that] specifically prescribes a course of action for an employee to follow," in which case the exception does not

---

[2]  Because the FTCA discretionary function exception is a limitation on the waiver of sovereign immunity, cases which fall within the exception must be dismissed for lack of subject matter jurisdiction. Baird v. U.S., 653 F.2d 437, 440 (10th Cir. 1981), cert. denied, 454 U.S. 1144 (1982).

apply. Id., 486 U.S. at 536. If the conduct involves discretionary judgment under the first step of Berkovitz, then the analysis proceeds to the second step, which requires this court to "determine whether that judgment is the kind that the discretionary function exception was designed to shield."  Id. The exception protects only those discretionary actions or decisions which are "based on considerations of public policy." The purpose of the exception is to prevent judicial "second-guessing" of legislative and administrative decisions "grounded in social, economic, and political policy through the medium of an action in tort." Id., at 536-37, cited in Duke v. Department of Agriculture, 131 F.3d 1407 (10th Cir. 1997). Thus, in order to eliminate Defendants' conduct from the discretionary function exemption, Plaintiffs must show that either BIA supervisors' conduct violated a federal statute or policy that was both "specific and mandatory," or that the choices or decisions made by the supervisors are not protected by the discretionary function exception under the FTCA.

**I.      Policies and Regulations Regarding Operation of Government Vehicles**

A.      BIA Policies

The Government contends that there was no provision specifically requiring revocation or suspension of an employee's authorization to operate a Government vehicle in the event that the employee was convicted of driving under the influence of alcohol.[3] Thus, the BIA policies in effect "left room" for supervisory personnel to exercise policy judgment when deciding whether such employees should be authorized to operate Government vehicles on official business. Not only does this contention lack support from the evidence, but even if true, it does not dispose of

_____

[3] Defendants state that under the policy in effect from 1999 to 2002, an employee could be convicted of DWI and still be authorized to drive a Government vehicle, as long as the employee still had a valid state driver's license. See Ex. 46 at 34.

the issues needing to be confronted and resolved in this case. Plaintiffs contend that BIA policies and regulations specified requirements other than simply having a valid driver's license, and that BIA supervisors violated those provisions. They further argue that any choices or decisions made by supervisory personnel which were not violations of policy or regulations, do not come under the discretionary function exception and therefore bear scrutiny under tort law.

The starting point for the Court, then, is an examination of the policies and regulations which were in effect during Larson's employment at BIA.[4] About the time Lloyd Larson was entrusted with a Government vehicle in September 1988, BIA utilized the policy set forth in Part 25 of the Bureau of Indian Affairs Manual ("BIAM"), Supplement 7, Release 3 ("25 BIAM Supp. 7,3").[5] The relevant portions of that policy reads in part, and in paraphrase:

> 1.   *all incidental operators shall qualify for and be issued an Employee's Driver Authorization.*
>
> 2.   *to qualify for the required Driver's Authorization, the employee must . . . have a safe driving record.*

Ex. J, § 3.1(C). In addition, 25 BIAM Supp. 7,3 required supervisors to:

---

[4]   Defendants' Motion for Partial Summary Judgment (Doc. 219) bears the electronic signature of Attorney Traci L. Colquette. I note with some concern that counsel for Defendants omitted salient portions of the relevant BIA policies and neglected to mention any of the various C.F.R. regulations which are clearly pertinent to this case, until Defendants' Reply (Doc. 346). Plaintiffs provided this clearly relevant information. Defendants address the regulations for the first time replying to Plaintiff Beller's brief which is almost entirely devoted to a recitation of the applicable C.F.R. regulations.

[5]   The policy was reissued in 1989, eliminating the requirement that "incidental operators" qualify for and be issued a U.S. Government Motor Vehicle Operator's Identification Card (SF 46 - the equivalent of a Government driving license) before driving a Government vehicle. An "incidental operator" is an employee whose duties required the operation of a motor vehicle. Ex. 36, ¶ 5; Ex. J. Employees in this category were still required to have a valid state driver's license and Government identification card.

