IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JAMES J. "JIM" BELLER, as
Personal Representative of LARRY BELLER
and RITA BELLER, deceased, and TERRY
PFEIFER, as Personal Representative of
EDWARD RAMAEKERS and ALICE
RAMAEKERS, deceased,

        Plaintiffs,

v.                                                                          Civil No. 02-1368 WPJ/LFJ (ACE)

UNITED STATES OF AMERICA, and
the BUREAU OF INDIAN AFFAIRS,

        Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court upon Plaintiff Pfeifer's ("Plaintiff") Motion for Sanctions for Obstruction of Justice, filed September 30, 2003 **(Doc. 226)**. This action arises from a fatal collision between a car in which Plaintiffs' decedents were traveling and a government pickup truck driven by Lloyd Larson ("Larson"), an employee of the Bureau of Indian Affairs ("BIA"). Larson, who was intoxicated, was driving the BIA pickup truck in the wrong direction on Interstate 40. Plaintiffs bring this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, alleging that the Bureau of Indian Affairs (BIA), the governmental agency for which Larson worked, is responsible for the wrongful death of the four individuals killed in the crash, under theories of *respondeat superior*, negligent entrustment of an automobile, and negligent hiring, retention and supervision.

In the instant motion, Plaintiff contends that Defendants interfered with the truthful

testimony of witnesses in three ways: (1) that the Government threatened Bureau of Indian Affairs ("BIA") employees and supervisors with withdrawal of assistance and legal representation if these individuals made admissions or statements against the interest of the employer, regardless of the truthfulness of the statement; (2) that the Government threatened Lloyd Larson with future prosecution on other charges[1] in order to prevent him from testifying; and (3) that the Government interfered with testimony of BIA employee and Ettaline Perry, Mr. Larson's girlfriend, by allegedly influencing Ms. Perry to assert spousal privilege.[2]

While Defendants' contention that Plaintiff's motion is untimely has some worth, the basis for Plaintiff's delay in filing the motion is reasonable. Most of the depositions which have some connection to the present motion were completed prior to the discovery motion deadline of August 25, 2003. Plaintiff wanted to wait until Larsons' deposition, which was done a few days after the deadline, to see whether Larson asserted his Fifth Amendment privilege. Therefore, Plaintiff's motion will not be denied on the basis of timeliness. It will, however, be denied on its merits, as discussed below.

**I.      Alleged Threat to Withdraw Representation from BIA employees**

Plaintiff contends that as a result of the Government's improper use of its influence, witnesses came to their depositions refusing to give their opinion, claiming not to know things they should have known, or were dishonest in their answers unless presented with specific instances of

---

[1] These charges include falsification of federal employment application, failure to disclose prior convictions for DWI on applications for a New Mexico driver's license, and use of a revoked or suspended license to prove that he had a valid New Mexico driver's license.

[2] The basis for the privilege was a common law marriage under Navajo law between Larson and Ms. Perry.

behavior. The Government may not use its power to influence, or interfere with, a witness' choice about whether to talk to the opposing side.  However, there is no evidence that this occurred.

It seems that the basis for this part of Plaintiff's motion is essentially a dissatisfaction with the deposition answers of certain witnesses.  For example, in her deposition, Elouise Chicharello, Regional Director for the BIA Navajo Region, found it difficult to have a personal opinion about BIA policies when, as a manager, she was expected to have an opinion that was consistent with the policy that was in place. Paula Puente responded with several "I don't know" answers; David Jones didn't think that someone with a DWI has a "drinking problem"; and Bobby Pablo stated that no one told him that Larson had a drinking problem.  Not only are these responses are not necessarily evasive, but there is no evidence that their formation was the result of BIA interference or threats.

Arguably, Chicharello's incorrect statements to several supervisory employees that BIA would not represent them if they made statements against the BIA's interests, appear questionable at the outset.  However, it is clear from the affidavits submitted by Defendants that these statements had no effect on whether any of those employees would have agreed to be informally interviewed by Plaintiff's counsel.  Each of these individuals consistently understood that the Government did not represent them, but they were not discouraged against obtaining personal counsel. These employees were told that each would have to decide whether to agree to be interviewed, and that they would be expected to tell the truth if they did so.  It is ironic that none of these employees who were threatened as Plaintiff alleges, chose to retain counsel,[3] and even

---

[3] The reason for deciding against personal counsel was the fact that these witnesses were not parties. See, e.g., Exs. 1 and 4.

more ironic that neither Ms. Chicharello, Mr. Jones, Mr. Pablo, nor Ms. Puente was approached by Plaintiff's counsel for an informal interview.

For all of Plaintiff's indignation, there is no evidence that any BIA supervisor interfered with the obligation of these witnesses to give truthful answers.  There *is* evidence, however, that at least one supervisor who was interviewed by Plaintiff's investigator did not suffer any subsequent adverse consequences.  The cases cited by Plaintiff correctly identify the relevant black letter law pertaining to the prohibition against the Government interfering with a witness' testimony or with a witness' choice to speak with the opposing side, but these cases are factually dissimilar to the present case.[4]  As far as any requests made by Defendants or its attorneys to BIA employees to refrain from submitting to *ex parte* interviews with opposing counsel, I do not find this to constitute impermissible interference by the Government.  Such conduct is well within ethical boundaries regarding "fairness to opposing party and counsel."  See  N.M.R.Prof. Conduct § 16-304F, 1978 N.M.R.A. ("A lawyer shall not request a person other than a client to refrain from voluntarily giving relevant information to another party unless: (1) the person is a relative or an employee or other agent of a client. . . .").  Therefore, Plaintiff's allegations of improper conduct with regard to obstructing and interfering with Plaintiff's ability to depose and/or interview witnesses during discovery, are completely unfounded.

---

[4] Two of the cases are criminal case: U.S. v. Gonzales, 164 F.3d 1285, 1292 (10th Cir. 1999) and U.S. v. Pinto, 755 F.2d 150, 152 (10th Cir. 1985).  In Gonzales, the Government violated a court order which required the Government to provide "face to face" encounters with witnesses. In Pinto, the Tenth Circuit found in the end that the Government had not interfered with the free choice of the witness to speak with the defense. The one civil case mentioned by Plaintiff, National Medical Enterprises, Inc., 792 F.2d 906 (9th Cir. 1986), the Government had repeatedly attempted to discourage a witness from making a reference to certain documents which would then be discoverable. None of these cases lend a negative inference to the facts in this case.

**II.     Alleged Threat of Future Prosecution to Prevent Larson from Truthfully Testifying**

Plaintiff portrays this situation as if the Government was intimidating Larson with threats of future prosecution for other criminal charges in order to convince him to claim the Fifth Amendment privilege, and in doing so, silence him on making statement that would be damaging to the BIA.  To support these allegations, Plaintiff presents several instances of Government's communications with Larson's criminal defense attorney, Mr. Alonzo Padilla, an Assistant Federal Public Defender, only without their contextual background.[5] According to Plaintiff's depiction of events, the U.S. Attorney's Office initiated the idea that Larson should invoke his Fifth Amendment privilege. What actually happened, based on a review of the series of letters from the U.S. Attorney's Office prior to Larson's deposition, is that Larson had already been advised by his defense attorney not to make any statements in the civil case, including giving a deposition.  Ex. 11.[6]  It was not until Plaintiff's counsel expressed an intention to proceed with deposing Larson on a broad range of topics in the civil case, that Defendants' counsel suggested to Mr. Padilla that Larson "may well be able to invoke his privilege with respect to a fairly broad range of topics." Ex. H.  By that time, however, Larson had fully intended to exercise his rights under the Fifth Amendment.  There was nothing improper in this communication, particularly when it is consistent with preserving a criminal defendant's basic constitutional rights, as Mr. David Iglesias, the U.S. Attorney, noted in his responsive to Plaintiff's counsel. Ex. 19; see also, McNeal v. Hollowell, 481

---

[5] Plaintiff goes so far as to indict the Government with violation of a federal statute, 18 U.S.C. § 1503, which is actually directed to the offense of corruptly influencing jurors or court officers. As Defendants note, the statute was amended in 1982 to delete references to "witnesses" when 18 U.S.C. § 1512 (the current witness intimidation statute), was enacted.

[6] Plaintiff's exhibits are lettered, while Defendants' exhibits are numbered.

F.2d 1145, 1152 (5th Cir. 1973) (finding nothing improper in defendant's attorney impressing on witness' lawyer the risk to witness of testifying against defendant while witness himself was under indictment and reminding him of protection afforded by Fifth Amendment). That Larson's invocation of the Fifth Amendment privilege should perhaps work to the Government's advantage in its defense of the civil case does not change this, as long as the methods used by Defendants were beyond reproach.  See, N.M.R.Prof. Conduct, § 16-404, N.M.R.A. ("Respect for Rights of Third Persons": "a lawyer shall not . . . use methods of obtaining evidence that violate the legal rights of [a third person]").

 Plaintiff's allusions to threats made by Defendants' attorney to coerce Larson's silence are without merit. The Government gave assurances to Larson's defense counsel that none of the information developed in the civil litigation was shared with prosecutors in the related criminal case. Further, it appears as though Plaintiff's counsel jumped the gun, so to speak, on this issue. Based on a letter from Mr. Iglesias to Mr. Padilla, at that time the Government had not reviewed the information developed during civil discovery and was thus "not in a position to determine" whether further charges would ever be brought against Larson. Ex. J.  Ironically, it was an inquiry from Plaintiff's counsel which presented the idea that Larson had potential exposure to additional criminal charges. Ex. J at 2.

 Plaintiff inaccurately characterizes the U.S. Attorney's response as an outright refusal to make assurances, when the letter clearly reflected both the reluctance and inability of the U.S. Attorney's Office to make guarantees about issues which that Office had not yet fully investigated, or over which it had no control. For example, Mr. Iglesias informed Mr. Padilla that while the U.S. Attorney's Office agreed not to seek an upward departure of Larson's applicable sentencing range,

6

information obtained from Larson's depositions could still find its way before the sentencing judge if the Court *sua sponte* sought to review the deposition transcripts in connection with any resentencing proceeding. Ex. J.[7] Thus, Plaintiff's spin on the Government's refusal to provide Mr. Padilla with assurances that Larson would not face future criminal charges relating to his conduct while employed by the BIA is contradicted even by the evidence submitted by Plaintiff. Accordingly, I find no merit to Plaintiff's accusations that Defendants or their counsel threatened or coerced Larson to invoke his Fifth Amendment Privilege against self-incrimination. In fact, considering that on January 25, 2003, Larson placed himself in the situation of becoming extremely intoxicated, driving a government owned vehicle the wrong way on Interstate 40 and crashing head on into a vehicle killing four innocent people, I am not surprised that Larson would invoke his Fifth Amendment Right against self incrimination nor am I surprised that Larson's attorney would advise him not to make any statements, including statements under oath in the civil wrongful death action brought against the Government by Plaintiff.

**III.     Use of Government's Influence of Ms. Perry to Assert Spousal Privilege**

Plaintiff asserts that the Government exerted improper influence on Ettaline Perry to retain counsel and invoke a marital communications privilege during her deposition. Plaintiff contends that the U.S. Attorney's Office became concerned with Ms. Perry's marital communications privilege only *after* Traci Colquette, the Assistant U.S. Attorney handling the litigation of the civil case, had "privately and fully interviewed" Ms. Perry. This assertion suffers the same infirmities as

---

[7] The Hon. C. LeRoy Hansen is the district judge presiding over Mr. Larson's case. Since the briefs in the present motion were filed, Larson's appeal of his sentencing was heard by the Tenth Circuit. See U.S. v. Larson, 2003 WL 22346988 (10th Cir., Oct. 15, 2003). Larson's criminal case was remanded for resentencing.

the previous one regarding improper coercion by the Government in order to induce Mr. Larson to refrain from testifying in his deposition. Plaintiff fixes on circumstances that occurred within a small window of time, and attaches certain meanings to those circumstances, without any evidence to sustain them.[8]

The allegation regarding Ms. Perry stems from what Plaintiff's counsel imagines what went on behind closed doors when Ms. Perry met with Ms. Colquette in April, 2003. Because Ms. Perry refused to speak with Plaintiff's counsel the following month, the Government -- Plaintiff insists -- must be responsible for Ms. Perry's refusal. However, all of the evidence states otherwise. In her affidavit, Ms. Perry states that after learning she would be deposed (*not* after speaking with Ms. Colquette), she became concerned about the possibility of answering questions about Larson that might "hurt him in the criminal case." Ex. 5. It was Ms. Perry's idea, not the Defendants', that she needed to retain a lawyer to advise her on "personal matters and matters relating to her husband." Other than a sheer chronology of one event following another (Ms. Perry's meeting with Ms. Colquette, and then subsequent invoking of the marital privilege), there is no basis for concluding that Ms. Perry decided to invoke a marital privilege as a direct result of her interview with Defendants' counsel, particularly since Ms. Perry was asked these pertinent questions in her deposition.[9] Instead, Ms. Perry indicated that Ms. Colquette never suggested that

---

[8] The substantive issue of whether Ms. Perry could invoke the marital privilege was resolved on September 9, 2003, when Judge Lorenzo Garcia entered a protective order holding that Ms. Perry and Larson had a common law marriage under Navajo law and that both were entitled to invoke a federal privilege for marital communications. See Doc. 188.

[9] In between the meeting Ms. Perry had with Ms. Colquette and Ms. Perry's decision to use her spousal privilege, Ms. Perry had also found out that she would have to testify at a deposition. Plaintiff chooses to ignore this event when connecting the dots between Ms. Perry's meeting with Ms. Colquette and her assertion of the privilege.

she obtain personal counsel or assert a spousal privilege, even though Ms. Perry identified herself as Larson's common law wife during the interview. Ex. 25 at 6-7. Without more than syllogism to offer a basis for Plaintiff's allegations against Defendants, Plaintiff's motion on this issue will be denied.

**THEREFORE,**

**IT IS ORDERED** that Plaintiff Pfeifer's Motion for Sanctions for Obstruction of Justice, (**Doc. 226**) is hereby DENIED for reasons set forth in this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE