## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JAMES J. "JIM" BELLER, as Personal Representative of
LARRY BELLER and RITA BELLER, deceased,
and TERRY PFEIFER, as Personal Representative of
EDWARD RAMAEKERS and ALICE RAMAEKERS,
deceased,

                    Plaintiffs,

        - vs. -                                Civil No. 02-1368 WPJ/LFG (ACE)

UNITED STATES OF AMERICA,

                    Defendant.

### DEFENDANT'S PROPOSED FINDINGS OF FACT
### AND CONCLUSIONS OF LAW

       Defendant United States of America, by its undersigned counsel, pursuant to the Court's

January 7, 2004 Order Setting Definite April 12, 2004 Trial and Pretrial Case Management

Schedule, respectfully files its Proposed Findings of Fact and Conclusions of Law.

**I.      PROPOSED FINDINGS OF FACT**[1]

       **A.      Proposed Findings Re: Larson's DWI-Related Arrests And Convictions**

       1.*      Certified court records for the case captioned *Navajo Nation v. Larson*, No. CP-

CR 3630-86 and 3631-86 (Navajo Dist. Ct.), reflect that Larson was charged with driving under

the influence of alcohol at Smith Lake near Crownpoint, New Mexico on July 26, 1986, and that

the charges were dismissed on July 30, 1986.

---

       [1] Each propose factual finding marked with an asterisk ("*") has been stipulated to by the
parties in the Amended Pretrial Order (Doc. 401 at 7-15).

2.*     Certified court records for the case captioned *Navajo Nation v. Larson*, Case No.
CP-TCR-270-90 (Navajo Dist. Ct.), reflect that Larson was charged with driving while
intoxicated and driving without a valid State driver's license near Standing Rock, New Mexico
on June 10, 1990, and that Larson pleaded guilty on July 31, 1990 and paid a $300 fine.

3.*     Certified court records reflect that a traffic ticket and complaint was issued by the
Navajo Nation police charging Larson with driving without a valid State driver's license on
August 30, 1990, and that the complaint was resolved by the payment of a $50 fine.

4.*     Certified court records reflect that a traffic ticket and complaint was issued by the
Navajo Nation police charging Larson with driving without a valid State driver's license on
December 28, 1991, and the complaint was resolved by a payment of a $50 fine.

5.*     Certified court records for the case captioned *Navajo Nation v. Larson*, Case No.
CP-TCR-088-93 (Navajo Dist. Ct.), reflect that Lloyd Larson was charged with driving while
intoxicated and driving without a valid State license near Smith Lake on March 20, 1993.

6.      Certified court records for the case captioned *Navajo Nation v. Larson*, Case No.
CP-TCR-088-93 (Navajo Dist. Ct.), reflect that the prosecution arising from this DWI-related
arrest was deferred for ninety days, and the charges later were dismissed after Larson completed
DWI school.

7.*     Certified court records for the case captioned *City of Gallup v. Larson*, No. 1994-
01-44776 (Gallup Municipal Ct.), reflect that Lloyd Larson was charged with driving while
intoxicated on January 1, 1994 in Gallup, New Mexico, and that Larson was sentenced to 90
days in jail (87 days suspended) and required to attend DWI school on January 4, 1994 based on
a guilty plea.

8.*   Certified court records for the case captioned *State of New Mexico v. Larson*, No. DI000529/LR (McKinley County Magistrate Ct.), reflect that Lloyd Larson was charged with driving while intoxicated and driving without a valid State license in McKinley County, New Mexico on February 21, 1994, and that Larson was sentenced to 90 days in jail (87 days suspended) on March 31, 1994 based on a guilty plea.

9.*   Certified court records for the case captioned *State of New Mexico v. Larson*, No. M-0035-DR-9502293/JC (McKinley County Magistrate Ct.), reflect that Lloyd Larson was charged with driving while intoxicated, careless driving, driving without a valid State license, and leaving the scene of an accident on April 16, 1995, and that the charges subsequently were dismissed.

10.*   Certified court records for the case captioned *State of Arizona v. Larson*, Case No. TR97003084 (Apache County Puerco Justice Ct.), reflect that Lloyd Larson was charged with driving while intoxicated in Apache County, Arizona on July 31, 1997, and that Larson was sentenced to 24 hours in jail on September 25, 1997 based on a guilty plea.

11.*   Certified court records for the case captioned  *Navajo Nation v. Larson*, No. CP-TCR-1228-01 (Navajo Dist. Ct.), reflect that Lloyd Larson was charged with driving under the influence of alcohol near San Antone, New Mexico on May 16, 2001, and that the charges were dismissed on August 14, 2001.

12.*   Certified court records for the case captioned *Navajo Nation v. Larson*, Case No. WR-CR-1528/TCR-3384-01 (Navajo Dist. Ct.), reflect that Lloyd Larson was charged with driving under the influence of alcohol near Window Rock, Arizona on August 11, 2001 and that, on November 13, 2001.

13.     As of January 2002, Larson's last DWI conviction was based upon the guilty plea entered on September 25, 1997 based upon his July 31, 1997 arrest in the case captioned *State of Arizona v. Larson*, Case No. TR97–3084 (Apache County Puerco Justice Ct.).

14.     The Navajo Nation did not report any of Larson's arrests and/or convictions occurring on the Navajo Reservation to the New Mexico State Motor Vehicles Department.

15.     None of the Larson's arrests and convictions identified in paragraphs 1 through 11 of the Stipulated Factual Contentions (Stipulations Re: Larson's DWI-Related Arrests and Convictions) involved the operation of a Government-owned vehicle; all occurred during Larson's personal time and in his personal vehicle.

16.     As of January 25, 2002, more than four years had elapsed since the date of Larson's last DWI conviction.

**B.     Proposed Findings Re: The Status Of Larson's Driver's License**

17.*    Records maintained by the New Mexico State Motor Vehicles Department reflect that, on August 9, 1993, Lloyd Larson applied for and was issued New Mexico driver's license No. 082994114, with an expiration date of January 27, 1997.

18.*    Records maintained by the New Mexico State Motor Vehicles Department reflect that effective January 21, 1994, Lloyd Larson's New Mexico driver's license No. 082994114 was revoked for one year pursuant to the provisions of New Mexico's Implied Consent Law, N.M.S.A. 1978, § 66-8-111C, following his arrest for driving while intoxicated on January 1, 1994.

19.*    Records maintained by the New Mexico State Motor Vehicles Department reflect that effective March 13, 1994, Lloyd Larson's New Mexico's driver's license No. 082994114

was revoked for one year pursuant to the provisions of New Mexico's Implied Consent Law, N.M.S.A. 1978, § 66-8-111C3, following his arrest for driving while intoxicated on February 21, 1994.  On June 17, 1994 the Motor Vehicle Department posted a criminal conviction for DWI for the February 21, 1994 incident.

20.    The one-year revocation of Larson's driver's license based upon the two offenses described in paragraphs 18 and 19 ran concurrently.

21.*    Records maintained by the New Mexico State Motor Vehicles Department reflect that, on March 21, 1994, pursuant to N.M.S.A. 1978, § 66-5-35, Lloyd Larson applied for and was issued New Mexico limited driver's license No. 082994114, with an expiration date of March 21, 1995.

22.*    Records maintained by the New Mexico State Motor Vehicles Department reflect that, on March 6, 1995, Lloyd Larson's New Mexico's driver's license No. 082994114 was suspended pursuant to N.M.S.A. 1978, § 66-5-210B for failure to meet the requirements of the security following accident provisions of New Mexico's Financial Responsibility Law (default in payment under settlement agreement).

23.*    Records maintained by the New Mexico State Motor Vehicles Department reflect that, effective May 10, 1995, Lloyd Larson's New Mexico's driver's license No. 082994114 was revoked pursuant to the provisions of New Mexico's Implied Consent Law, N.M.S.A. 1978, § 66-8-111, as a result of his refusal to submit to a test for alcohol following his arrest on April 20, 1995, for driving while intoxicated.

24.*    Records maintained by the New Mexico State Motor Vehicles Department reflect that, on June 5, 1996, Lloyd Larson paid a $100 reinstatement fee and two days later, on June 7,

1996, his New Mexico driver's license No. 082994114 was reinstated and he received a new license with an expiration date of January 27, 2000.

25.*    Records maintained by the New Mexico State Motor Vehicles Department reflect that, effective December 10, 1997, Lloyd Larson's New Mexico driver's license No. 082994114 was suspended for failure to make required payment of child support.

26.*    Records maintained by the New Mexico State Motor Vehicles Department reflect that, on January 2, 1998, Larson paid a $25 reinstatement fee and a $25 parental responsibility fee, and his New Mexico driver's license No. 082994114 was reinstated.

27.*    Records maintained by the New Mexico State Motor Vehicles Department reflect that, on June 19, 2000, Lloyd Larson's New Mexico driver's license No. 082994114 was renewed, with an expiration date of January 27, 2004.  This license was valid and in effect on January 25, 2002.

### C.    Proposed Findings Re: Larson's Employment with the BIA

28.*    Larson was employed by the United States government through the BIA's Eastern Navajo Agency, Branch of Roads ("ENA-BOR") from 1987 through January 2002 as a Civil Engineering Technician ("CET") with a permanent duty station at the ENA-BOR's office in Crownpoint, NM.

29.*    Larson's position description, which sets forth his duties as a CET, also provides that he "may be required, as an incidental duty, to operate a government owned or leased vehicle in the performance of duties."

30.    Many of Larson's duties as a CET did not require him to be individually assigned a Government-owned vehicle or to operate a Government-owned vehicle.

31.     Many of Larson's duties as a CET did not require him to drive in his official capacity.

32.     During periods of his employment with the ENA-BOR in Crownpoint, Larson was not always assigned a Government-owned vehicle for his individual use.

33.     During periods of his employment as a CET, Larson was a member of a survey crew who traveled together in one Government-owned vehicle as required by their duties.

34.*    While employed by the ENA-BOR, at various times, Larson did not possess a current, valid New Mexico driver's license because his license had been suspended due to DWI-related arrests and convictions occurring on Larson's personal time and in his personal vehicle, or for failure to pay child support.

35.*    On several occasions in 1995 and 1996, prior to reinstatement of his New Mexico driver's license in June 1996, Larson operated a Government-owned vehicle in violation of applicable Government motor vehicle operator policies.

36.*    From late December 1999 through January 25, 2002, Bobby Pablo, a Supervisory Civil Engineering Technician with the BIA, was Larson's direct supervisor.

37.*    In and about May 2001, while Bobby Pablo was Larson's direct supervisor, he learned that Larson had been arrested on DWI-related charges.

38.     In and about May 2001, while Bobby Pablo was Larson's direct supervisor and after learning that Larson had been arrested on DWI-related charges, Mr. Pablo required Larson to demonstrate that he possessed a current, valid New Mexico driver's license and to provide proof of the disposition of those charges; thereafter Larson provided Mr. Pablo with court documentation demonstrating that the charges had been dismissed.

39.    BIA supervisors did not learn of Larson's August 2001 DWI-related arrest by the Navajo Nation until after the January 25, 2002 collision.

### D.    Proposed Findings Re: Larson's Assignment and Travel Authorization for January 2002

40.*    At times prior to and in January 2002, Larson was assigned as the ENA-BOR's chief inspector on Project N55 and was responsible for inspecting work at this BIA road construction project located near Alamo, New Mexico.

41.*    Project N55, also known as the Alamo Project or the N55(1) Project, is the name of the first of four construction phases of the Alamo Road, which will run from the Navajo Alamo Band Reservation's boundary north and eventually connect with Route 66 and Interstate 40; Project N55 refers to the grade and drain work and paving work on that portion of the Alamo Road that begins at the Alamo Navajo-Band Reservation boundary and runs north for 8.56 miles.

42.    None of the work at Project N55 took place in Canoncito, New Mexico, which was located approximately 50 miles and more than an hour's drive from the Project N55 job-site.

43.*    The construction work on Project N55 was performed by the BIA's Construction and Heavy Equipment Unit ("CHEU") of the Branch of Roads.

44.*    While assigned to Project N55, Larson was required to travel on a weekly basis from his duty station at the BIA's ENA-BOR's office in Crownpoint to the Project N55 job-site.

45.*    In January 2002 and while working at the Project N55 job-site, Larson's place of temporary lodging in Albuquerque was the Super 8 Motel, 6030 Iliff Road NW, which was a location approved by the ENA-BOR.

46.*    In January 2002, Larson was assigned a white Government-owned truck which he was to permitted to use in connection with his employment.

- 8 -

47.     In January 2002, Larson typically would depart from the Crownpoint office on the first day of the work week (usually Monday) at 7:00 a.m. and would return to the Crownpoint office on the last day of the work week (usually Friday) by approximately 3:30 p.m.

48.     Due to the nature of Larson's responsibilities as the chief inspector on Project N55, coworkers from CHEU and ENA-BOR typically saw and/or interacted with Larson at least once a day at the Project N55 job-site when Larson was on the job, and several coworkers saw and/or interacted with Larson numerous times a day.

49.     Due to the nature of Larson's responsibilities as the chief inspector on Project N55, Larson's coworkers on Project N55 typically heard his voice over the two-way radio off and on over the course of the day when Larson was on the job.

50.     Larson's work schedule on Project N55 was determined by the work schedule for the Construction and Heavy Equipment Unit ("CHEU") of the Branch of Roads, the agency that was responsible for the construction work on Project N55; his  daily starting and ending hours also were based on CHEU's schedule.

51.     In January 2002, CHEU and therefore ENA-BOR employees (including Larson) assigned to Project N55 were assigned to work on a 5/8 schedule – eight hours a day on Mondays through Fridays.

52.     In January 2002, the work day at the Project N55 job-site began at 7:00 a.m. and ended at 3:30 p.m. and workers, including Larson were required to be on the job-site during those duty hours in the absence of express authorization to the contrary.

53.     Larson was authorized to use a Government-owned vehicle to drive from the ENA-BOR's office in Crownpoint to the Project N55 job-site on the first day of the work week;

to commute between the Project N55 job-site and his place of temporary lodging in Albuquerque during the work week; and then to return to the ENA-BOR office in Crownpoint from the Project N55 job-site on the afternoon of last day of the work week.

54.     In January 2002 and while working at the Project N55 job-site, Larson's place of temporary lodging in Albuquerque was the Super 8 Motel, 6030 Iliff Road NW, which was an approved location.

55.     Under the applicable provisions of the Federal Travel Regulation, Larson was authorized to operate a Government-owned vehicle *only* for official purposes as provided for in 41 C.F.R. § 301-10.201 (2001 ed.).

56.     While operating a Government-owned vehicle, Larson was specifically required to obey all applicable State and local traffic laws unless his duties required otherwise.  *See* 41 C.F.R. § 102-34.250.  Under this regulation, when operating a Government vehicle within the State of New Mexico, Larson was required to obey New Mexico's statutes which prohibit driving while under the influence of intoxicating liquor or drugs, consuming alcoholic beverages in a vehicle, and carrying an open container of alcohol in a vehicle.  *See* N.M.S.A. 1978, §§ 66-8-102, 66-8-138.

57.     The alcohol-related prohibitions in the New Mexico statutes relating to drinking and driving regularly were discussed at weekly safety meetings which Larson attended throughout his employment with the BIA, including the period that he was assigned to work on Project N55.

58.     Larson's familiarity with these prohibitions was well known amongst his coworkers on Project N55 because he regularly admonished his coworkers against drinking while driving their Government-owned vehicles and against drinking on the job.

59.     Larson knew the consequences of driving a Government-owned vehicle while intoxicated because his former supervisor Harold Slim and four of his ENA-BOR coworkers resigned under pressure of termination based on misconduct that included driving a Government-owned vehicle while intoxicated.

60.     During periods that Lloyd Larson was not required to be on the Project N55 job-site; and/or in transit between the job site of Project N55 and his motel in Albuquerque, NM or the Crownpoint office; Lloyd Larson also was authorized to use his Government-owned vehicle to drive to restaurants and/or supermarkets to purchase meals and/or food, and to retail stores to purchase necessary incidentals such as toiletries and grooming aids.

**E.      Proposed Findings Re: Larson's Work Assignment And
Travel Authorization For The Week Of January 22-25, 2003**

61.*    The drive from Albuquerque, NM to the Project N55 job-site and *vice versa* took approximately one and a half hours each way.

62.*    Typically, the drive from the Project N55 job-site to the ENA-BOR office in Crownpoint and *vice versa* took approximately two and a half hours each way.

63.     On January 22, 2002, after reporting for work at 7:00 a.m. at the ENA-BOR's office in Crownpoint, Larson was authorized to depart from the Crownpoint office and drive directly to the job site of Project N55.

64.     On the afternoons of January 22 and 24, 2002, Larson was authorized to depart from the Project N55 job-site at 3:30 p.m. and drive directly to the Super 8 Motel, his temporary place of lodging in Albuquerque.

65.*    On January 23, 2002, Larson was authorized to depart his motel in Albuquerque and drive to the Sheraton Old Town Hotel in Albuquerque to arrive by 8:00 a.m. to attend a preconstruction meeting between certain employees of the ENA-BOR and representatives of Souers Construction regarding the paving work on Project N55.

66.*    On the afternoon of January 23, 2002, Larson was authorized to drive from the Sheraton Old Town Hotel to Ethridge Tire Center, 6201 Montgomery NE, Albuquerque to have the tires on his Government-owned vehicle checked for wear; thereafter, Larson was authorized to drive back to his motel.

67.     On the mornings of January 24 and 25, 2002, Lloyd Larson was authorized to depart from his motel in Albuquerque, NM and drive directly to the Project N55 job-site in time to arrive at the job site by 7:00 a.m.

68.     The normal route a ENA-BOR employee took from Albuquerque to arrive at the Project N55 job-site is as follows: the employee would drive west on Interstate 40 for approximately 33 miles and exit at mile marker 126; drive south on State Route 6 for approximately 2 miles; exit near the railroad track overpass; drive west for approximately 1 miles on old U.S. Route 66; drive south on the earth road N55 and travel south for approximately 40 miles; this route would be reversed for the drive from the Project N55 job-site to Albuquerque.

69.     On the afternoon of January 25, 2002, Lloyd Larson was authorized to depart from the Project N55 job-site and drive directly to the ENA-BOR office in Crownpoint time to arrive by 3:30 p.m.

70.     The normal route an employee of the Eastern Navajo Agency, Branch of Roads of the Bureau of Indian Affairs took from the job site of Project N55 to the ENA-BOR office in Crownpoint, NM is as follows: the employee would drive north from the job site of Project N55 for approximately 40 miles to old U.S. Route 66; drive east on U.S. Route 66 for approximately 1 miles to State Route 6; drive north on State Route 6 for approximately 2 miles; enter Interstate 40 on exit 126 and drive west on Interstate 40 for approximately 73 miles; exit at mile marker 53 to Thoreau, NM; and drive north on State Route 371 for approximately 25 miles to Crownpoint, NM; this route would be reversed for the drive from the ENA-BOR office in Crownpoint, NM to the Project N55 job-site.

71.     On the afternoon of January 23, 2002, Mr. Pablo expressly authorized Larson to drive from the Sheraton Old Town Hotel to Ethridge Tire Center, 6201 Montgomery NE, Albuquerque to have the tires on his Government-owned vehicle checked for wear.

**F.     Proposed Findings Re: Larson's Location and Actions on January 25, 2002**

72.     On January 24, 2002, several of Larson's coworkers observed that he appeared to be ill, and Larson discussed the prospect of taking sick leave on January 25, 2002.

73.     On January 25, 2002, Larson did not travel to the Project N55 job-site and did not report for work at 7:00 a.m. or at any time thereafter.

74.     If Larson had intended to report for work at the Project N55 job-site by 7:00 a.m. on January 25, 2002, he needed to depart from the motel by 5:30 a.m. because it takes approximately an hour and a half to travel from that motel to the Project N55 job-site.

75.*    At 6:55 a.m. on January 25, 2002, Larson checked out of the Super 8 Motel at 6030 Iliff Road N.W. on Albuquerque's west side, where he typically stayed while working on Project N55.

76.*    At 6:55 a.m. on January 25, 2002, Larson used his personal cellular telephone to call the Project N55 field office.

77.     When Larson called the Project N55 field office at 6:55 a.m. on January 25, 2002, he spoke with Janet Ladd, a CHEU employee and told her that he was sick and would not be coming into work that day.

78.     At 6:57 a.m. on January 25, 2002, Larson used his personal cellular telephone to call Lucy Apache, a woman with whom he had a personal relationship and whom he had socialized the evening before, and obtained directions to the apartment at which she was staying located in the vicinity of Tennessee and Marquette NE in Albuquerque.

79.     At approximately 7:30 a.m. on January 25, 2002, Larson arrived at the apartment complex at Tennessee and Marquette NE in Albuquerque in his white Government-owned vehicle where he had a conversation with Ms. Apache.

80.     At 7:33 a.m. on January 25, 2002, Larson used Ms. Apache's cellular telephone to call the Project N55 field office; he spoke with Ms. Ladd, Victor Castillo, a CHEU employee, and his coworker Deanne Seumptewa and told them that he would not be coming into work that day because he was sick.

81.     On January 25, 2002, the CHEU and ENA-BOR employees who were on the job at Project N55 did not see Larson at the job-site and did not hear his voice over the two-way radio at any time over the course of the day.

82.     Because the ENA-BOR's leave policy required that an employee notify his immediate supervisor if he intends to take sick leave, during the 7:33 a.m. telephone call, Ms. Seumptewa asked Larson whether he had notified Mr. Pablo that he was taking sick leave; Larson responded affirmatively.

83.*    Mr. Pablo did not receive a call from Larson notifying him that Larson intended to take sick leave on January 25, 2002

84. *   Mr. Pablo did not receive any telephone calls at all from Larson on January 25, 2002, and did not otherwise speak with or see Larson on that day.

85.     Because Larson did not request permission to take sick leave from Mr. Pablo on January 25, 2002 as required by the official leave policy, Larson was placed on AWOL (absent without leave) status for January 25, 2002 and was not paid for that day.

86.     Larson remained in the vicinity of the apartment complex at Marquette and Tennessee in Albuquerque until at least 10:00 a.m. on January 25, 2002.

87. *   At 11:24 a.m. on January 25, 2002, Larson withdrew $40.00 in cash from an ATM machine on East Lomas Blvd. NE in Albuquerque.

88.*    At 11:55 a.m. on January 25, 2002, Larson purchased a 12-pack of Bud-Lite beer at the Smith's Supermarket at 111 Coors Road SE in Albuquerque.

89.     In the afternoon of January 25, 2002, Larson drove his Government-owned truck to the Dairy Queen in the Laguna Travel Center, which is located at exit 140 off of Interstate 40, where he purchased a "to go" meal and then drove away.

90.     Larson smelled of alcohol and appeared to be intoxicated while in the Dairy Queen at the Laguna Travel Center.

91.     Sometime between 12:30 p.m. and 1:00 p.m. on January 25, 2002, Larson knocked on the door of Marvin Yazzie's home in Canoncito, New Mexico and asked Marvin Yazzie for directions to the residence of someone named "Alonzo."

92.     At approximately 1:45 p.m. on January 25, 2002, Larson drove his Government-owned truck to the Canoncito Grocery Store, which is located just north of exit 131 (the To'hajiilee exit) off of Interstate 40; there, Larson got out of his Government-owned truck, briefly entered the Canoncito Grocery Store, and then drove away in his truck.

**G.     Proposed Findings Re: January 25, 2002 Collision**

93.*    Shortly before 1:53 p.m. on January 25, 2002, Larson drove his Government-owned truck onto the east-bound lane of Interstate 40 and began traveling the wrong way on the east-bound lane against oncoming traffic.

94.     While Larson was drove his Government-owned truck the wrong way on the east-bound lane of Interstate 40, at least 37 drivers took evasive action to avoid collision with Larson.

95.*    At that time, a silver 2001 Cadillac in which Larry Beller, Rita Beller, Edward Ramaekers and Alice Ramaekers were traveling was proceeding east-bound on Interstate 40; Larry Beller was driving, Edward Ramaekers was in the front passenger seat and Alice Ramaekers and Rita Beller were in the back seat.

- 16 -

96.*   The silver 2001 Cadillac was owned by Edward and Alice Ramaekers who had authorized Larry Beller to drive their vehicle.

97.*   At approximately 1:53 p.m. on January 25, 2002, in the vicinity of mile marker 128 on Interstate 40, Larson's Government-owned truck collided head-on with the silver 2001 Cadillac in which Plaintiffs' decedents were traveling.

98.   The collision was witnessed by Lt. Michael Valverde of the New Mexico State Police who had been pursuing Larson for approximately two-miles in an unsuccessful effort to attract his attention and get him off the highway.

99.   Lt. Valverde observed that, immediately before the collision, Larry Beller and Edward Ramaekers were facing each other and engaged in conversation and Larry Beller was not looking at the highway in front of him.

100.   Lt. Valverde was on the scene of the collision within seconds after it occurred and observed that all four passengers in the silver Cadillac were dead.

101.   Larry Beller, Rita Beller, Edward Ramaekers and Alice Ramaekers died immediately upon impact as a result of the collision.

102.   Edward Ramaekers experienced no conscious pain and suffering between the time of impact and the time of death.

103.   Alice Ramaekers experienced no conscious pain and suffering between the time of impact and the time of death.

104.*   At the time of the collision, Larson was extremely inebriated.

105.   At the time of the collision, Larson was so inebriated that he was incapable of forming any intent with respect to his actions and conduct.

- 17 -

106.  *  A test performed approximately two hours after the collision revealed Larson's blood alcohol content to be .205.

107.*   The Ramaeker's Cadillac was totaled in the collision.

108.*   The fair market value of the Cadillac on the date of the collision was $31,588.00.

109.*   The Government-owned truck driven by Larson also was totaled in the collision.

110.*   Larson presently has no memory of the events of January 25, 2002.

111.    Larson presently has no memory of the events transpiring during the period beginning approximately one week before and ending approximately one week after January 25, 2002.

**H.    Proposed Findings Re: January 11, 2002**

112.*   On January 11, 2002, Larson drove his Government-owned truck to his uncle's house in Church Rock, New Mexico instead of returning it to the ENA-BOR Crownpoint office.

113.*   That evening, Ms. Perry had a telephone conversation with Larson's grandmother and learned Larson had arrived at the uncle's home in his Government-owned truck and in an intoxicated state.

114.*   Ms. Perry drove to the uncle's home in Church Rock to pick Larson up.  Once there, however, Ms. Perry realized that she could not return Larson's Government-owned truck to the ENA-BOR office that evening because she was not authorized to drive the vehicle and Larson was clearly too drunk to drive.

115.*   Larson spent the night in Church Rock and returned his Government-owned truck to the ENA-BOR office in Crownpoint on January 12, 2002.

- 18 -

116.*   On the evening of January 25, 2002, Ms. Seumptewa went to University Hospital in Albuquerque to see Larson after learning about the collision, and discussed Larson's misuse of his Government-owned truck on January 11, 2002 with Ms. Perry.

117.    To conceal his misconduct and prevent his supervisor from learning about it, Larson falsified his travel expense and time reports for the week of January 7-11, 2002, by noting that he had returned to the ENA-BOR office in Crownpoint at 3:30 p.m. on Friday, January 11, 2002.

118.    Ms. Seumptewa reported Larson's misuse of his Government-owned truck to Mr. Pablo on Monday, January 28, 2002.

119.    Before January 28, 2002, Mr. Pablo had been unaware that Larson failed to return his Government-owned truck to the ENA-BOR's office in Crownpoint at the end of the work day on January 11, 2002.

120.    Before January 28, 2002, Mr. Pablo did not learn that Larson had been driving his Government-owned truck on January 11, 20002 while intoxicated.

121.    Because Mr. Pablo did not learn of Larson's impropriety on January 11, 2002 before the January 25, 2002, he was unable to take disciplinary action against Larson.

**I.      Proposed Findings Re: Plaintiff's Entitlement to Wrongful Death Damages**

122.    Plaintiff Terry Pfeifer, Jerry Pfeifer (deceased), Doug Pfeifer, Brenda Krummel and Jeanne Guta were born to the union of decedent Alice Ramaekers and her first husband Frank Pfeifer.  Decedent Edward Ramaekers did not adopt Terry Pfeifer, Jerry Pfeifer (deceased), Doug Pfeifer, Brenda Krummel and/or Jeanne Guta when he married Alice Ramaekers or at any time thereafter.

123.    Michael Ramaekers, Mark Ramaekers and Kevin Ramaekers were born to the union of decedent Edward Ramaekers and his first wife Anne Ramaekers.  Decedent Alice Ramaekers did not adopt Michael Ramaekers, Mark Ramaekers and/or Kevin Ramaekers when she married Edward Ramaekers or at any time thereafter.

124.    Crystal Wood and Timothy Ramaekers were born to the union of Alice Ramaekers and Edward Ramaekers.

125.    At the time of his death in 1986, Jerry Pfeifer was unmarried and left no surviving children.

126.    The parents of all of Alice Ramaekers' grandchildren and step-grandchildren were living at the time of Alice Ramaekers' death.

127.    The parents of all of Edward Ramaekers' grandchildren and step-grandchildren were living at the time of Edward Ramaekers' death.

128.    At the time of Alice Ramaekers' death, all of her children and stepchildren had reached the age of majority.

129.    At the time of Edward Ramaekers' death, all of his children and stepchildren had reached the age of majority.

130.    At the time of her death, none of Alice Ramaekers' children, stepchildren, grandchildren or step-grandchildren lived in her home.

131.    At the time of his death, none of Edward Ramaekers' children, stepchildren, grandchildren or step-grandchildren lived in his home.

- 20 -

132.   At the time of her death, none of Alice Ramaekers' children, stepchildren, grandchildren or step-grandchildren was financially dependent upon Alice Ramaekers for support.

133.   At the time of his death, none of Edward Ramaekers' his children, stepchildren, grandchildren or step-grandchildren was financially dependent upon Edward Ramaekers for support.

134.   Alice Ramaekers retired on September 30, 1999 and had no intention to return to full-time employment.

135.   Edward Ramaekers retired on September 30, 1999 and had no intention to return to full-time employment.

## II.   PROPOSED CONCLUSIONS OF LAW

### A.   Scope Of Employment

1.   Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit. *FDIC v. Meyers*, 510 U.S. 471, 475 (1994). Sovereign immunity is jurisdictional in nature. *Id.* Thus, the terms of the United States' consent to be sued in any court define that court's jurisdiction to entertain the suit. *Id.*; *United States v. Sherwood*, 312 U.S. 584, 586 (1941). Waivers must be construed strictly in favor of the sovereign and not be enlarged beyond what the language requires. *Library of Cong. v. Shaw*, 478 U.S. 310, 318 (1986).

2.   The Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 1402, 2401(b), 2402, 2671-2680, grants the federal district courts jurisdiction over a certain category of claims

for which the United States has waived its sovereign immunity and rendered itself liable.

*Meyers*, 510 U.S. at 477.  This category includes claims that are:

> "[1] against the United States, [2] for money damages, . . . [3] for
> injury or loss of property, or personal injury or death [4] caused by
> the negligent or wrongful act or omission of any employee of the
> Government, [5] while acting within the scope of his office or
> employment, [6] under circumstances where the United States, if a
> private person, would be liable to the claimant in accordance with
> the law of the place where the act or omission occurred."

*Ibid.* (quoting 28 U.S.C. § 1346(b)(1); bracketed numerals added by Court).

      3.      A claim comes within this jurisdictional grant only if it alleges the six enumerated

elements set forth in the statute.  *Meyers*, 510 U.S. at 477.  *See also Baca v. United States*, 467

F.2d 1061, 1063 (10th Cir. 1972) ("To state a cause of action in a suit against [the United States],

plaintiffs must bring themselves within the sovereign grant of permission to sue, and without the

statutory exceptions retained.").  Accordingly, in order to establish jurisdiction under 28 U.S.C.

§1346(b), the plaintiff must prove that the employee in question was "acting within the scope of

his office or employment."  As stated in *Hubsch v. United States*, 174 F.2d 7, 9 (5th Cir.), *cert*

*granted*, 338 U.S. 814, *referred to district court pursuant to former 28 U.S.C. § 2677*, 338 U.S.

440 (1949):

> There can, therefore, be no jurisdiction in the Court to hear and
> determine claims against the Government under the Federal Tort
> Claims Act for any injury caused by the negligence of an employee
> who was not acting within the scope of his employment.  That is to
> say, the Government has not consented to be sued or to be liable
> for injuries caused by the negligent acts of its employees who are
> in and about their own personal and private enterprises.  The Court
> would have no jurisdiction to try a tort action against the United
> States which was not based upon acts within the scope of the
> employment or duty of a servant.

*See also Benavidez v. United States*, 998 F.Supp. 1225, 1228 (D. N.M. 1997) (quoting 28 U.S.C. § 1346(b) ("The jurisdiction of this Court over Plaintiff's claims against the United States for the acts of omissions of [Federal] employees is first dependent on whether [the employee in question] was 'acting within the scope of his office or employment' when he committed the acts alleged by the Plaintiff."), *rev'd on other grounds*, 177 F.3d 927 (10th Cir. 1999).

       4.     Under the FTCA, whether the employee of the United States was acting within the scope of is employment is determined by the doctrine of *respondeat superior* as applied in the state where the act or omission occurred.  *Williams v. United States*, 350 U.S. 857 (1955); *Richman v. Straley*, 48 F.3d 1139, 1145 (10th Cir. 1995); *Henderson v. United States*, 429 F.2d 588, 590 (10th Cir. 1970); *Leonard v. United States*, 235 F.2d 330, 333 (10th Cir. 1956).  In determining the extent of the United States' liability under the FTCA, however, "'scope of employment' sets the line."  *Primeaux v. United States*, 181 F.3d 876, 878 (8th Cir. 1999) (*en banc*) (quoting *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 423 (1995).  "Thus, even if state law extends a private employer's vicarious liability to employee conduct not within the scope of employment, the government's FTCA liability remains limited to employee conduct within the scope of employment, as defined by state law."  *Primeaux*, 181 F.3d at 878.

       5.     Under New Mexico law, an employee's act is in the course of his employment if:

> 1.  It was something fairly and naturally incidental to the employer's business assigned to the employee, and
> 2.  It was done while the employee was engaged in the employer's business with the view of furthering the employer's interest and did not arise entirely from some external, independent and personal motive of the employee.

New Mexico Jury Instruction, SCRA 1986, 13-407.  *See also White Auto Stores, Inc. v. Reyes*, 223 F.2d 298, 302 (10th Cir. 1955); *Richardson v. Glass*, 835 P.2d 835, 838 (N.M. 1992); *Miera*

*v. George*, 237 P.2d 102, 105 (N.M. 1951); *Childers v. Southern Pacific Co.*, 149 P. 307 (N.M. 1915); *Gonzales v. Southwest Security and Protection Agency, Inc.*, 665 P.2d 810 (N.M. App. 1983).

6.      Further, whether an employee was authorized or had permission to drive the employer's automobile is not determinative of whether the employee was acting within the scope of employment while operating the vehicle.  *See Benham v. All Seasons Child Care, Inc.*, 686 P.2d 978, 979-80 (N.M. App. 1984) (employee was not acting within scope of employment while driving employer's vehicle with permission on a personal mission); *Bryant v. Gilmer*, 639 P.2d 1212, 1214 (N.M. App. 1982) (employer is not responsible for negligence of employee even if employee had permission to use employer's car; rather, in order to be liable under master-servant theory, the automobile must have been used with employer's consent *and* the accident must have occurred within the scope of employment in facilitation of the employer's business); *Sanchez v. United States*, 177 F.2d 452, 453 (10th Cir. 1949) (applying New Mexico law) (Federal employee's operation of Government vehicle was not within scope of employment even though such use was authorized).  *See also* Fowler V. Harper, Fleming James, Jr., and Oscar S. Gray, The Law of Torts (2d ed. 1986) § 26.8 n.1 ("[T]he master's consent to the use of his instrumentalities (e.g., truck) for the servant's own purposes, such as a fishing trip, does not bring that use within the scope of employment.").

7.      Larson was outside the scope of his employment on January 25, 2002, because his actions on that day (i) were not fairly and naturally incidental to his employer's business; and (ii) were not done while he was engaged in his employer's business with a view of furthering his employer's interest, but instead arose entirely from Larson's own external, independent, and

- 24 -

personal motives.  *See* N.M.J.I. 13-407.   By substantially deviating from his authorized route of travel, Larson's actions were in no way incidental to his employer's business.  "If in the course of a business trip an employee makes a major deviation, major because of its duration in time or because of its nature, or both, it can be said that as a matter of law he as abandoned his employment."  *Carter v. Burn Construction Co., Inc.*, 508 P.2d 1324, 1327 (N.M. App. 1973). *See also Massey v. Beacon Supply Co.*, 371 P.2d 798, 803 (N.M. 1962) (where employee's deviation is marked and unusual, he is not in scope of employment); *Spradley v. United States*, 119 F. Supp. 292, 293 (D.N.M. 1954) (employee outside scope who "actually turns away from master's business and changes the course of the vehicle [from its authorized course]"); *Narney v. Daniels*, 846 P.2d 347, 356 (N.M. App. 1993) (employee was outside scope when auto accident was not reasonably close to authorized travel area).

8.     Larson pursued his own personal interests on January 25, 2002, rather than his employer's and was, therefore, outside the scope of his employment.  *Bryant v. Gilmer*, 639 P.2d 1212, 1214 (N.M. App. 1982) (to be within scope, employee's acts must have occurred in facilitation of master's business).  Even before he Larson checked out of his hotel room, he had embarked on a course of conduct that can only be considered a personal frolic because it was in no way incidental to his employer's business or to his job responsibilities.  Larson never reported to work at the N55 project on January 25, 2002, nor did he intend to do so.  Instead, Larson did not check out of his motel room until 6:55 a.m. that morning, too late to have reported to work on time.  *See Nabors v. Harwood Homes, Inc.*, 423 P.2d 602, 603 (N.M. 1967) (employee was not in scope when he had not yet arrived at the job-site, was not furthering his employer's business, and was using employer's truck for the personal benefit of his family).

9.      Instead of reporting for work or performing any work-related activities, Larson went to visit a personal acquaintance, Lucy Apache.  Larson remained on his personal frolic by loitering outside of the apartment complex in the Northeast Heights of Albuquerque for at least two and a half hours during which time he either was asleep or passed out, as opposed to pursuing his employer's business.  Still pursuing his personal agenda – after buying beer, getting lunch and drinking himself into an inebriated state – Larson went to Canoncito in search of someone named "Alonzo."  All of this conduct was far outside the scope of his employment and in no way was intended to further the employer's interests.  *See Sanchez v. United States*, 177 F.2d 452, 453 (10th Cir. 1949) (employee outside scope when he volunteered for activity unrelated to job duties and performed no act for benefit of United States); *Barela v. DeBaca*, 359 N.M. 138, 140 (N.M. 1961) (employee not in scope when he deviated from employer's mission and visited nightclub); *Valdez v. Warner*, 742 P.2d 517, 518 (N.M. App. 1987) (employee outside scope when he left place of employment to see about damage to his car); *Benham v. All Seasons Child Care, Inc*., 686 P.2d 978, 980 (N.M. App. 1984) (employee outside scope when she used employer's van to pick up and transport friends to church); *Caldwell v. Adams*, 367 S.W.2d 804, 806 (Tenn. App. 1962) (employee outside scope of employment when he stopped at café for two hours and drank to intoxication).

10.      Once an employee departs from the scope of his employment, he cannot reenter it, no matter how much he may desire to, until (i) he is again reasonably near the authorized space and time limits of his employment, and (ii) is acting with the intention of serving his employer's business.  *See Barela v. DeBaca*, 359 P.2d 138, 140 (N.M. 1961), *citing with approval* Restatement of Agency (2d) § 237 (1958).  In *Barela*, the New Mexico Supreme Court held that

an employee who had abandoned his employment by stopping at a nightclub, where he drank and danced for an hour and a half, had not reentered the scope of his employment when he was involved in an automobile accident, even though he had resumed his original purpose of acting on behalf of his employer at the time of the accident.  The Court concluded that, because the accident occurred beyond any reasonable time it should have taken the employee to make the trip on behalf of his employer, he was outside the scope of his employment.  *Id.*; *see also Carter*, 508 P.2d at 1327 (once employee made major deviation from employment, he was outside scope regardless of whether he returned to route of business trip).

11.     Here, the fatal collision occurred at approximately 1:53 p.m., far beyond any reasonable time it would have taken Larson to travel either to Project N55 or to the ENA-BOR office in Crownpoint from Albuquerque after checking out from his hotel room at 6:55 a.m. Accordingly, even if at the time of the fatal collision Larson was on his way to either of those locations and intended to resume his employment, he was not acting within the scope of his employment.  *See Barela v. DeBaca*, 359 P.2d at 140;  *Carter*, 508 P.2d at 1327.

12.     Moreover, Larson's state of extreme intoxication by the time he left Canoncito immediately before the collision precludes any possibility that he was acting with the requisite intent to serve his employer's business.   As a factual matter, assuming Larson still had any capacity for rational thought by this time, he must have been aware that if he showed up either at Project N55 or the Crownpoint office in his highly intoxicated state while operating a Government-owned vehicle, he would subject himself to termination of his employment.  Thus, if Larson had any wits about him, the only reasonable inference is that Larson intended to pursue a course like he took on Friday, January 11, 2002, when he drove his Government-owned truck

to his uncle's home to sober up, rather than returning to the Crownpoint office before the office

closed for the weekend.  Further, as a legal matter, Larson was so intoxicated by the time he left

Canoncito that he simply was incapable of forming the requisite intent of resuming his master's

business or reentering the scope of his employment.  *See Cronin v. Hertz Corp.*, 818 F.2d 1064,

1069 (2d Cir. 1987) (driver may become so intoxicated so as to preclude formation of intent to

return to employment); *Caldwell v. Adams*, 367 S.W.2d 804, 808 (Tenn. App. 1962) (same);

*Rosa v. United States*, 119 F. Supp. 623, 625 (D. Haw. 1954) (same); Annot., *Deviation from*

*Employment in Use of Employer's Car During Regular Hours of Work*, 51 A.L.R.2d 8, 32, 99

(1957).[2]

13.     On January 25, 2002, Larson substantially deviated from the scope of his

employment.  His actions that day were not incidental to his employer's business or in

furtherance of his employer's interests, but, instead, were entirely in pursuit of his own personal

motives.  After embarking on a personal frolic early on the morning of January 25, 2002, Larson

never resumed his job responsibilities or reentered his employment and was outside the scope of

his employment at the time of the fatal collision.  Therefore, the United States is not vicariously

liable for his actions.  *Romero v. Shelton*, 374 P.2d 301 (N.M.1962) *overruled on other grounds*

*by Archuleta v. Pina*, 519 P.2d 1175 (N.M.1974) (doctrine of *respondeat superior* applies only

when the employer/employee relationship existed in respect to the very thing from which the

---

[2] Alternatively, if Larson was capable of forming the intent to reenter the scope of his employment and was in the process of driving either to Project N55 or the Crownpoint office at the time of the collision, then his conduct in driving the wrong way on Interstate 40 for nearly three miles and knowingly putting everyone in his path in apprehension of imminent harmful contact also would necessarily be intentional.  In that event, Larson's conduct constituted the tort of battery and Plaintiff's claims would be barred by the FTCA's intentional tort exception.  28 U.S.C.  § 2680(h).

injury arose); *Chavez v. Ronquillo*, 612 P.2d 234, 236 (N.M. Ct. App. 1980) (employee outside

scope of employment at time of auto accident when he was intoxicated and there was no

evidence that he was furthering his master's business).

       **B.**    **Comparative Fault**

      14.    New Mexico has adopted the doctrine of comparative fault and abolished the

traditional doctrine of joint and several liability, subject to certain statutory exceptions. *See* New

Mexico Several Liability Act, N.M.S.A. § 41-3A-1; *Herrera v. Quality Pontiac*, 73 P.2d 181,

193 (N.M. 2003); *Reichert v. Atler*, 875 P.2d 379, 381-82 (N.M. 1994); *Barth v. Coleman*, 878

P.2d 319, 321-22 (N.M. 1994); *Bartlett v. New Mexico Welding Supply, Inc.*, 646 P.2d 579, 586

(N.M. App. 1982) (concluding that a defendant whose concurrent negligence caused injury to

plaintiff was only severally liable – liable solely for the percentage of the plaintiff's total

damages that corresponds to that defendant's comparative fault). Under New Mexico's doctrine

of comparative fault, the total damages suffered by the plaintiff are apportioned between all

parties in proportion to their fault. *Herrera v. Quality Pontiac*, 73 P.2d at 193. Defendant is not

liable for the percentage of fault attributable to other tortfeasors, or to any comparative fault of

the plaintiff. *Ibid.*

      15.    Exception (C)(2) to the New Mexico Several Liability Act (N.M.S.A. § 41-3A-

1(C)(2)), which retains joint and several liability with respect "to any persons whose relationship

to each other would make one person vicariously liable for the acts of the other," does not apply

in this case since Larson was acting outside the scope of his employment on January 25, 2002.

Thus, the United States is only severally liable for its share of comparative fault, if any, in

causing the fatal collision. N.M.S.A. § 41-3A-1.

16.     Moreover, the United States cannot be held jointly and severally liable under the New Mexico Court of Appeals' ruling in *Medina v. Graham's Cowboy, Inc.*, 827 P.2d 859 (N.M. App. 1992).  In *Medina*, the New Mexico Court of Appeals upheld a judgment determining that the owner of a bar was jointly and severally liable for injuries sustained by a patron who was assaulted by a doorman employed by the owner.  *Id.* at 864.  In so ruling, the *Medina* court noted that the case was one of first impression in that no prior New Mexico decision had "addressed what happens when one tortfeasor commits an intentional tort and a concurrent tortfeasor is negligent."  *See Medina*, 827 P.2d at 862.  The court further noted that the New Mexico Several Liability Act did not apply, since the complaint in the case was filed before the statute's effective date, and that in any event the statute did not "address the liability of a negligent tortfeasor when a co-tortfeasor committed and intentional tort."  *Ibid.*

17.     *Medina* is not controlling in this case for several reasons.  First, *Medina* is no longer good law, having been implicitly overruled by the New Mexico Supreme Court.  Finding no prior New Mexico cases which addressed the issue of a negligent tortfeasor's liability when another tortfeasor commits an intentional tort, the Court of Appeals in *Medina* followed a Kansas decision which it characterized as the only case in point from another jurisdiction.  *See Medina*, 827 P.2d at 862, *citing Kansas State Bank & Trust Co. v. Specialized Transp. Servs., Inc.*, 819 P.2d 587, 606 (Kan. 1991) (employer liable for all damages caused by intentional tort of negligently retained servant).   Subsequently, however, the New Mexico Supreme Court has specifically and repeatedly rejected the holding of the Kansas Supreme Court in *Kansas State Bank & Trust Co.  See Reichert v. Atler*, 875 P.2d at 626 (citing and rejecting *Kansas State Bank & Trust Co.*); *Barth v. Coleman*, 878 P.2d at 321 (noting and reaffirming *Reichert*'s rejection of

- 30 -

*Kansas State Bank & Trust Co.* and similar cases from other jurisdictions refusing to apportion

fault between negligent defendants and intentional tortfeasors); *Herrera v. Quality Pontiac*, 73

P.2d at 193 (quoting *Barth*).

18.     Second, insofar as *Medina* adopted a rule making the employer vicariously liable

for torts committed by an employee outside the scope of employment, such a rule could not be

applied in cases brought against the United States under the Federal Tort Claims Act.  The court

in *Medina* specifically recognized that the employee whose conduct was at issue in the case

before it had not acted within the scope of employment, but the court nevertheless held that the

employer was vicariously liable for the employee's intentional tort:

> We recognize that the traditional rule of respondeat superior does
> not apply in this case.  The district court found that [the
> employee's] tort was not committed within the course and scope of
> his employment with [the employer], presumably because [the
> employee's ] assault on [the plaintiff] was not in any way
> "actuated * * * by a purpose to serve" [the employer.  *Restatement
> (Second) of Agency, supra*, § 228(c)(1); *see id.* § 235.
> Nevertheless, we believe that it is a natural extension of the
> doctrine of respondeat superior to hold an employer who is liable
> for negligently hiring an intentional tortfeasor should be
> vicariously for the fault attributed to the tortfeasor-employee.

*Medina*, 827 P.2d at 863.  As already noted, however, "if state law extends a private employer's

vicarious liability to employee conduct not within the scope of employment, the government's

FTCA liability remains limited to employee conduct within the scope of employment, as defined

by state law." *Primeaux*, 181 F.3d at 878.  Accordingly, *Medina* could not be applied against the

United States in any event.

19.     Finally, this case is distinguishable from *Medina* in any event because Plaintiff

specifically contends that Larson was not an intentional tortfeasor.  *See Medina*, 827 P.2d at 864

("[A]n employer who has negligently hired an employee [is liable] for all damages arising from an *intentional* tort of the employee when the tort was a reasonably foreseeable result of the negligent hiring.") (emphasis added).  When an employer negligently entrusts an employee with an automobile and the employee then *negligently rather than intentionally* injures another while driving the vehicle outside the scope of his employment, the employer's fault must be compared with the fault of the negligent employee.  *See Ogden v. J.M. Steel Erecting, Inc.*, 31 P.3d 806, 810-11 (Ariz. App. 2001); *McCart v. Muir*, 641 P.2d 384, 389 (Kan. 1982).  Thus, since Larson's conduct does not constitute an intentional tort, *Medina's* holding which extended joint and several liability to a case in which an employer negligently hires an intentional tortfeasor-employee does not apply.[3]

**C.    Negligent Entrustment**

20.    New Mexico recognizes the tort of negligent entrustment of an automobile.  *See, e.g., Hermosillo v. Leadingham*, 13 P.2d 79, 84 (N.M. App. 2000); *DeMatteo v. Simon*, 812 P.2d 361, 363 (N.M. App. 1991); *Spencer v. Gamboa*, 699 P.2d 623, 624 (N.M. App. 1985); *McCarson v. Foreman*, 692 P.2d 537, 542 (N.M. App. 1984); *Bryant v. Gilmer*, 639 P.2d 1212, 1214 (N.M. App. 1982); *McKee v. United Salt Corp.*, 630 P.2d 1237, 1240 n.1 (N.M. App. 1980), *aff'd in relevant part and rev'd in other part*, 628 P.2d 310 (N.M. 1981).

21.    "'The rationale of the tort of the negligent entrustment cases is not founded upon the negligence of the driver of the automobile but upon the primary negligence of the entruster in

---

[3]  If, in the alternative, Larson's conduct were to constitute an intentional tort, then Plaintiffs' claims - including their claims for negligent entrustment, hiring, supervision, and retention - would be barred by 28 U.S.C. § 2680(h), the FTCA's intentional tort exception which retains the sovereign immunity of the United States with respect to "[a]ny claim arising out of assault, [or] battery."

supplying the chattel, an automobile, to an incompetent or reckless driver.'"  *McKee v. United*

*Salt Corp.*, 630 P.2d at 1240 n.1, *quoting Upland Mutual Ins., Inc. v. Noel*, 519 P.2d 737 (Kan.

1974).

22.     To establish a claim for injuries caused by the negligent entrustment of an

automobile, the plaintiff must show that the defendant entrusted his automobile to another whom

the defendant knew or should have known was an incompetent driver, and whose incompetence

caused the plaintiff's injuries.  *Hermosillo v. Leadingham*, 13 P.2d at 84; *Spencer v. Gamboa*,

699 P.2d at 624.  The defendant is not liable for injuries sustained by another simply because he

owns the vehicle and permits another to operate it.  *Spencer v. Gamboa*, 699 P.2d at 624;

*Bryant v. Gilmer*, 639 P.2d at 1214.  Thus, in the absence of evidence that the defendant knew or

should have known of the driver's incompetence, the defendant cannot be held liable under a

theory of negligent entrustment.  *See Bryant v. Gilmer*, 639 P.2d at 1214.

23.     Here, the evidence is insufficient to establish that the defendant knew or should

have known of Larson's incompetence.  As of the date of the collision in which the decedents

were killed, Larson possessed a valid New Mexico driver's license, which was evidence of his

competency to operate motor vehicles.  *See Spencer v. Gamboa*, 699 P.2d at 625 (possession of a

driver's license indicative of driver's competence, but lack thereof is in itself no evidence of

incompetence).  Further, more than four years had elapsed since Larson's last conviction for

driving while intoxicated, a lapse of time which renders his prior conviction of little or no

relevance in determining his competence to operate motor vehicles.  *See Bryant v. Gilmer*, 639

P.2d at 1214 (undisputed evidence that driver had not had any accidents in nine months

preceding the accident precluded imposition of liability for negligent entrustment).  Finally, none

of Larson's prior traffic offenses involved the operation of a Government-owned vehicle; to the contrary, all of Larson's prior offenses, including specifically all his prior drunk driving arrests and convictions, involved Larson's operation of his privately owned vehicles during non-duty hours.  *Cf. McCarson v. Foreman*, 692 P.2d at 542 (evidence of driver's habits concerning use of company truck, including prior DWI citation and conviction and drug use during or close to time truck was driven is admissible to prove negligent entrustment).

### D.   <u>Negligent Hiring, Training, Retention And Supervision</u>

24.      New Mexico also recognizes the torts of negligent hiring, negligent supervision, negligent training, and negligent retention of an employee.  *See, e.g., Los Ranchitos v. Tierra Grande, Inc.*, 861 P.2d 263, 269 (N.M. App. 1993); *Narney v. Daniels*, 846 P.2d 347, 356 (N.M. App. 1993); *Medina v. Graham's Cowboys, Inc.*, 827 P.2d 859, 861 (N.M. App. 1992); *Valdez v. Warner*, 742 P.2d 517, 519-20 (N.M. App. 1987); *Pittard v. Four Seasons Motor Inn, Inc.*, 688 P.2d 333, 340 (N.M. App. 1984); *Gonzalez v. Southwest Security and Protection Agency, Inc.*, 665 P.2d 810, 812-13 (N.M. App. 1983); *F&T Co. v. Woods*, 594 P.2d 745, 747-48 (N.M. 1979).

25.      An employer may be held liable in tort for negligent hiring, negligent supervision, negligent training, or negligent retention of an employee even though it is not responsible for the wrongful acts of the employee under the doctrine of respondeat superior.  *Los Ranchitos v. Tierra Grande, Inc.*, 861 P.2d at 269.  Instead, the liability flows from a direct duty running from the employer to those members of the public whom the employer might reasonably anticipate would be placed in a position of risk of injury as a result of the hiring or retention of the employee.  *Narney v. Daniels*, 846 P.2d at 356; *Medina v. Graham's Cowboys, Inc.*, 827 P.2d at 861; *Valdez v. Warner*, 742 P.2d at 519.

- 34 -

26.     In order for the employer to be liable under the theory of negligent hiring or retention, there must be evidence that the employee was unfit, considering the nature of the employment and the risk he posed to those with which he would foreseeably associate, and that the employer knew or should have known of that the employee was unfit. *Valdez v. Warner*, 742 P.2d at 519; *F&T Co. v. Woods*, 594 P.2d at 747.

27.     In addition, the negligent hiring or retention of the employee must have been the proximate cause of the injury. *Valdez v. Warner*, 742 P.2d at 520; *F&T Co. v. Woods*, 594 P.2d at 747-48. The proximate cause of an injury is that which in the natural and continuous sequence unbroken by any knew and independent causes produces the injury and without which the injury would not have occurred. *Pittard v. Four Seasons Motor Inn, Inc.*, 688 P.2d at 340; *F&T Co. v. Woods*, 594 P.2d at 747-48. Foreseeability is imposed to preclude a finding of liability where defendant's conduct was part of the causal chain of the injury but the resulting injury could not have been reasonably foreseen by the defendant. *Pittard v. Four Seasons Motor Inn, Inc.*, 688 P.2d at 340.

28.     On October 7, 1987, shortly after Larson was hired, BIA acted appropriately to rescind Larson's authorization to operate Government-owned vehicles because of his past driving record. Larson's authorization to operate Government-owned vehicles was reinstated effective August 13, 1993, after his New Mexico driver's license was reinstated. Thereafter, Larson's New Mexico driver's license was revoked at various times during the years 1994 through 1996. During these times, Larson was permitted to operate a government-owned vehicle on several occasions when BIA was on notice that he did not possess a valid state driver's license. Assuming *arguendo* that BIA was negligent in its supervision of Larson during these

- 35 -

periods, such negligence was not the proximate cause of the collision on January 25, 2002, in which Plaintiff's decedents were killed because it was not reasonably foreseeable that such negligence would result in injury years later. *See F&T Co. v. Woods*, 594 P.2d at 747-48 ("[T]he question of 'foreseeability' or 'proximate cause' must be resolved before defendant's liability can be determined. It is not enough that plaintiff prove that defendant was negligent in hiring or retention of [the employee]. In addition, plaintiff must prove that the negligent hiring or retention was the proximate cause of the [injury].").

29.     As of the date of the collision in which the decedents were killed, more than four years had elapsed since Larson's last conviction for driving while intoxicated. Although Larson was arrested on two occasions for driving while intoxicated in the year immediately preceding the collision, neither arrest resulted in a conviction or the revocation of Larson's New Mexico driver's license. Moreover, only one of these arrests came to BIA's attention, and Larson's immediate supervisor, Bobby Pablo, acted appropriately by confronting Larson about the matter. Larson protested his innocence, and produced proof that he still possessed a New Mexico driver's license and documents showing that the charges had been dismissed. Finally, on January 14, 2002, as part of the semi-annual check of ENA-BOR employees to determine whether they possessed valid State driver's licenses, Larson produced his New Mexico driver's license, which had been issued on June 19, 2000, and this license remained valid on January 25, 2002. Under these circumstances, BIA's supervision and retention of Larson was not negligent. *See F&T Co. v. Woods*, 594 P.2d at 749.

- 36 -

E. **Damages**

30.     The elements of damages that are recoverable in a wrongful death action under

New Mexico law are enumerated in New Mexico Uniform Jury Instruction (Civil) 13-1830,

N.M.R.A.  Assuming that Plaintiff prevails on any part of his case, however, he is not entitled to

all the elements of damages that are enumerated in this jury instruction.  As stated to the

Directions for Use that are appended to the instruction:

> It is important to note that the elements of damages listed in the
> instruction may not all be recoverable by the same person or entity.
> For example, a personal representative is not entitled to recover for
> a surviving spouse's or a familial caretaker's loss of consortium
> unless the personal representative is one and the same as the
> surviving spouse or the family caretaker.  Similarly, the personal
> representative may not always recover each of the elements of
> damages depending upon the evidence produced at trial.  If there
> are no minor children, item 7 [*i.e.*, the loss of guidance and
> counseling ti the deceased's minor children] should be excluded.
> * * * Only those elements of supported by the evidence are to be
> included in the instructions given the jury.

N.M. UJI (Civil) 13-1830, N.M.R.A., Directions for Use.

31.     In addition, N.M. UJI (Civil) 13-1830 makes clear that certain elements of

damages are not recoverable in wrongful death actions under New Mexico law.  Thus, the very

last sentence of New Mexico's wrongful death damages instruction specifically instructs jurors:

> You must not permit the amount of damages to be influenced by
> sympathy or prejudice, or by *the grief or sorrow of the family*, [or
> the *loss of the deceased's society to the family*].

N.M. UJI (Civil) 13-1830, N.M.R.A. (bracketed material in original).  *See also id.*, Directions for

Use ("If the personal representative is not the surviving spouse or familial caretaker, the

damages in item 6 [*i.e.*, the emotional distress to the spouse, parent(s), grandparent(s), or other

familial caretaker caused by loss of (as appropriate) decedent's society, guidance,

- 37 -

companionship, and/or sexual relations] should not be included in the instructions, and the bracketed language in the last sentence should remain in the instruction.").

32.    Wrongful death plaintiffs in New Mexico may recover only for the conscious pain and suffering of a decedent.  *Haceesa v. United States*, 309 F.3d 722, 734 (10th Cir. 2002) (noting that the New Mexico Wrongful Death Act permits an award of damages for a "decedents conscious pain and suffering . . . between the date of injury and death."); *Rival v. Atchison, Topeka and Santa Fe. Ry. Co.*, 306 P.2d 648, 654 (N.M. 1957 ("The rule is stated that if the [decedent] lives for any appreciable length of time there may be recovery to the beneficiaries for the pain and suffering endured by him while conscious.").  Generally, there is no recovery of damages for pain and suffering without a showing of conscious suffering.  *See* 22 Am. Jur. 2d Damages § 250 ("[N]o recovery of damages for pain and suffering is allowed when death is instantaneous."); *Great N. Ry. Co. v. Capital Trust Co.*, 242 U.S. 144, 147 (1916) (establishing that decedent must be conscious for an appreciable period of time after sustaining injuries to allow recovery for predeath pain and suffering); *Alexander v. Whitman*, 114 F.3d 1392, 1399 (3d Cir. 1997) ("[A]n award for pain and suffering is appropriate only for pain and suffering that is conscious."); *Ghotra v. Bandila Shipping,* Inc., 113 F.3d 1050, 1060-61 (9th Cir. 1997) (it is well-established that decedent must be conscious for an appreciable period of time for predeath pain and suffering damages); *Nichols v. Marshall*, 48 F.2d 791, 793 (10th Cir. 1973) ("[P]ain and suffering must be realized by the injured party before it is compensable . . . .").  Because there is no evidence that either Edward or Alice Ramaekers were conscious for any appreciable period of time between injury and death, no damages for conscious pain and suffering experienced by the decedents may be awarded in this action.

- 38 -

33.     Furthermore, no damages may be awarded for the grief or sorrow experienced by the family of Edward and Alice Ramaekers by reason of their deaths. N.M. UJI (Civil) 13-1830, N.M.R.A. Nor may any damages be awarded for the emotional distress that the adult children, adult stepchildren, minor grandchildren, or minor step-grandchildren of Edward and/or Alice Ramaekers experienced by reason of the loss of either or both decedents' society, guidance, or companionship. *Ibid.*[4]

34.     The New Mexico Wrongful Death Act, N.M.S.A. § 41-2-3, provides that in assessing damages the fact finder may "tak[e] into consideration pecuniary injury resulting from the death to the surviving party entitled to the judgment, or any interest in the judgment * * *." Accordingly, New Mexico's Uniform Jury Instruction on wrongful death damages states that in awarding damages the jury may "consider the loss to the beneficiaries of other expected benefits that have a monetary value." N.M. UJI (Civil) 13-1830 (item 8), N.M.R.A. Such benefits having monetary value encompass services rendered by the decedent or the decedents to the statutory beneficiaries, such as plumbing, carpentry and electrical work. *See Lujan v. Gonzales*, 501 P.2d 673, 684-85 (N.M. App. 1972). In order to be a recoverable item of damages, however, the recipient of such services must have been a statutory beneficiary under New Mexico's Wrongful Death Act. *See Lujan*, 501 P.2d at 685 (noting that the recipients of the services were the decedent's wife and children, who were the distributees of the wrongful death award under the statute).

---

[4]Even if damages for loss of the decedents' society and companionship were recoverable under New Mexico law, such damages could not be awarded in this case because no administrative claims seeking such damages were presented under the Federal Tort Claims Act. *See Haceesa v. United States*, 309 F.3d 722, 733-34 (10th Cir. 2002) (claims by wife for loss of decedent's consortium is separate from claim under wrongful death statute).

35.     The only statutory beneficiaries with respect to the action brought by Plaintiff Terry Pfeifer as personal representative of Edward Ramaekers, deceased, are the surviving children of Edward Ramaekers, *i.e.*, Michael Ramaekers, Mark Ramaekers, Kevin Ramaekers, Crystal Wood, and Timothy Ramaekers.  The stepchildren of Edward Ramaekers, *i.e.*, Terry Pfeifer, Jerry Pfeifer (deceased), Doug Pfeifer, Brenda Krummel, and Jeanne Guta, none of whom ever were adopted by Edward Ramaekers, are not statutory beneficiaries with respect to the action brought by Plaintiff Terry Pfeifer as personal representative of Edward Ramaekers, deceased.  *See* N.M.S.A. § 41-2-3 (defining "child" by reference to New Mexico Probate Code); N.M.S.A. § 45-1-201 (defining "child" to exclude "a person who is only a stepchild"); *Otero v. City of Albuquerque*, 965 P.2d 354, 359-60 (N.M. App. 1998) (decedent's minor stepchild not entitled to recover damages for loss of parental guidance and counseling).  Accordingly, no damages may be awarded for any loss of expected benefits having monetary value that Terry Pfeifer, Jerry Pfeifer (deceased), Doug Pfeifer, Brenda Krummel, and Jeanne Guta may have sustained as a result of the death of Edward Ramaekers.

36.     Similarly, the only statutory beneficiaries with respect to the action brought by Plaintiff Terry Pfeifer as personal representative of Alice Ramaekers, deceased, are the surviving children of Alice Ramaekers, *i.e.*, Terry Pfeifer, Doug Pfeifer, Brenda Krummel, Jeanne Guta, Crystal Wood, and Timothy Ramaekers.  The stepchildren of Alice Ramaekers, *i.e.*, the Michael Ramaekers, Mark Ramaekers, and Kevin Ramaekers, are not statutory beneficiaries with respect to the action brought by Plaintiff Terry Pfeifer as personal representative of Alice Ramaekers, deceased.  *See* N.M.S.A. § 41-2-3; N.M.S.A. § 45-1-201; *Otero v. City of Albuquerque*, 965 P.2d at 359-60.  Accordingly, no damages may be awarded for any loss of expected benefits having

monetary value that Michael Ramaekers, Mark Ramaekers, and Kevin Ramaekers may have sustained as a result of the death of Alice Ramaekers.

37.     None of the grandchildren and step-grandchildren of Edward or Alice Ramaekers is a statutory beneficiary with respect to the either of the actions brought by Plaintiff Terry Pfeifer as personal representative of Edward Ramaekers or Alice Ramaekers, deceased.  Under New Mexico's wrongful death statute, grandchildren may become statutory beneficiaries "by right of representation."  N.M.S.A. § 41-2-3C ("if there is no husband or wife, but a child or grandchild, then to such child and grandchild by right of representation); N.M.S.A. §§ 45-2-103, 45-2-106 (prescribing how grandchildren take by representation).  Since none of the parents of Edward or Alice Ramaekers' grandchildren and step-grandchildren predeceased Edward or Alice Ramaekers, none of their grandchildren or step-grandchildren have any "right of representation" under New Mexico law.  *Ibid.*   Accordingly, no damages may be awarded for any loss of expected benefits having monetary value that the grandchildren or step-grandchildren of Edward and Alice Ramaekers sustained by the reason of their deaths.

38.     Finally, certain damages, even if recoverable under New Mexico law, cannot be recovered against the United States in an action under the Federal Tort Claims Act.  *See* 28 U.S.C. § 2674 (punitive damages cannot be awarded against United States).  Plaintiff's claim for multiplication of damages based on the aggravating circumstances attending the deaths of Edward and Alice Ramaekers have been stricken by the Court because such an award is prohibited by 28 U.S.C. § 2674.  *See Beller v. United States*, 296 F.Supp.2d 1277 (D. N.M. 2003).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID C. IGLESIAS
United States Attorney
District of New Mexico

JAN ELIZABETH MITCHELL
ELIZABETH M. MARTINEZ
Assistant United States Attorneys
District of New Mexico

JAMES G. TOUHEY, JR.
Senior Trial Counsel
Civil Division, Torts Branch

<u>Electronically Filed on 03/15/04</u>
TRACI L. COLQUETTE
Trial Attorney
Civil Division, Torts Branch
U.S. Department of Justice
P.O. Box 888, Ben Franklin Station
Washington, DC  20044
Tel.: (202) 305-7536
Fax: (202) 616-5200
Attorneys for Defendant
UNITED STATES OF AMERICA

## <u>CERTIFICATE OF SERVICE</u>

   I HEREBY CERTIFY that a copy of the foregoing pleading was mailed on March 15, 2004 to the following counsel of record for Plaintiff Pfeifer:

Randi McGinn
Kathleen Love
McGinn & Carpenter, P.A.
420 Central SW, Suite 200
Albuquerque, NM 87102


<u>Electronically Filed on 03/15/04 </u>
ELIZABETH M. MARTINEZ
Assistant United States Attorney