> 1.      check the employee's application form and verify that the employee has a valid driver's license, and
>
> 2.      verify the employee's safe driving through the State Motor Vehicle Office and the National Driver register.

§§ 2.2, 2.5(A).  The policy included provisions relating to ongoing supervision:

> [It] shall be the responsibility of supervisors at all levels to "continuously evaluate the performance of subordinates in the operation of motor vehicles," and to "initiate action to remove or suspend the Driver's Authorization of individuals who fail to meet acceptable standards of health, conduct or safe driving."

Ex. J, § 2.7. Whether an employee had a "safe driving record" was based upon information from the employee's application, State Motor Vehicle Office Records, and the "results of queries to the National Driver Register using OPM supplemental forms and rating guides." Ex. J, § 1.4(I).

A determination that an that an employee did not have a safe driving record *required* that his driver's authorization had to be suspended or revoked ("*In the event that it is determined that an employee does not have a safe driving record, the employee's Driver's Authorization shall be suspended or revoked*"). Ex. J, § 2.7. Other circumstances also expressly required the revocation of Driver's Authorization:

> 1.      if the employee is convicted of driving a motor vehicle under the influence, including convictions on any Indian reservation;
>
> 2.      if the employee's state license is revoked, or
>
> 3.      if the employee is convicted of leaving the scene of an accident without making his/her identification known.

Ex. J, § 2.7(C)(2).  If a supervisor wished to reinstate an employee's revoked Driver's Authorization, the supervisor had to arrange for the employee to participate in the Standard Defensive Driving Training Course before the employee could reapply for authorization. Thus, the

25 BIAM Supp.7,3 policy not only required a safe driving record including a state driver's license in order for an employee to be authorized to operate a government vehicle, but also made it incumbent on the supervisor to "continuously evaluate" the employee's driving record. Moreover, under the policy, failure to maintain a safe driving record would mean revocation or suspension of privileges.

In August 1994, 25 BIAM Supp.7,3 was formally rescinded because BIA determined that the policy was duplicative of the general policy used by the Department of the Interior ("DOI") for the operation of motor vehicles for official business, 485 Departmental Manual Chapter 16 ("485 DM 16").[6] This policy called for each bureau to establish a "system for restricting motor vehicle operations to qualified and authorized persons." Ex. 9. It required employees to have a valid state driver's license, and supervisors to "establish that the employee has the ability to operate the vehicle safely in the operational environment assigned." It also required that supervisors "ensure that employees maintained safe driving records."  Employees were required to notify his employer if his driver's license was suspended, revoked or canceled.  This policy was in effect at the time of the fatal accident on January 25, 2003.

B.      C.F.R. Regulations

In addition to the policies issued in the agency's manuals, certain C.F.R. regulations were in effect as well, contained within Title 5 of the Code of Federal Regulations, Subpart A (Motor Vehicle Operators). The regulations established "minimum procedures to ensure the safe and

_____

[6]  In March of 1994, DOI entirely eliminated the requirement for a SF 46 for all employees who drove Government vehicles. The expectation was that 25 BIAM Supp. 7,3 would be revised accordingly.  Instead, it was rescinded altogether, as mentioned above.  During the period between March and August of 1994, an interim policy was in effect. The requirements of this interim policy were similar to those of 485 DM Chapter 16.

efficient operation of such vehicles," in order to identify federal employees who are "qualified and authorized" to operate Government vehicles, and to periodically review these individuals' qualification." 5 C.F.R. §§ 930.103, 930.104.

Section 930.105, which was promulgated in 1985, set out "minimum requirements" for positions involving driving of Government vehicles:

> (a)    An agency may fill motor vehicle operator positions in the competitive or excepted services by any of the methods normally authorized for filling positions. Applicants for motor vehicle operator positions and incidental operators must meet the following requirements for these positions:
>    (1)    Possess a safe driving record **as defined in OPM qualification guides** [emphasis added];
>    (2)    Possess a valid State license;
>    (3)    Except as provided in § 930.107, pass a road test; and
>    (4)    Demonstrate that they are physically qualified to operate the appropriate motor vehicle safely in accordance with the standards and procedures published in chapters 339 and 930 of the Federal Personnel Manual.
> (b)    Agencies may establish additional requirements to assure that the objectives of this subpart are met.

The "OPM qualification guides" referred to in the bold language above, were issued by the predecessor of the Office of Personnel Management ("OPM"), the U.S. Civil Service Commission. This "Examining Guide for Motor Vehicle Operator/Incidental Operator" ("Examining Guide")[7] contains a "Table of Disqualifications" which lists various driving record violations and a time period chart. Ex. 58.    Language referring to "OPM qualification guides" was deleted from 5 C.F.R. § 930.105 in 1995, after the Federal Personnel Manual ("FPM") was

---

[7] The "Examining Guide is also referred to as a "rating guide" in the definition of "safe driving record in the 25 BIAM Supp.7,3 policy. See Discussion, above, on that policy.

abolished.[8] However, according to Defendants, the "Examining Guide" still provides "guiding criteria" for whether applicants for motor vehicle operator positions have a "safe driving record." Ex. 54, ¶ 7. The amended version of 5 C.F.R. § 930.105, i.e., the version without reference to "OPM qualification guides," remained effective throughout Larson's employment.

The other federal regulation relevant to this case, 5 C.F.R. § 930.113, has not been amended since it was first promulgated in 1985.  It addresses corrective action an agency is required to take when faced with certain conduct by an employee operating a Government vehicle:

> *An agency will take adverse, disciplinary, or other appropriate action against an operator or an incidental operator **in accordance with applicable laws and regulations** [emphasis added]. Agency orders and directives will include the following reasons among those constituting sufficient cause for such action against an operator or an incidental operator:*
>
> *(a)   The employee is convicted of operating under the intoxicating influence of alcohol, narcotics, or pathogenic drugs.*
> *(b)   The employee is convicted of leaving the scene of an accident without making his or her identity known.*
> *(c)   The employee is not qualified to operate a Government-owned or -leased vehicle safely because of a physical or medical condition. In making such a determination, agencies should consult a Federal medical officer or other medical authority as appropriate.*
> *(d)   The employee's State license is revoked.*
> *(e)   The employee's State license is suspended. However, the agency may continue the employee in his or her position for operation of Government-owned or -leased motor vehicles on other than public highways for not to exceed 45 days from the date of suspension of the State license.*

---

[8] See 60 Fed.Reg. 3055, 3067 (Jan. 13, 1995); see also 60 Fed.Reg. 66709 (Dec. 27, 2001) ("The Office of Personnel Management is issuing a final rule to remove all references to the Federal Personnel Manual (FPM). With the abolishment of the FPM, these references are no longer in effect. This action does not make any substantive changes to the affected rules").  I detect some confusion with regard to whether the FPM was abolished in 1993 or 1995. Cmp. Ex. 54, ¶ 7 with reference to Schmidt v. U.S., 153 F.3d 1348, 1353 (Fed.Cir. 1988), cited at page 7 in Defendants' reply.

Defendants contend that because § 930.113 does not specify what corrective actions are required, it should be read in conjunction with the guidance provided by OPM in Chapter 930 of the FPM, entitled "Corrective Actions." Ex. 57, at 930-8.  That section tracks the language in 5 C.F.R. § 930.113, except that the FPM language *suggests*, rather than *requires*, temporary removal from duties requiring the operation of a major vehicle in situations where an employee is "convicted of operating under the influence of intoxicating liquor."  Thus, Defendants argue Plaintiffs have not shown that BIA violated any specific or mandatory policy directives. As I will explain, Defendants' view of the policies and regulations in effect during Larson's employment is selective and myopic.

## II.    First Prong of Berkovitz Inquiry

The discretionary function exception applies even when the discretionary acts themselves constitute negligence. <u>Barnson v. U.S.</u>, 816 F.2d 549 (10th Cir. 1987).  It may also apply to day-to-day operational decisions made by Government employees, <u>U.S. v Gaubert</u>, 499 U.S. 315, 325 (1991). This seemingly broad sweep of the exception affords the Government ample basis to argue that an individual's status as a federal government employee renders each one of his decisions or choices a "discretionary function" protected under the FTCA. This view would allow the discretionary function exception to swallow the FTCA's "sweeping waiver of sovereign immunity. <u>Duke v. Dept of Agriculture</u>, 131 F.3d 1407, 1411 (10th Cir. 1997). However, the discretionary function exception also stops short of the full <u>Berkovitz</u> analysis, *viz.*, the second prong of the test, which will be addressed later.

### A.    Policies and Regulations in Effect Prior to 1994

The Government's argument goes like this: BIA policies regarding authorization to

operate Government vehicles did not require disqualification of an employee who was convicted of DWI but who still had a valid state driver's license. Therefore, supervisors complied with the mandates of its policies. Further, any decisions or choices made by BIA supervisors that were not covered under specific mandates of the policies, and any discretionary act authorized by the regulation is shielded by the discretionary function exception of the FTCA. My review of the policies and regulations in effect while Larson was employed, and of the case law surrounding the exception, reveals that neither proposition is correct.

In arguing that responses taken by BIA supervisors in situations where an employee is convicted of DWI were discretionary, Defendants rely on the non-specific language of § 930.113 and on the suggestive character of the FPM section on "Corrective Actions" ("the following circumstances are *suggested* as bases for agency action to remove employees. . . from duties requiring the operation of a motor vehicle") (emphasis added). What Defendants choose to ignore are the provisions that mandate specific action. Section 930.105 required *both* a valid license and a "safe driving record," and 25 BIAM Supp.7,3 required revocation or suspension of Driver's Authorization in certain situations such as a DWI conviction, or failing to have a "safe driving record."[9]  The original version of 5 C.F.R. § 930.105(a)(1) which was effective until the FPM was abolished, utilized the OPM Examining Guide until at least that time if not afterward.  Under "Suspension of Driving Permit," in the Examining Guide, 1 or more offenses in the last 2 years

_____

[9] Defendants urge that § 930.113 should be read in conjunction with Chapter 930 of the FPM (Ex. 57) which only *suggests*, rather than requires, revocation of driving authority, but curiously does not make the same assertion with regard to BIAM's own policy *requiring* revocation of authority to drive when certain conditions occur (such as an employee not having a safe driving record, or when the employee is convicted of operating a motor vehicle under the influence of narcotics or intoxicants. Ex. J (25 BIAM 7, 3 §2.7(c)(2)).

would disqualify an employee from operating Government vehicles.  See Ex. 56.[10]  A view of the facts favorable to Plaintiffs shows that Larson's license was suspended, and remained that way, from shortly after the time he started working at the BIA in 1988, until 1993 when he finally was issued a state driver's license.

In the same Examining Guide, under the heading "Driving under influence of narcotics or intoxicants," 1 or more offenses in the last 2 years, or 2 or more in the last 5 years, would also disqualify an employee.  Larson was arrested, charged and convicted of DWI in January 1994, in March 1994, in April 1995 and in July 1997. Thus, by the express language in pre-1994 BIA policies effective while Larson was employed at the agency, BIA supervisors would have been required to take certain actions set forth in the policies and regulations.

Defendants maintain that at all times BIA was aware that Larson's New Mexico driver's license had been suspended, he was not permitted to operate a Government vehicle. However, the allegations in Plaintiffs' negligence claims in Counts I and II include not only Defendants' conduct based on BIA supervisors' allowing Larson to drive when his driver's license had been suspended, but also allowing Larson to drive when he had been arrested and convicted of DWI but still

_____

[10]  Disqualification is based on "offenses" which were "followed by conviction, forfeiture of bond, etc." Ex. 56. It is not clear whether the April 1995 arrested resulted in a conviction, although a conviction on that date is not necessary for Larson's string of offenses to meet the Examining Guide's criteria.

Defendants state in their Reply that Larson would not have been disqualified under these guidelines because Larson was not convicted of driving while intoxicated during the two years immediately before January 25, 2002, and had only one DWI conviction during the five-year period immediately preceding that date. Reply Brf. at 10. The Government's careful selection of that window of time does not divert the Court's attention away from the reality that compliance with the same Examining Guide earlier in Larson's tenure of employment would have resulted in a revocation of Larson's authority to drive Government vehicles long before the fatal collision happened -- and perhaps mandated the decision not to hire Larson for a BIA position that required driving as part of his job in the first place.

maintained a valid license.  Thus, questions for summary judgment are not confined simply to
whether Defendants violated BIA policy that required revocation of driving authority when
Larson's state license had been suspended or revoked.  It should be clear from the discussion thus
far that this argument utterly fails. Plaintiffs have presented material questions of fact on the issue
of whether Larson was allowed to continue to operate a government vehicle even while BIA
supervisors knew Larson's license was suspended. Pltff's Ex. H, Ex. F at 77, Ex. I at 17.
Additionally, Plaintiffs offer evidence that, based on BIAM policies and regulations (including the
OPM Examining Guide) in effect at the time, BIA supervisors violated these policies and
regulations either by issuing Larson authorization to operate Government-owned vehicles or in
continuing to allow him to do so, when BIA supervisors knew about Larson's DWI arrests and
convictions.

       This is not a situation where Larson started his employment at BIA on the wrong foot and
eventually cleaned up his act.  Larson was the proverbial accident waiting to happen. According
to the evidence on the record thus far, Larson's supervisors at BIA were well aware of his
drinking problem, his DWI's and his alcohol-related absences from work. Larson believed that his
supervisors knew about his numerous DWI arrests "one way or another," including reports from
newspaper accounts. Although Larson could not recall which supervisor he told for each DWI, he
stated that his usual procedure each time was to appear before the judge on a Monday morning,
and then return to work and explain to his supervisors where he was that morning.  Ex. A at 14-
19.  Larson did recall speaking about his arrests and convictions to supervisor, Jimmy Martinez,
but couldn't remember which ones. Plaintiffs present evidence, through Larson's deposition
testimony, which suggests that instead of being required to obtain treatment at the risk of losing

his job, Larson's supervisors discouraged this, because they needed him at the job site.  This evidence directly supports Plaintiffs' allegations of negligent entrustment (Count II) and negligent hiring, retention, training and supervision (Count III).[11]

During the period prior to 1994, the policies and regulations in effect required BIA supervisors to "continuously evaluate" employees who drove Government-owned vehicles for safe driving records, in addition to valid state driver's licenses, and required revocation of authorization to drive Government vehicles if an employee either did not have a "safe driving record" or was convicted of operating a motor vehicle under the influence of narcotics or intoxicants. BIA supervisors were without discretion to ignore those requirements. These policies and regulations specifically prescribed a "course of action for an employee to follow," and did not involve "an element of judgment of choice."  Gaubert, 499 U.S. at 322 (quoting Berkovitz, 486 U.S. at 536). Because there are disputes of fact concerning whether BIA supervisors disobeyed the specific mandates of the policies and regulations, the actions of BIA supervisors could not have been truly discretionary, and therefore the Government is not entitled to the protection of the discretionary function exception to the FTCA. See Id., 499 U.S. at 324.  Thus, as for the period of time from Larson's hiring to August, 1994, Defendants are not entitled to summary judgment

_____

[11] Defendants argue that even if there were "lapses" during which Larson drove Government-owned vehicles during periods when he was not authorized to do so, these "lapses" were not the proximate cause of the deaths of Plaintiffs' decedents, since Larson did have a valid driver's license at the time the accident occurred.  See Mem. Brf. at 24, n.15. This argument begs the question of whether Larson's mere possession of a valid state driver's license is enough to get the Government off the hook, which I have already concluded was insufficient to absolve the Government from liability.  Defendants' "proximate cause" argument also completely ignores the evidence which suggests that had Larson been dealt with in accordance with the policies in effect during the first part of his employment, he would not have had the chance to be behind the wheel of a Government-owned vehicle on January 25, 2003.

on Counts II and III of Plaintiffs' claims on the basis that the discretionary function exception does not apply to BIA supervisors' conduct under the policies and regulations in effect during that time.

B.    Policies and Regulations in Effect After 1994

The abolishment of the Federal Personnel Manual resulted in the removal of the OPM Examining Guide for Motor Vehicle Operator, which set forth parameters by which BIA supervisors could determine whether an employee had a "safe driving record," as well as the chapter in the FPM on Motor Vehicle Operators (Chapter 930), which "suggested" that an agency remove an employee from duties requiring the operation of a motor vehicle when the employee was convicted of operating under the influence of intoxicating liquor. However, the policy binding on the BIA after 1994 relevant to authorizing employees to operate Government-owned vehicles, i.e., 485 DM 16, still required an employee to have a valid state driver's license and supervisors to "establish" that an employee was able to operate a Government-owned vehicle "safely."

Defendants contend that FPM provisions no longer in force are nevertheless relevant to construe regulations that were promulgated or were in effect before the FPM was abolished. See Reply Brf at 9 (citing Markland v. Office of Personnel Management, 140 F.3d 1031, 1034 (Fed.Cir. 1998)). Defendants' intention is to push the idea that BIA supervisors were not required to take any specific actions, such as revocation of driving authority, in the face of Larson's multiple DWI arrests and convictions. Rather, as Chapter 930 of the FPM states, such action is only "suggested." However, Defendants do not explain what place, if any, the OPM Examining Guide has in construing the same regulations.  For example, Defendants do not say whether the Examining Guide be used to dictate agency action referred to in § 930.113 ("Corrective action")

17

when the conduct listed in § 930.113 occurs, or whether the Examining Guide should be used as the template to "establish" whether an employee "has the ability to operate the vehicle safely in the operational environment assigned." See Ex. 9.  Incorporation of the OPM Examining Guide would characterize the post-1994 policy (485 DM 16) as one which eliminates choice, and prescribes a course of action for BIA supervisors to follow. Under that view of the post-1994 policies, I find that Defendants' conduct, through BIA supervisory employees, was not protected by the discretionary function exception for the same reason as described above with regard to the pre-1994 policies: because Plaintiff has presented evidence which suggests that BIA supervisors violated the specific mandates of the policies and regulations that were in effect at the time. Further, the 485 DM 16 policy required the BIA to "[p]rovide a system for restricting motor vehicle operations to qualified and authorized persons." Ex. 9, § 16.3(A). Other than what 485 DM 16 provides, Defendants have not shown any evidence of any "system" designed for such a purpose, which leads to the question of whether failure to design and implement such a system is in itself a violation of the policy.

Instead, Defendants insist on the discretionary character of the policies because the policies do not mandate removal of an employee from duties requiring the operation of a Government-owned vehicle when he is convicted of a DWI. The flaw in this theory is in Defendants' analysis under the second step of the Berkovitz inquiry. It has not escaped the Court's attention that there are subtle differences between the policies binding the agency before and after 1994. Arguably, the provisions in the motor vehicle safety policy in place after 1994 (485 DM 16) are less specific that the previous policies, and relegate more to a BIA supervisor's

judgment or discretion.[12] Even so, Plaintiff's claims would still survive this summary judgment motion if that discretion is not the type meant to enjoy the protection of the discretionary function exception - which brings me to the next part of the analysis.

## III.      Second Prong of Berkovitz Inquiry

Where the conduct of a Government employee involves an element of judgment or choice, the Court must proceed to the second part of the Berkovitz test. It is not enough for Defendants to claim that the conduct of Larson's supervisors is protected from liability under the FTCA because they exercised their discretion in allowing Larson to drive a Government-owned vehicle. The question is whether that discretion was the type that the exception was designed to shield, Berkovitz, 486 U.S. at 536, and must be answered without considering whether the exercise of that discretion was either negligent or wrong, or whether the discretion was abused. Duke, 131 F.3d at 1410. Generally, decisions concerning hiring and employment are discretionary. See Richman v. Straley et al., 48 F. 3d 1139, 1146 (10th Cir. 1995) ("[d]ecisions regarding employment and termination are inherently discretionary).  However, the inquiry is still a factual one.  Routh & Sons v. U.S., 668 F.2d 454 (10th Cir. 1981) (determination of whether or not a given act by the United States is discretionary, and so excluded from coverage under the FTCA, is very much a factual issue, depending upon evidentiary circumstances present in each individual case).[13]

---

[12] For example, as mentioned earlier, § 2.7 of 25 BIAM Supp.7,3 *required* revocation of an employee's Driver's Authorization, as did the OPM Examining Guide, which was used as a reference for "safe driving record" under the original version of 5 C.F.R. § 930.105(a)(1). Both the 25 BIAM Supp.7,3 policy and the OPM Examining Guide were not in effect after 1994.

[13]  The Court's conclusion in Richman was based on the facts of that case, although there was little analysis. The plaintiff in Richman sued the Government for terminating her appointment

I do not find this to be a case where Defendants can argue that Larson's supervisors were just following policy.  Cmp., U.S. v. Varig Airlines, 467 U.S. 797 (1984) (actions of employees complying with "spot-check" plan for airplane inspection formulated by Federal Aviation Administration were protected by discretionary function exception because of agency's authority to establish safety standards for airplanes"). The scenario plays out on two levels.  Plaintiffs allege, and have provided evidence sufficient to withstand summary judgment, that Larson was allowed to operate a Government-owned vehicle even when his supervisors knew his driver's license had been suspended or revoked.  The factual evidence also plays out to Plaintiffs' allegations that Larson kept his authority to drive his Government vehicle even when BIA supervisors knew about his continual DWI arrests and convictions. It is true that 485 DM 16 did not contain language specifying exactly what to consider in order to "establish" that  employees could "operate the vehicle safely,"or what should be done in situations where a BIA employee has a DWI conviction but still holds a valid state driver's license.  Nevertheless, Defendants cannot prevail in their summary judgment motion by arguing that BIA supervisors followed policy in asking to see an employee's driver's license.

Viewing the facts favorably to Plaintiffs, there is ample evidence: (1) that BIA supervisory employees decided, over and over again, to allow Larson to continue driving a Government-owned vehicle when they knew he either had his license suspended or revoked, or had numerous

---

as standing trustee. In that case, the court pointed out that the "relevant statutes provide[d] no guidance or restrictions." In the present case, regulations and policies that were in place during Larson's employment did offer considerable guidance to BIA supervisors. Moreover, authorizing Larson to operate a Government vehicle at different times in his employment differs markedly from the one-time decision made in the Richman case to terminate the plaintiff's employment, which clearly involved a consideration of social, economic and political policy by that agency.

DWI arrests and convictions, (2) that one BIA supervisor facilitated Larson obtaining a temporary

license after his driver's license was revoked yet another time, and (3) that BIA supervisors did

not require Larson to get treatment for his alcohol problem, and even refused to give him time off

for that purpose because they needed him at the job site. See, e.g.,  Ex. A at 24-25, Ex. F at 76-

77, Ex. K at 62-62, Deft's Ex. Ex. 26F.

"Choice" is not always a "discretionary function" under the FTCA. Duke, 131 at 1412.[14]

At different times during Larson's employment, BIA supervisors made choices to allow Larson to

drive a Government-owned vehicle.  However, regardless of their motives,[15] these decisions are

not susceptible to policy analysis because they cannot fairly be said to be "grounded in the policy

of the regulatory regime." Gaubert, 499 U.S. at 325. The situation here is more like the example

mentioned in Berkovitz, 486 U.S. at 538, n.3, where failure to maintain a lighthouse in good

condition subjected the Government to suit under the FTCA, even though the initial decision to

undertake and maintain lighthouse services was a discretionary judgment (citing Indian Towing

Co. v. U.S., 350 U.S. 61 (1955)). In describing acts that are outside the discretionary function

exception, the Court in Gaubert used the example of a Government agent negligently colliding

with another car.  The Court explained that although driving required the "constant exercise of

_____

[14] The Court in Duke found that supervisory employees had discretion in where to place
warning signs near falling rock area, but held that this discretion was not protected as a
discretionary function exception under the FTCA. 131 F.3d at 1407.

[15] Subjective intent in exercising discretion is not a factor in this part of the Berkovitz
inquiry. See Gaubert, 499 U.S. at 325. ). So, e.g., it would be irrelevant that BIA supervisors
were short-handed and needed Larson at the job site. See Duke, 131 F.3d at 1412 ("insufficient
government resources alone do not a discretionary function make").

discretion," it can "hardly be said to be grounded in regulatory policy." 499 U.S. at 325 n.7.

Likewise, in the present case, regardless of whether BIA supervisory employees were wrong in

their decisions concerning Larson's driving authorization, these decisions were not in the category

of decisions being made with the intention of carrying out regulatory policy, nor did they involve

any "permissible exercise of policy judgment." Indian Towing, 350 U.S. at 69. If anything, these

decisions totally ignored any semblance of deference to regulatory policy.

       In sum, I find that the judgment calls made by supervisors regarding Larson's driving

authority to operate a Government-owned vehicle are not the kinds of decisions which are

exercises of "political, social, [or] economic judgment." Gaubert, 499 U.S. at 325. The nature of

such actions are not susceptible to policy analysis because they cannot possibly be meant to

further the purposes of any of the policies or regulations which BIA was bound to follow. I can

neither find nor conceive a connection between decisions made by Larson's supervisors regarding

whether he should be permitted to drive a Government-owned vehicle, and "readily identifiable

public policy decisions." See Daigle v. Shell Oil Co., 972 F.2d 1527, 1537-38 (10th Cir. 1992).

Thus, actions taken by BIA supervisors may have an involved an exercise of discretion, but they

are nevertheless outside the scope of the protection afforded by the discretionary function

exception.

## CONCLUSION

       Based on the foregoing analysis, I conclude that the acts of BIA supervisory employees

did not involve elements of judgment or choice under the policies and regulations in effect prior to

1994, and that therefore the discretionary function exception under the FTCA does not apply to

their conduct.  Furthermore, evidence exists that BIA supervisors violated these policies and

regulations.  As for those acts of supervisory personnel which were not violations of the provisions set out in the guidelines or policy manuals used by BIA after 1994 to authorize operation of government vehicles, I find that they are outside the scope of the discretionary function exception under the FTCA.

**THEREFORE**,

**IT IS ORDERED** that Defendants' Motion for Partial Summary Judgment Dismissing Plaintiffs' Claims of Negligent Entrustment (Count II) and Negligent Hiring, Retention, Training, and Supervision (Count III) for Lack of Subject Matter Jurisdiction Pursuant to the Federal Tort Claims Act's Discretionary Function Exception **(Doc. 219)** is hereby DENIED for reasons set forth in this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE