IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO



04 MAR 15  PM 4: 31

TERRY PFEIFER, as Personal Representative of
EDWARD RAMAEKERS and ALICE RAMAEKERS,
deceased,

        Plaintiffs,

vs.                      CIVIL NO. 02-1368 WPJ/LFG (ACE)

UNITED STATES OF AMERICA,

        Defendant.

### PLAINTIFF PFEIFER'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Terry Pfeifer, through his attorneys McGinn, Carpenter, Campbell,

Montoya & Love, P.A. (MCCML), submits the following Proposed Findings of Fact and

Conclusions of Law:

### FINDINGS OF FACT

1.      The United States government owned the white pick up truck involved in the head

on collision with Bud and Alice Ramaekers on January 25, 2002.

Amended Pretrial Order, Stipulated Fact No. 33.

2.      The United States government provided the white pick up truck to Lloyd Larson

and authorized him to drive it for the entire month of January, 2002, at various

locations, including between Albuquerque and the N-55 jobsite and Crownpoint.

Amended Pretrial Order, Stipulated Facts Nos. 28, 31, 32, 33.

Plaintiff's Exhibits 86 – 89.



3.     The United States government first provided Lloyd Larson with a government
       vehicle in 1988 and continuously allowed him to drive a government vehicle
       without restriction for 15 years, including through January 25, 2002.

Testimony of Lloyd Larson, Paula Puente, Michele Justice, John Lovejoy, David Jones,
Bobby Pablo, Jimmy Martinez, Harold Slim.

4.     Lloyd Larson was an employee of the United States government and the Bureau
       of Indian Affairs (BIA) Department of Roads in the Navajo Region from 1987
       through January 25, 2002.

Amended Pretrial Order, Stipulated Fact No. 22.

Testimony of Lloyd Larson, Paula Puente, John Lovejoy, David Jones, Bobby Pablo.

5.     At the time he was hired, the BIA knew that Mr. Larson had a bad driving record
       (including a 1986 automobile accident and at least one arrest on the Navajo
       Nation for DWI on July 26, 1986) and had a suspended state driver's license in
       1986, 1987 and 1988.  His driving problems and license suspension were related
       to his alcohol abuse.

Plaintiff's Exhibits Nos. 2, 3, 4, 5.

Amended Pretrial Order, Stipulated Fact No. 1.

Testimony of Lloyd Larson.

6.     Under the BIA rules and policies in existence at the time, Mr. Larson should
       probably never have been hired for a position where driving was required and
       should never have been authorized to drive a government vehicle.

Plaintiff's Exhibits Nos. 56 – 72.

Testimony of Alfred Abeita, James Dean, Eloise Chicharello.

7.      Despite Mr. Larson's bad driving record and driver's license suspensions, in
        1988. the BIA authorized him to drive a government vehicle and provided him a
        vehicle for his regular use.

Testimony of Lloyd Larson, John Lovejoy, David Jones, Paula Puente.

8.      Mr. Larson's authorization to drive a government vehicle was never revoked by
        the government from 1988 until after the collision on January 25, 2002.   He was
        provided a government vehicle to drive out of town, without supervision during
        that time period.

Testimony of Lloyd Larson, John Lovejoy, David Jones, Paula Puente, Harold Slim.
Jimmy Martinez, Eloise Chicharello.

9.      From 1988 to the present, the United States government has had the ability to
        obtain state driving records reflecting the DWI arrests and convictions of its
        employees.

Testimony of MVD Records Supervisor Curt Sanchez or designee, Navajo Nations
Records Custodian, Alfred Abeita, Eloise Chicharello, Paula Puente, Michele Justice,
Augustine Abeita, James Dean.
Plaintiffs Exhibits Nos. 38, 48. 53, 90, 91.

10.     From 1988 to the present, the United States government has had the ability to
        obtain records from the Navajo Nation which would reflect the DWI arrests and
        convictions of its employees.

Testimony of Augustine Abeita. Alfred Abeita, Eloise Chicharello, James Dean, Navajo
Nation Records Custodian.

11.     From May 31, 1989 – March 30, 1994, the Department of the Interior and the BIA
        had a policy that required the immediate suspension of driving privileges of an
        employee who had a DWI conviction, had his drivers license suspended or
        otherwise had an unsafe driving record.

Plaintiff's Exhibits Nos. 58, 60, 61, 62, 65, 68, 70, 71.

Testimony of Eloise Chicharello, David Jones, John Lovejoy, Paula Puente.

12.     During the time that Lloyd Larson worked for the BIA, CFR regulations
        established minimum procedures to ensure the safe and efficient operation of
        government vehicles.  They required that operators of government vehicles
        possess a safe driving record.  They also required that an agency take appropriate
        action against an employee who is convicted of DWI, whose license is revoked or
        suspended, or who is not capable of safely driving a motor vehicle.

Plaintiff's Exhibits No. 57.

Testimony of Eloise Chicharello.

13.     On June 10, 1990, Lloyd Larson was arrested for DWI and was convicted on July
        31, 1990 in Navajo Tribal Court.

Amended Pretrial Order, Stipulated Fact No. 2.

Plaintiff's Exhibit No. 6.

14.     On August 30, 1990, Lloyd Larson paid a $50 fine on a Navajo Nation traffic
        ticket and complaint for driving without a valid state driver's license.

Amended Pretrial Order, Stipulated Fact No. 3.

Plaintiff's Exhibit No. 7.

15.     On December 28, 1991, Lloyd Larson paid a $50 fine on a Navajo Nation traffic ticket and complaint for driving without a valid state driver's license.

Amended Pretrial Order, Stipulated Fact No. 4.

Plaintiff's Exhibit No. 8.

16.     On March 20, 1993, Lloyd Larson was arrested on the Navajo Nation for DWI and driving without a valid license. He pled guilty to that charge, was convicted and received a deferred sentence in Navajo Tribal Court.

Amended Pretrial Order, Stipulated Fact No. 5.

Plaintiff's Exhibit No. 11.

Testimony of Navajo Nation Record Custodian.

17.     On January 1, 1994, Lloyd Larson was arrested for DWI in Gallup, N.M. and prosecuted in McKinley County. He pled guilty and was convicted of that charge on January 4, 1994 in state court and sentenced to 3 days in jail, plus DWI school. Stipulation No. 6. As a result of this conviction, his state driver's license was suspended for one year. Stipulation 13.

Amended Pretrial Order, Stipulated Facts Nos. 6, 13.

Plaintiff's Exhibits Nos. 15, 17.

18.     On February 21, 1994, Lloyd Larson was arrested for DWI and driving with a revoked license while driving on Interstate 40. On March 31, 1994, he pled guilty and was convicted in state court. Stipulation No. 7. As a result of this arrest, his state driver's license was suspended for one year. Stipulation 14.

Amended Pretrial Order, Stipulated Facts Nos. 7, 14.

Plaintiff's Exhibit No. 21.

19.   In 1993-1994, BIA security specialist James Dean informed the BIA Department
      of Roads about numerous employees who had DWI convictions and unsafe
      driving records, with a recommendation that the Department follow BIA policy
      and either terminate the employees or immediately suspend their driving
      privileges.

Testimony of James Dean.

20.   The BIA Department of Roads did not follow the recommendations of its
      security specialist or its own policies and continued to allow these employees to
      drive government vehicles without restriction or supervision. Instead, the
      Department of Roads requested that security specialist Dean do no more
      background investigations into the driving records of its employees.

Testimony of James Dean.

21.   Between 1989-1995, Mr. Larson was supervised by Jimmy Martinez. Harold
      Slim, David Jones and John Lovejoy, who were all employees and supervisors for
      the BIA and the United States government at the time they were supervising
      Lloyd Larson.

Testimony of Lloyd Larson, Jimmy Martinez, Harold Slim, David Jones, John Lovejoy.

22.   It was the BIA supervisors' responsibility to ensure that employees have safe
      driving records before being allowed to drive a government vehicle and to remove
      the driving privileges of any employee who was not a safe driver.

Testimony of Eloise Chicharello.

Plaintiff's Exhibits Nos. 60, 61, 65, 71.

23.    Between 1989 – March 31, 1994, Mr. Larson's BIA supervisors were made
       aware of each of his 4 DWI arrests and convictions and were informed that his
       driver's license had been suspended as a result of some of those convictions.

Testimony of Lloyd Larson, David Jones, John Lovejoy, Bobby Pablo.

Amended Pretrial Order, Stipulated Fact No. 27.

Plaintiff's Exhibits Nos. 9, 10, 16.

24.    Instead of following BIA policy and either terminating Mr. Larson's employment
       or taking away the keys to Mr. Larson's government vehicle, his supervisors
       continued to allow him to drive a government vehicle without restriction.

Testimony of Lloyd Larson, John Lovejoy, David Jones, Bobby Pablo, Harold Slim,
Jimmy Martinez, Eloise Chicharello.

25.    Despite his knowledge of Mr. Larson's DWI convictions and unsafe driving,
       BIA supervisor Jimmy Martinez helped Lloyd Larson apply for a limited driver's
       license in March, 1994, so Larson could continue to drive a government vehicle.
       As a result of Supervisor Martinez' efforts, Mr. Larson received a limited state
       driver's license for one year from March 21, 1994 – March 21, 1995.

Testimony of Jimmy Martinez, Lloyd Larson, MVD Records Supervisor Curt Sanchez or
designee.

Plaintiff's Exhibit No. 22.

26.    In the two years from 4/30/93 through 4/20/95, Lloyd Larson was Absent Without
       Leave (AWOL) from his employment with the BIA at least 27 different days,
       often for a week at a time, without explanation. These AWOLs were a result of
       his severe drinking problem.

Testimony of Lloyd Larson, David Jones, Bobby Pablo, John Lovejoy, Harold Slim, Jimmy Martinez, Paula Puente.

Plaintiff's Exhibit Nos. 12, 13, 14, 16, 18, 19, 20, 23, 24, 25, 26, 27, 28, 29, 31, 32, 33.

27.    Mr. Larson's supervisors were aware of all his AWOLs and that they were connected to his problems with alcohol. Despite this knowledge, his supervisors never suspended or restricted his ability to drive a government vehicle.

Testimony of Lloyd Larson, David Jones, Bobby Pablo, John Lovejoy, Harold Slim, Jimmy Martinez.

28.    The BIA could have terminated Mr. Larson's employment after his 3rd AWOL, solely on the basis of being AWOL, but did not do so.

Testimony of Michele Justice, Paula Puente, David Jones, John Lovejoy, Eloise Chicharello, Jimmy Martinez, Harold Slim.

Plaintiff's Exhibit Nos. 73, 74, 75.

29.    The decision not to terminate Mr. Larson, but to give him lesser discipline, was made or approved by supervisors Slim, Jones, Lovejoy and BIA employee Paula Puente, who was acting within the scope of her employment in reviewing Mr. Larson's file and making her recommendations.

Testimony of Harold Slim, David Jones, John Lovejoy, Paula Puente.

Plaintiff's Exhibit Nos. 12, 13, 14, 19, 20, 26, 28, 29, 31, 32, 33.

30.    From March 30, 1994 – March 12, 1999, the Department of the Interior and the BIA had a policy requiring employees to have a valid state driver's license and a safe driving record before they could be allowed to drive a government vehicle.

Testimony of Eloise Chicharello.

8

Plaintiff's Exhibit Nos. 60, 62, 65, 68.

31.    On March 6, 1995, Lloyd Larson's driver's license was suspended for one year
       for his failure to pay damages caused by his alcohol-related automobile accident
       in 1986.

Amended Pretrial Order, Stipulated Fact No. 16.

Plaintiff's Exhibit No. 17.

Testimony of Lloyd Larson, MVD Records Supervisor Curt Sanchez or designee.

32.    On April 16, 1995, Lloyd Larson rolled his vehicle on I-40 while driving while
       intoxicated and fled the scene of the rollover. He was cited for DWI, careless
       driving, driving without a valid State license and leaving the scene of an accident.
       Stipulation 8.  A bench warrant was issued for his arrest after he failed to appear
       for trial and the charges were dismissed 5 years later, when Mr. Larson was
       finally located.

Amended Pretrial Order, Stipulated Fact No. 8.

Testimony of Lloyd Larson.

Plaintiff's Exhibit No. 30.

33.    On May 10, 1995, Lloyd Larson's drivers license was revoked for one year as a
       result of his failure to submit to a breath test after his April 16, 1995 rollover
       accident.

Plaintiff's Exhibit No. 17.

Testimony of Lloyd Larson, MVD Records Supervisor, Curt Sanchez, or designee.

Amended Pretrial Order, Stipulated Fact No. 17.

34.     Mr. Larson's state driver's license remained suspended or revoked from March 6,

        1995 until June 7, 1996, when he applied to have it re-issued.

Amended Pretrial Order, Stipulated Fact No. 18.

Plaintiff's Exhibit No. 17.

Testimony of Lloyd Larson, MVD Records Supervisor, Curt Sanchez, or designee.

35.     On July 13, 1997, Lloyd Larson was arrested for DWI in Sanders, Arizona, pled

        guilty and was convicted of DWI on September 25, 1997, when he was sentenced

        to 24 hours in jail.

Amended Pretrial Order, Stipulated Fact No. 9.

Plaintiff's Exhibit No. 37.

Testimony of Lloyd Larson.

36.     On December 10, 1997, Lloyd Larson's state driver's license was suspended for

        failure to make child support payments and was reinstated on January 2, 1998.

Amended Pretrial Order, Stipulated Fact Nos. 19, 20.

Plaintiff's Exhibit No. 17.

Testimony of Lloyd Larson, MVD Records Supervisor Curt Sanchez, or designee.

37.     Mr. Larson informed his BIA supervisors of the rollover on I-40, his arrests for

        DWI, his DWI conviction and the suspension and revocation of his driver's

        license, all of which indicated that he did not have a safe driving record.

Testimony of Lloyd Larson.

38.     Despite knowledge of Mr. Larson's rollover, his arrests, his convictions, his

        drivers license suspension and revocation, all indicating an unsafe driving record,

10

Larson's BIA supervisors continued to allow him to drive a government vehicle without restriction from March 30, 1994 through March 12, 1999.

Testimony of Lloyd Larson, John Lovejoy, David Jones, Bobby Pablo, Harold Slim, Jimmy Martinez.

39.     From March 12, 1999 through January 25, 2002, DOI and BIA policy required government supervisors to establish that employees could safely operate a government vehicle and to make sure each employee had a valid state driver's license and a safe driving record validated through a state records check or the National Drivers Registration.

Plaintiff's Exhibit No. 65, 67, 68, 71.

40.     At no time from March 12, 1999 through January 25, 2002, did the BIA ever validate Mr. Larson's driving record as required by its own internal policy.

Testimony of Alfred Abeita, David Jones, John Lovejoy, Bobby Pablo, Eloise Chicharello.

41.     Mr. Larson did not have a safe driving record from March 12, 1999 through January 25, 2002.

Testimony of Eloise Chicharello, Paula Puente, Michele Justice, Lloyd Larson, Alfred Abieta, James Dean.

Plaintiff's Exhibits Nos.2, 3, 6, 7, 8, 9, 10, 11, 15, 17, 21, 30, 37.

42.     Bobby Pablo was an employee of the BIA and Lloyd Larson's direct supervisor from 1999 through January 25, 2002.

Testimony of Bobby Pablo, Lloyd Larson.

Amended Pretrial Order, Stipulated Fact No. 26.

43.     Before becoming Mr. Larson's supervisor, Mr. Pablo had also worked with Mr. Larson at the BIA since 1987.

Testimony of Lloyd Larson, Bobby Pablo.

44.     Before January 25, 2002, Bobby Pablo knew that Lloyd Larson had been arrested for DWI on more than one occasion and was an unsafe driver who should not have been allowed to drive a government vehicle.

Testimony of Lloyd Larson, Bobby Pablo.

Amended Pretrial Order, Stipulated Fact No. 27.

45.     On May 16, 2001, Lloyd Larson was arrested for DWI by Navajo Police on NM 337 near San Antone, New Mexico.  Stipulation 10.  At the time, Mr. Larson admitted having consumed a 6 pack of beer in the previous hour and, although the charges were dismissed, Mr. Larson admitted that he was, in fact, driving while intoxicated on that date.

Amended Pretrial Order, Stipulated Fact No. 10.

Plaintiff's Exhibit No. 43.

Testimony of Lloyd Larson.

46.     Mr. Larson informed his direct supervisor, Bobby Pablo, of the May 16, 2001 arrest within days of its occurrence, but Mr. Pablo did nothing to investigate or limit Mr. Larson's driving privileges.

Testimony of Lloyd Larson.

Plaintiff's Exhibit No. 45.

47.   On May 24, 2001, Mr. Larson's arrest for DWI was publicly published in the
      *Navajo Times* newspaper in what was known at the BIA as "The Honor Roll"- a
      list of DWI arrests on the reservation.

Plaintiff's Exhibit No. 44.

48.   Only after Mr. Larson's arrest was publicized and BIA supervisor David Jones
      called, did supervisor Pablo require Mr. Larson to write up something for his file
      explaining the arrest.

Plaintiff's Exhibit No. 45.

Testimony of Lloyd Larson, David Jones and Bobby Pablo.

49.   In his written description of the arrest, Mr. Larson told Mr. Pablo that he did not
      have to worry about the arrest, because, regardless of whether Mr. Larson was
      convicted, the Navajo Courts did not have the power to revoke his state driver's
      license, so he could continue to operate a government vehicle.

Plaintiff's Exhibit No. 45.

50.   Neither Mr. Pablo, Mr. Jones or anyone else in the BIA security department did
      anything further to investigate whether Mr. Larson was actually driving while
      intoxicated on May 16, 2001 and no one in the BIA did anything to restrict or
      more closely supervise his driving during work hours.

Testimony of Lloyd Larson, Bobby Pablo, David Jones, John Lovejoy, Eloise
Chicharello, Alfred Abeita, Paula Puente.

51.   On August 11, 2001, Lloyd Larson was involved in a traffic accident and arrested
      by the Navajo police for DWI near Window Rock, Arizona.  Stipulation 11.  On
      November 13, 2001, he pled guilty to this charge and was given a deferred

sentence on the condition that he complete DWI school and not drink and drive for 90 days until February 13, 2001.

Amended Pretrial Order, Stipulated Fact No. 11.

Plaintiff's Exhibit No. 46.

52.    Mr. Larson informed his supervisor, Bobby Pablo, of his arrest in August, 2001, soon after it occurred.

Testimony of Lloyd Larson.

53.    Mr. Larson's August, 2001 arrest was publicized in the *Navajo Times* on August 16, 2001 and became known among his other supervisors and co-workers at the BIA.

Plaintiff's Exhibit No. 47.

54.    In the fall of 2000, Mr. Larson's job was re-classified and the government was supposed to conduct a new, more extensive background investigation into Mr. Larson.   This background investigation was supposed to be conducted by security specialists for the BIA with the assistance of the BIA Personnel Department, whose supervisor was now Paula Puente.

Testimony of Michele Justice, Paula Puente.

Plaintiff's Exhibit No. 41.

55.    Approximately one year after the request for a more extensive background investigation into Mr. Larson, the government asked Mr. Larson to fill out, sign and submit the initial security background information form, which he completed on August 26, 2001.  In that form, Mr. Larson informed the government in writing that he had been recently arrested for DWI in August, 2001 and May,

2001 and that he had a bench warrant in August, 2000 (issued after the I-40 rollover in April, 1995).

Testimony of Lloyd Larson, Michele Justice, Paula Puente.

Plaintiff's Exhibit Nos. 41, 48, 50, 51, 91, 107M.

56.  On September 26, 2001, after a written request for additional information, Lloyd Larson informed government security specialist Michele Justice in writing that he had also been arrested for DWI in April, 1995 and described his rollover on I-40.

Plaintiff's Exhibit No. 51.

57.  Security specialist Michele Justice and BIA Personnel Supervisor Paula Puente were employees of the government, acting in the scope and course of their employment, at all times that they were involved in conducting the more extensive background investigation into Lloyd Larson.

Testimony of Paula Puente, Michele Justice.

58.  After receiving the written information in August and September, 2001, with Larson's self-reported 3 arrests for DWI, including a rollover on I-40, the government security specialist did not take steps to remove or suspend Mr. Larson's driving privileges, did nothing to expedite the ongoing security investigation into his background and did not order or obtain his driving record before January 25, 2002.

Testimony of Lloyd Larson, Paula Puente, Michele Justice.

Plaintiff's Exhibit No. 91.

59. From March, 1999 through January 25, 2002, Lloyd Larson regularly drank on the job in his government vehicle, including buying beer, setting it in his government truck and drinking as he drove around on the job.

Testimony of Lloyd Larson, Travis Witt, Augustine Abeita.

60. Mr. Larson recognized that he had a drinking problem and requested time off from his supervisors to obtain help with his alcohol abuse problem, including rehabilitation programs. His supervisors told him that he was needed on the jobsite and that he could not be spared the time off from work to receive treatment for his alcohol abuse problem.

Testimony of Jennifer Larson, Lloyd Larson.

61. Two weeks before the collision on Friday, January 11, 2002, Lloyd Larson became intoxicated in his government vehicle during work hours and failed to turn in his government vehicle at the Crownpoint yard on Friday evening.

Testimony of Ettaline Perry, Deanne Seumptewa, Bobby Pablo, David Jones, Lloyd Larson.

62. Mr. Larson's BIA co-worker, Deanne Seumptewa, knew that Mr. Larson had been drinking and driving in his government vehicle on January 11, 2002 and did not turn the truck into the BIA yard in Crownpoint.

Testimony of Ettaline Perry and Deanne Seumptewa.

63. Mr. Larson's supervisors knew or should have known that he was drinking and driving in his government vehicle on January 11, 2002. However, his supervisors did not declare him AWOL for that day, but paid him his full salary for working on January 11, 2002.

Testimony of Lloyd Larson, Bobby Pablo, David Jones.

Plaintiff's Exhibit Nos. 86.

64.      From March, 1999 through January 25, 2002, Mr. Larson's supervisors knew or should have known of his problems with alcohol abuse, that he did not have a safe driving record and that he, and other BIA employees were drinking and driving while on the job.

Plaintiff's Exhibit Nos. 2, 3, 6, 7, 8, 9, 10, 11, 15, 17, 21, 30, 37, 43, 44, 45, 46, 47, 48, 51.

Testimony of Lloyd Larson.

65.      Despite the government's knowledge of Mr. Larson's arrests for DWI and his unsafe driving history, no one in the government took away his government vehicle or restricted his driving privileges before the collision on January 25, 2002.

Testimony of Lloyd Larson, David Jones, Bobby Pablo, Eloise Chicharello, Paula Puente, Michele Justice.

66.      Throughout the time Lloyd Larson worked for the BIA, BIA employees with unsafe driving records, including DWIs, were allowed to drive government vehicles without restriction or supervision.

Testimony of Lloyd Larson, Jimson Largo, Billy Tsinajinnie, Tommy Moses, James Dean.

67.      Lloyd Larson's BIA supervisor Jimmy Martinez had a current and continuing alcohol abuse problem while working at the BIA.

Testimony of David Jones, Bobby Pablo, John Lovejoy, Jimmy Martinez.

17

68.     BIA supervisor Harold Slim was caught drinking on the job with his crew in
        1998-1999.

Testimony of John Lovejoy, David Jones, Harold Slim.

69.     BIA supervisor John Lovejoy was arrested for DWI on December 19, 1995.

Testimony of John Lovejoy.

70.     Before January 25, 2002, there were at least 29 employees within the BIA Navajo
        with one or more DWI arrests or convictions, who were allowed to drive
        government vehicles.

Plaintiff's Exhibit 53, 54, 55.

Testimony of Afred Abeita.

71.     Although the Navajo Region of the BIA is the second largest region in number of
        employees, it had the most employees with DWI convictions who were allowed to
        drive government vehicles.

Plaintiff's Exhibit 53, 54, 55.

Testimony of Afred Abeita Eloise Chicharello.

72.     There was a culture and practice in the BIA Department of Roads of allowing
        employees and supervisors with current and continuing alcohol abuse problems to
        have government vehicles and to drink and drive in those government vehicles.

Testimony of Lloyd Larson, Billy Tsinajinnie, Tommy Moses, Jimson Largo, Harold
Slim, Jimmy Martinez, James Dean.

73.      On September 4, 2001 BIA employee Tommy Moses was drinking and driving
        during work hours and ran his government vehicle into another vehicle in Gallup,
        New Mexico.

Testimony of Tommy Moses, David Jones, Bobby Pablo.

Plaintiff's Exhibit No. 49.

74.     The BIA knew or should have known that employees and supervisors at the
        Department of Roads, besides Lloyd Larson, were drinking and driving during
        work hours in government vehicles.

Testimony of James Dean, Lloyd Larson, Tommy Moses, Billy Tsinajinnie, Jimson
Largo.

75.     Despite its knowledge that there was a problem with employees and supervisors
        in the BIA Department of Roads drinking and driving government vehicles during
        work hours, the BIA took insufficient action to restrict the driving privileges of
        those employees, take away their government vehicles, more closely supervise
        their activities or add devices to their government vehicles which would prevent
        them from driving the vehicle while intoxicated.

Testimony of James Dean, Lloyd Larson, Tommy Moses, Billy Tsinajinnie, Jimson
Largo.

76.     From March, 1999, through the present, Elouise Chicharello was an
        employee of and supervisor for the BIA, acting in the scope and course of her
        employment as the Director of the Navajo Region.

Testimony of Eloise Chicharello.

77.     While she was the Director of the Navajo Region, Director Chicharello had the
        responsibility to make sure that BIA policies and procedures were being followed
        in the BIA Department of Roads and had the ability to address the problem of
        employees with unsafe driving records having possession of government vehicles

and the problem of employees drinking and driving in government vehicles. She did not do so.

Testimony of Eloise Chicharello.

78. From 1989 through January 25, 2002, no BIA supervisor or government security specialist ever suspended or revoked Lloyd Larson's privileges to drive a government vehicle.

Testimony of Lloyd Larson, Michele Justice, Paula Puente, Harold Slim, Jimmy Martinez, David Jones, John Lovejoy, Bobby Pablo, Alfred Abeita.

79. The BIA provided Lloyd Larson a month-long travel authorization for January, 2002, permitting him to have possession of and drive a government-owned, taxpayer-funded truck to and from and within Crownpoint, McKinley County; Alamo, Socorro County; Thoreau, McKinley County; Grants, Cibola County; Albuquerque, Bernalillo County; and Socorro, Socorro County, NM.

Plaintiff's Exhibit No. 87.

Amended Pretrial Order, Stipulated Facts Nos. 31, 32, 33.

80. The BIA's travel authorization allowed Mr. Larson to stay in Albuquerque during the week and travel in his government vehicle from Albuquerque to the job site or the BIA office in Crownpoint.

Plaintiff's Exhibit No. 87.

Amended Pretrial Order, Stipulated Fact No. 32.

81. Lloyd Larson's driving of a federal government vehicle was incident to his business and employment with BIA.

Testimony of Lloyd Larson, Travis Witt, Augustine Abeita, Deanne Seumptewa, David
Jones, Jimson Largo, Billy Tsinajinnie.

Plaintiff's Exhibit Nos. 77, 78, 87, 88, 92, 93.

82.     As part of his duties with the BIA Branch of Roads in January, 2002, Lloyd
        Larson was required to work at Navajo Road 55 (N-55) in Alamo, N.M. and drive
        a government vehicle to and from that jobsite and temporary places of lodging in
        hotels in Albuquerque.

Amended Pretrial Order, Stipulated Fact No. 31, 32.

Testimony of Lloyd Larson, David Jones, Bobby Pablo.

83.     During the work week, as part of his job, Mr. Larson was required to stay in
        hotels overnight in Albuquerque, New Mexico.

Amended Pretrial Order, Stipulated Fact No. 32.

Testimony of Lloyd Larson, David Jones, Bobby Pablo.

84.     In his employment with the BIA, Lloyd Larson was regularly paid for the time he
        spent driving between lodging in Albuquerque and either the job site or the BIA
        office in Crownpoint.

Testimony of Lloyd Larson, Deanne Seumptewa, Paula Puente, Bobby Pablo, David
Jones.

85.     On January 24, 2002, Lloyd Larson drove his government-issued vehicle, a
        Dodge Dakota G41-58539, to Albuquerque, where he spent the night on a
        government authorized trip.

Testimony of Lloyd Larson, Deanne Seumptewa, Bobby Pablo.

Plaintiff's Exhibit Nos. 88, 79.

86.     The BIA paid for Mr. Larson's lodging in a hotel in Albuquerque on the night of
        January 24, 2002.

Plaintiff's Exhibit 87.

Testimony of Lloyd Larson, Ettaline Perry, David Jones, Bobby Pablo, Paula Puente.

87.     The only reason Mr. Larson stayed in Albuquerque on the night of January 24,
        2002 and had to drive back to the jobsite and then, to Crownpoint, on January 25,
        2002, was as a result of his work with the BIA Branch of Roads.

Testimony of Lloyd Larson, Bobby Pablo, David Jones.

88.     But for his job with the BIA, Mr. Larson would not have been in Albuquerque on
        the morning of January 25, 2002, with a need to return to the job site and then,
        return his vehicle to Crownpoint that evening.

Testimony of Lloyd Larson, Bobby Pablo, David Jones.

89.     On January 25, 2002, the only reason why Mr. Larson was driving in a
        government-owned vehicle from Albuquerque (where he spent the night at
        government expense) to the N-55 jobsite and then, Crownpoint, was because of
        his employment and business with the BIA.

Testimony of Lloyd Larson, Ettaline Perry, Deanne Seumptewa.

90.     But for his job with the BIA, Mr. Larson would not have been driving a
        government vehicle on I-40 on January 25, 2002.

Testimony of Lloyd Larson, David Jones, Bobby Pablo, Eloise Chicharello.

91.     On Friday, January 25, 2002, Lloyd Larson was scheduled to work for the BIA,
        including the drive back from Albuquerque to N-55, then to the main office at
        Crownpoint.

Plaintiff's Exhibit No. 87.

Testimony of Lloyd Larson, Deanne Scumptewa, David Jones, Bobby Pablo.

92.     On Friday, January 25, 2002, the BIA had given Mr. Larson approved travel

        status in his job as Project Manager of the N-55 Alamo road project.

Plaintiff's Exhibit No. 87.

Testimony of Lloyd Larson, David Jones, Bobby Pablo.

93.     Mr. Larson's scheduled work hours on January 25, 2002 were from 7:00 a.m. to

        4:30 p.m., after which he was required to return his government vehicle to the

        Crownpoint yard, where such vehicles were kept on the weekends.

Plaintiff's Exhibit No. 87.

Testimony of Deanne Seumptewa, Bobby Pablo, David Jones, Lloyd Larson.

94.     At 6:55 a.m. on the morning of January 25, 2002, Lloyd Larson called the N-55

        project field office [Stipulation No. 39] and told Deanne Scumptewa that he was

        not feeling well, but would be at the project site later in the day.

Testimony of Deanne Seumtpewa, Bobby Pablo.

Plaintiff's Exhibit No. 83, 84, 85.

95.     Mr. Larson checked out of the Super 8 Motel at 6030 Iliff Rd. NW on

        Albuquerque's west side at 6:55 a.m.

Amended Pretrial Order Stipulated Fact No. 38.

Plaintiff's Exhibit No. 79.

Testimony of Troyce McKinley.

96.     After checking out of the motel, Mr. Larson drove east, away from the job site, to

        an apartment where a friend, Lucy Apache was staying.

Testimony of Lucy Apache.

97.    Mr. Larson had been drinking with Ms. Apache and her sister, Bernice, the night

       before at the hotel.

Testimony of Lucy Apache.

98.    Ms. Apache believed that Mr. Larson did not look well, but she could not tell

       whether Mr. Larson was ill, still drunk or was hungover from the night's revelries.

Testimony of Lucy Apache.

99.    Ms. Apache told Mr. Larson that he should go to work at the N-55 project.

Testimony of Lucy Apache.

100.   Mr. Larson parked his government truck in front of the apartment and went to

       sleep in the cab.

Testimony of Lucy Apache.

101.   Sometime after 10:30 a.m. Lloyd Larson woke up and started driving west,

       toward the job site.

Testimony of Lucy Apache.

102.   In 2002, it was the practice at the BIA for employees to be allowed to run

       personal errands in the government vehicle during work hours.

Testimony of Lloyd Larson, Billy Tsinajinnie, Jimson Largo, Deanne Seumptewa.

103.   At 11:24 a.m., while driving west, Mr. Larson stopped at an ATM machine on

       East Lomas Blvd. NE in Albuquerque and withdrew $40.00.

Amended Pretrial Order, Stipulated Fact No. 42.

Plaintiff's Exhibit No. 80.

104.    At 11:55 a.m., Mr. Larson stopped at a Smith's supermarket on 111 Coors Rd. SE
        and, as he had done on previous occasions during work hours, purchased a 12
        pack of Bud-Lite beer [Stipulation No. 43], which he set in the cab of the truck
        and drank while he drove west toward the job site.

Amended Pretrial Order, Stipulated Fact No. 43.

Testimony of Anthony Cano.

Plaintiff's Exhibit No. 81.

105.    While purchasing beer at the Smith's, Mr. Larson exhibited no signs of
        intoxication apparent to the sales clerk.

Testimony of Anthony Cano.

106.    Mr. Larson drove west on I-40 in his government truck for 14 miles, stopping
        at the Laguna travel center where he purchased some food.

Testimony of Travis Witt, Augustine Abieta, Deanne Seumptewa.

107.    After leaving the Laguna travel center, Mr. Larson drove west on I-40 until he
        reached the Tohajaillee exit, where he left the interstate and drove a short distance
        north to the Canoncito grocery store.

Testimony of Tracy Yazzie, Travis Witt, Augustine Abeita.

108.    Mr. Larson went into the Canoncito grocery store at approximately 1:45 p.m. and
        asked the clerk on duty whether she accepted government credit cards. When she
        said that she did not, Mr. Larson left the store in his government pick up truck,
        driving south, back toward the interstate.

Testimony of Tracy Yazzie.

25

109.   Lloyd Larson believed that he could reach the N-55 job site in Alamo from the
       Tohajiillee exit via a frontage road south of the interstate that ran parallel to the
       highway.

Testimony of Lloyd Larson.

110.   Attempting to reach the N-55 jobsite via the frontage road. Mr. Larson crossed
       over I-40 and mistakenly drove the wrong way down the interstate off-ramp.
       ending up driving the wrong way down the Interstate – going west toward
       eastbound traffic in the northern-most lane.

Testimony of Lloyd Larson, Lt. Valverde.

111.   Right before the collision, Mr. Larson had with him in his government truck his
       N-55 project diaries, diagrams, drawings and building plans for the N-55 project,
       numerous notes and memos relating to the project, a neon vest and other items
       necessary for him to do his job.

Testimony of Steve Fenton, Travis Witt, Augustine Abeita.

112.   At the time he tried to use a government credit card and then drove back to I-40 to
       try and reach the jobsite via the "frontage road," up to and including the time of
       the collision, Lloyd Larson was in the scope and course of his employment with
       the United States government and was performing a function incident to his job as
       Project Manager of the N-55, Alamo project, with the BIA.

Testimony of Travis Witt, Augustine Abeita, Lloyd Larson.

113.   At the time he tried to use a government credit card and then drove back to I-40 to
       try and reach the jobsite via the "frontage road," up to and including the time of
       the collision. Lloyd Larson had re-entered the scope and course of his

26

employment with the United States government and was performing a function
incident to his job as Project Manager of the N-55, Alamo project, with the BIA.

Testimony of Lloyd Larson, Travis Witt, Augustine Abieta.

114.    Mr. Larson was intoxicated and driving drunk when he drove the wrong way on I-
40.   A blood test taken several hours after the collision showed his blood alcohol
level to be .205.

Amended Pretrial Order, Stipulated Fact No. 49.

115.    Lloyd Larson did not act intentionally in driving the wrong way on the interstate
and causing a collision that killed 4 people and seriously injured himself.

Testimony of Lloyd Larson, Travis Witt, Augustine Abeita.

116.    As the government truck drove the wrong way on the interstate, it encountered
and endangered at least 38 other vehicles heading in the opposite direction on, I-
40 including one driven by state police officer Mike Valverde.

Testimony of Lt. Valverde, Clark Eugene Farrell, Rosalie Marquez.

Plaintiff's Exhibit No. 266.

117.    Because they encountered the government truck on relatively flat terrain, the
occupants in the other vehicles were able to avoid the truck.

Testimony of Steve Fenton, Lt. Valverde, Clark Eugene Farrell, Rosalie Marquez.

Plaintif's Exhibits Nos. 98 – 102.

118.    The people who encountered the government truck heading toward them in the
wrong direction experienced terror and a fear for their lives.

Testimony of Lt. Valverde, Clark Eugene Farrell and Rosalie Marquez.

119.    Larry Beller was driving a Cadillac owned by Bud and Alice Ramaekers
        eastbound on I-40. Bud Ramaekers was in the front passenger seat, Alice
        Ramaekers was sitting in the back seat behind the driver and Rita Beller was in
        the back, passenger side seat.

Amended Pretrial Order, Stipulated Facts Nos. 45 - 46.

120.    As the Ramaekers vehicle approached a rise in the highway, Larry Beller pulled
        from the right hand lane into the passing lane to pass a slower moving vehicle.

Testimony of Lt. Valverde.

Plaintiff's Exhibit No. 266.

121.    From the moment the government truck driven by Larson came over the rise
        going the wrong direction in the lane of travel of the Ramaekers' vehicle. Larry
        Beller had less than 8 seconds to recognize that the vehicle was not across the
        highway, but was in his lane of traffic and to take evasive action.

Testimony and expert report of Steve Fenton.

122.    Automotive Collision Avoidance Systems (ACAS) recommended by the National
Highway Transportation Safety Administration would not have detected the Dodge until it
was between 328 and 492 feet away.

Testimony and expert report of Steve Fenton.

123.    Larry Beller recognized the danger and reacted to the on-coming vehicle when it
was 540 feet away, quicker than expected by government studies, and was able to begin
taking evasive action by applying his brakes and turning the vehicle to the left, toward the
median, before the car was struck, head-on by the government pickup truck.

Testimony and expert report of Steve Fenton.

124.    Bud and Alice Ramaekers saw and recognized the danger posed by the oncoming truck in the seconds before the collision and would have suffered the same terror and fear for their own lives and the life of their spouse as did the other people who encountered the government truck.

Testimony of Lt. Valverde, Clark Eugene Farrell, Rosalie Marquez.

125.    Given the circumstances, there was nothing Mr. Beller could do to avoid this collision.

Testimony of Steve Fenton, Lt. Valverde.

126.    The Ramaekers vehicle was traveling below the 75 mph speed limit, going 71 miles per hour one second before the head on collision.

Testimony and expert report of Steve Fenton.

127.    The Ramaekers' deaths were not instantaneous and it is probable that they experienced pain at the moment of the collision and during the seconds it took for them to bleed out and die.

Testimony of Lt. Mike Valverde, Dr. Rebecca Irvine (in accordance with Court order).

128.    Larry Beller acted with ordinary care for his safety and that of his passengers.

Testimony and expert report of Steve Fenton.

129.    Passengers Bud Ramaekers, Alice Ramaekers and Rita Beller acted with ordinary care for their own safety.

Testimony and expert report of Steve Fenton.

130.    No act or omission of Larry Beller, Rita Beller, Bud Ramaekers or Alice Ramaekers was a proximate cause of this collision.

Testimony and expert report of Steve Fenton.

131.   The actions or omissions of the United States government, through its supervisors and employees, including Lloyd Larson, were a proximate cause of the collision on January 25, 2002.

132.   The actions or omissions of Lloyd Larson were a proximate cause of the collision on January 25, 2002.

133.   The collision on January 25, 2002, was a proximate cause of damage which completely totaled the Ramaekers vehicle. The fair market value of the vehicle at the time of the collision was $31,588.

Amended Pretrial Order, Stipulated Facts Nos. 50, 51.

134.   The collision on January 25, 2002, was a proximate cause of the deaths of Bud Ramaekers and Alice Ramaekers.

Testimony of Dr. Rebecca Irvine in accordance with Court Order.

135.   Following the collision on January 25, 2002, Paula Puente and Eloise Chicharello required Alfred Abeita to obtain the driving record of Lloyd Larson around February 14, 2002. Mr. Abeita was able to obtain the driving record on Lloyd Larson within days after his request.

Testimony of Alfred Abeita.

136.   Even following the collision and the deaths of 4 people, on January 29, 2002, security specialist Michele Justice made a report of a favorable screening which indicated that Lloyd Larson was still approved and competent to drive a government vehicle.

Testimony of Michele Justice.

Plaintiff's Exhibit No. 91.

137.    From 1986 through January 25, 2002, the State of New Mexico properly enforced
        the laws of the state regarding suspension, revocation and issuance of Mr.
        Larson's state driver's license.

Testimony of MVD Records Supervisor Curt Sanchez, or designee.

138.    Since the government allowed Mr. Larson to drive a government vehicle
        regardless of whether he had a valid state driver's license, no act or omission of
        the state of New Mexico in revoking his license was a proximate cause of the
        collision and damages on January 25, 2002.

Testimony of MVD Records Supervisor Curt Sanchez or designee.

139.    From 1986 through January 25, 2002, the Navajo Nation, an independent
        sovereign, had no compact or agreement with the state of New Mexico for sharing
        driving and court records and no agreement about the full faith and credit to be
        given convictions on the reservation.   The Nation was prohibited from sharing
        such information without such an agreement.

Testimony of Navajo Nation Records Custodian, Eloise Chicharello.

140.    During this time, had there been a compact for record-sharing, there was no
        system, including no computer system, in place to facilitate the regular
        dissemination or transfer of driving record information between the Navajo
        Nation and the state of New Mexico.

Testimony of Navajo Nation Records Custodian, Eloise Chicharello.

141.    From 1986 through January 25, 2002, the Navajo Nation properly enforced
        and complied with the rules of the tribe prohibiting the regular sharing of driving
        record information with the state of New Mexico, without a compact.

Testimony of Navajo Nation Records Custodian.

142. Since the government, through its supervisors, knew of all of Mr. Larson's arrests
     and convictions on the Navajo reservation, the sharing of this information with
     the state of New Mexico would have made no difference in whether the
     government allowed Mr. Larson access to a government vehicle.

Testimony of Lloyd Larson.

143. No act or omission of the Navajo Nation was a proximate cause of the collision
     and damages on January 25, 2002.

Testimony of Navajo Nation Records Custodian.

144. Edward "Bud" Ramaekers was born on September 28, 1940, and was 61 years
     and 4 months old at the time of his death.

Testimony, Report of Dwight Grant.

145. The life expectancy of a white male between the ages of 61 and 62 is 80 years.

Testimony, Report of Dwight Grant.

146. Bud Ramaekers' mother lived to the age of 93 and his father lived to the age of
     82.

Testimony of Terry Pfeifer.

147. At the time of his death, Bud Ramaekers had no medical problems or conditions
     which would have shortened his life expectancy.

Testimony, autopsy report, Dr. Rebecca Irvine.

148. Alice Ramaekers was born on August 25, 1941, and was 60 years and 7 months
old at the time of her death.

Testimony, report, Dwight Grant.

149. The average life expectancy of a white female between the ages of 60 and 61 is 83.2 years.

Testimony, Report of Dwight Grant.

150. Mrs. Ramaekers' mother lived until the age of 85 and her father lived until the age of 87.

Testimony of Terry Pfeifer.

151. At the time of her death, Alice Ramaekers had no medical problems or conditions which would have shortened her life expectancy.

Testimony and autopsy report of Dr. Rebecca Irvine.

152. Bud and Alice Ramaekers were married on August 21, 1970. They celebrated their 25th wedding anniversary on August 21, 1995, and had been married 31 years at the time of their deaths.

Testimony of Brenda Krumel, Jeanne Guta.

153. At the time they were married in 1970, Bud Ramaekers was a recent widower, whose wife had died of cancer, and had three young boys, Mike Ramaekers, age 6, Mark Ramaekers, age 4, and Kevin Ramaekers, age 9 months. Alice Ramaekers was also a recent widow, with five small children – Terry Pfeifer, age 7, Jerry Pfeifer, age 6, Brenda Pfeifer, age 3, Jeanne Pfeifer, age 2, and Doug Pfeifer, age 4.

Testimony of Ramaekers' children.

154. After their marriage, Bud and Alice Ramaekers had two more children, Crystal "Crissy" Ramaekers (born in 1976) and Tim Ramaekers (born in 1978). Testimony of Rameakers' children.

155.   At the time of their deaths, the Ramaekers had 28 grandchildren. Lyndie Pfeifer,
       age 17, James Pfeifer, age 15, Jessica Ramaekers, age 14, Alex Pfeifer, age 13,
       Brandon Ramaekers, age 12, Brian Ramaekers, age 9, Max Pfeifer, age 11,
       Michael Pfeifer, age 10, Allie Krumel, age 9, Joe Pfeifer, age 9, Ann Pfeifer, age
       10, Chad Guta, age 8, Jamie Krumel, age 8, and Natalie Pfeifer, age 8, Nicole
       Ramaekers, age 8, Carlie Guta, age 7, Cole Ramaekers, age 6, Grace Pfeifer, age
       6, John Ramaekers, age 6, John Pfeifer, age 6, Madeline Krumel, age 6, Mathew
       Pfeifer, age 4, Thomas Pfeifer, age 4, Dominick Pfeifer, age 2, Joshua Ramaekers,
       age 2, Kate Pfeifer, age 2, and twin girls, Leah and Olivia Ramaekers, age 2.  One
       additional grandchild, Elisabeth Pfeifer, was born after their deaths in 2004, and
       their youngest daughter, Crissy, is now pregnant with her first child.

Testimony of Ramaekers' children.

156.   In 1974, Bud and Alice Ramaekers moved their family from California to
       Norfolk, Nebraska, where they opened a welding business called B & A (for Bud
       and Alice) Welding.

Testimony of Mike Ramaekers, Terry Pfeifer.

157.   Bud and Alice Ramaekers trained each of their ten children to be responsible,
       hard working citizens and tax payers by having each one of them work after
       school in the family business.  Each child was encouraged to study hard in school,
       to do their best, be dependable and to make sure they could take care of
       themselves and their families as adults.

Testimony of Mike Ramaekers, Terry Pfeifer.

34

158.   At the business, Bud Ramaekers worked as a welder and Alice Ramaekers
       worked as the bookkeeper.

Testimony of Mike Ramaekers.

159.   Throughout his welding career, Bud Ramaekers entered into and often won first
       prize in welding competitions. He was involved in welding projects in almost
       every building constructed or repaired in the city of Norfolk. He also designed
       and welded numerous inventions to assist farmers and manufacturers in their
       businesses.

Testimony of Mike Ramaekers.

Plaintiff's Exhibits Nos. 241-156.

160.   Bud and Alice built B & A Welding into a successful business, whose income
       supported their family and helped pay for college educations for most of the
       children. The Ramaekers retired from their business in 2000, gradually turning
       the business over to their son, Mike Ramaekers and his wife Sue, as bookkeeper.

Testimony of Mike Ramaekers.

161.   In the last four, full time years running B & A Welding, Bud and Alice
       Ramaekers averaged $94,778.25 per year in income from the business.

Testimony of Mike Ramaekers, Dwight Grant.

Plaintiff's Exhibits Nos. 111, 112, 113.

162.   Following the sale of the business in 2000, Bud and Alice Ramaekers provided
       professional advice to Mike and Sue Ramaekers, resulting in an income to them
       of $26,061 in 2000.

Testimony of Mike Ramaekers, Dwight Grant.

163.    At the time of their deaths, both Bud and Alice Ramaekers were receiving social
        security benefits. The present value of the lost social security benefit for Bud
        Ramaekers, less personal maintenance expenses, at the time of his death is
        $168,000. The present value of the lost social security benefit for Alice
        Ramaekers, less personal maintenance expenses, at the time of her death is
        $77,000.

Testimony & report, Dwight Grant.

164.    After retirement, Bud Ramaekers had not foreclosed the possibility of taking on
        work and other projects and was assisting a friend of his in farming some land,
        which brought him additional income of approximately $10,000-$11,000 per year.

Testimony of Mike Ramaekers, Terry Pfeifer, Paul Moser.

165.    In addition to their lost earning and earning capacity, Bud and Alice Ramaekers
        lived extraordinarily full and productive lives. Their faith in God was extremely
        important to them and they were actively involved in their local Catholic church.
        Bud Ramaekers used his welding skills to make repairs at the Catholic school.
        Alice Ramaekers would organize fund-raising events, often involving food. Both
        Alice and Bud Ramaekers taught in the Sunday school and at the regular marriage
        encounter workshops held in the parish. They were used as an example of what a
        good Christian marriage could be.

Testimony of Mark Ramaekers, Doug Pfeifer, Kevin Ramaekers and Father Dave Belt.

166.    Bud and Alice believed strongly in the sanctity of life and worked for the
        preservation of life through their activities with the Birthright organization.

Testimony of Doug Pfeifer, Mark Ramaekers.

36

167. Alice Ramaekers had an extremely active social life, as indicated by her 2002 calendar (Plaintiff's Exhibit No. 258). She loved baking, sewing, crafts, card playing, traveling and socializing with friends of the family. She was involved in a bridge club and a quilting club. A fun loving person, she once entertained the family at Christmas by singing and playing a song on the accordion.

Testimony: Ramaekers and Pfeifer family.

Plaintiff's Exhibits Nos. 121-239.

168. Bud Ramaekers was also very active, involved in hunting, fishing, water skiing, traveling, card playing and visiting family and friends. He was involved with the local golf club and the shuffleboard league. He had a beautiful voice, which he used to sing to the grandchildren.

Testimony: Ramaekers and Pfeifer family.

Plaintiff's Exhibits Nos. 121 -239.

169. Bud Ramaekers led an extraordinary life, which was far above average and the present value of his life, apart from his earning capacity exceeds $5,300,000.

*Id.* and testimony of Dwight Grant.

170. Alice Ramaekers led an extraordinary life, which was far above average and the present value of her life apart from her earning capacity is at least $6,127,000.

*Id.*

171. Because the Ramaekers' children are adults and none of them were living at home, there is no basis to award damages in this case under New Mexico law for loss of consortium for guidance and counseling to the deceased's minor children.

172. However, while alive, the Ramackers provided expected benefits to their beneficiaries that had a monetary value for which they are entitled to damages under NM UJI 13-1830. Although they provided assistance to their children and grandchildren throughout their lives, that assistance and those services increased upon their retirement. Testimony of Ramackers and Pfeifer family.

173. For the weddings of each of their children, Bud and Alice Ramackers were actively involved in planning, organizing, providing food, making the dresses, providing decorations and helping pay for each of those weddings.

Testimony of Brenda Krumel, Jeanne Guta, Crissy Wood and Tim Ramackers; Plaintiff's Exhibits Nos. 219 – 240.

174. Post retirement, for the wedding of Crissy and Brian Wood, their assistance and services increased. For Crissy's wedding, they not only engaged in their usual activities, but Bud welded candlesticks and Alice hand made all of the centerpieces for the wedding.

*Id.*

175. After their deaths, Bud and Alice Ramackers were not available to plan and provide services for the wedding of their youngest son, Tim Ramackers, when he married his wife Michele on May 31, 2003. Tim Ramackers lost the expected benefits of having his parents plan, put together and pay for his wedding and reception.

Testimony of Tim Ramaekers.

176. Bud and Alice Ramackers were deeply involved with their children when a new grandchild was born. Upon the birth of each grandchild, Bud and Alice

Ramaekers would appear at the home of their children either at the time of the birth or shortly thereafter, where they helped take care of the new babies and new parents. Bud and Alice Ramaekers would usually stay for a week at a time, cleaning the house, and feeding and caring for the family during the post-partum transition.

Testimony of Brenda Krumel, Jeanne Guta.

177. Following their deaths, they were not available to provide this service to Doug and Lisa Pfeifer when their new daughter, Elisabeth, was born in 2004. Nor will they be available when Crissy Wood delivers her first child later this year. They will not be present and their services will not be available for any other children that are born in the future to their children or grandchildren.

Testimony of Brenda Krumel, Jeanne Guta, Crissy Wood and Doug Pfeifer.

178. Since their retirement, Bud and Alice Ramaekers, were always available to come to their childrens' homes and watch their grandchildren if their parents needed to go on a trip, take a vacation or had some crisis.

Testimony of Terry Pfeifer and other members of the Pfeifer and Ramaekers family.

179. Since their deaths, their adult children have lost those services and, given that all the brothers and sisters are actively involved in work and raising their family, have a difficult time finding anyone to replace their parents in caring for their children over night.

Testimony of Pfeifer and Ramaekers family.

180. Bud and Alice would also come to their childrens' home whenever there was trouble or a job that needed to be done. They helped Tim Ramaekers renovate his

home. Testimony of Tim Ramaekers. When a family member was ill, they could be counted on to be there to take care of whatever needed to be done. Testimony of Pfeifer and Ramaekers family. When Mark Ramaekers' wife, Maryrose, contracted cancer this year, had they been alive, Bud and Alice Ramaekers would have been there to take care of the children while Maryrose underwent cancer treatment. They would have been available to take care of Maryrose and Mark as they went through this terrible time and would have been there to comfort Mark when Maryrose ultimately succumbed to cancer. Testimony of Mark Ramaekers.

181.  Although no longer involved in B & A Welding on a day to day basis, Mike and Sue Ramaekers often consulted with Bud and Alice for difficult welding or bookkeeping problems, problems with staff and other business matters. With their deaths, they lost that valuable resource and the benefit of Their 26 years running the business.

Testimony of Mike Ramaekers.

182.  Bud and Alice Ramaekers were the center and heart of this family and made sure that there was a family reunion at least once a year and usually, more often, at the family home in Norfolk, Nebraska. Testimony of Pfeifer and Ramaekers Family. Alice Ramaekers would do all of the meal-planning and cooking for this huge family gathering and Bud Ramaekers would plan activities for the kids and grandkids. *Id.* Since their deaths, these services have been forever lost to the family. *Id.*

183.  The benefits provided by Alice and Bud Ramaekers to their beneficiaries while they were alive were unique and cannot be quantified on a mere hourly or fair

market value basis. The value of those lost expected benefits over the next twenty plus years is at least $100,000 per parent for each of the nine children or a total of $900,000 for the lost services of each parent over the next 20+ years.

Testimony of Dwight Grant.

184.    The pain and suffering experienced by Bud Ramaekers shortly before and at the moment of his death, along with the realization that not only he might die, but his beloved wife might die or be injured in this accident as well, is $1,000,000.

Testimony of Lt. Valverde, Dr. Rebecca Irvine, Clark Eugene Farrell, Rosalie Marquez.

Plaintiff's Exhibits Nos. 104, 105, 106, 115 – 120, 266 – 271.

185.    The pain and suffering experienced by Alice Ramaekers shortly before and at the moment of her death, along with the realization that not only she might die, but her beloved husband might die or be injured in this accident as well, is $1,000,000.

*Id.*

186.    The joint amount of funeral expenses for the Ramaekers was $19,853.78.

Testimony of Terry Pfeifer, Doug Pfeifer.

Plaintiff's Exhibit Nos. 114.

187.    Although this Court as ruled that it will not award aggravating circumstances damages because they are "punitive" in nature, this Court finds that there were aggravating circumstances and no mitigating circumstances attending the wrongful acts and neglect by the government and Lloyd Larson, pursuant to NM UJI 12-1830 (5).

188.   The wrongful deaths of the Ramaekers were aggravated because both parents
       were killed at the same time.

189.   The wrongful deaths of the Ramaekers were aggravated because other citizens
       driving on New Mexico highways were put at risk over the 15 years that the
       government allowed Lloyd Larson to have a government vehicle on the public
       roadways.

190.   The wrongful deaths of the Ramaekers were aggravated because, on January 25,
       2002, at least 38 other people, including Officer Valverde were terrified and put at
       risk as Lloyd Larson drove the wrong way down the interstate.

191.   The wrongful deaths of the Ramaekers were aggravated because of the grossly
       negligent conduct of the BIA over the 15 years of Lloyd Larson's employment.

## CONCLUSIONS OF LAW

1.   At the time of the collision on January 25, 2002, Lloyd Larson had re-entered the
     scope and course of his employment and was doing a job incident to his position
     as project manager for the United States government's N-55 Alamo Project, and
     the government is responsible for his actions pursuant to the doctrine of
     *respondeat superior* and the Federal Tort Claims Act.

2.   The government, through its employee, Lloyd Larson, was negligent and
     negligent per se (in violation of N.M.S.A. §66-8-102 and §66-7-314, 1998 Repl.
     Pamp.) in causing the collision on January 25, 2002.

3.   The government, through its employee Lloyd Larson, was grossly negligent in
     causing the collision on January 25, 2002.

4.   Lloyd Larson did not act intentionally in causing the collision on January 25, 2002.

5.   The government, through its employee, Lloyd Larson, proximately caused the collision on January 25, 2002, the deaths of Alice and Bud Ramaekers and all damages attendant with their deaths.

6.   The United States government was negligent and negligent per se (in violation of its own regulations and the CFR) in entrusting a government vehicle to Lloyd Larson for fifteen years.

7.   The United States government was grossly negligent in entrusting a government vehicle to Lloyd Larson over the fifteen years of his employment.

8.   The United States government's negligent entrustment of a government vehicle to Lloyd Larson was a proximate cause of the collision on January 25, 2002, the deaths of Bud and Alice Ramaekers and all damages that occurred as a result of the collision.

9.   The United States government's negligent entrustment of a government vehicle to Lloyd Larson over the fifteen years of his employment makes it jointly and severally liable with Mr. Larson pursuant to N.M.S.A. §41-3(A-1)(C)(2)&(4) and *Medina v. Graham's Cowboys, Inc.*, 113 N.M. 471, 827 P.2d 859 (Ct. App. 1992) for the deaths of Alice and Bud Ramaekers and all damages caused by Larson on January 25, 2002.

10.   The United States government, through its supervisors and employees, was negligent and negligent per se (in violation of its own policies and the CFR) in its hiring, retention, training and supervision of Lloyd Larson.

11.     The government, through its supervisors and employees, was grossly negligent in its hiring, retention, training and supervision of Lloyd Larson.

12.     The government's negligent hiring, retention, training and supervision of Lloyd Larson was a proximate cause of the collision on January 25, 2002, and the deaths and damages to Bud and Alice Ramaekers.

13.     The government's negligent hiring, retention, training and supervision of Lloyd Larson over the fifteen years of his employment makes it jointly and severally liable for the deaths of the Ramaekers and all damages caused by the collision on January 25, 2002.

14.     The United States government is liable or jointly and severally liable for the following damages caused by the wrongful deaths of Bud and Alice Ramaekers:

    Property damage to Cadillac          $31,588.00

    Joint funeral expenses               $19,853.78

| Description | Bud Ramaekers | Alice Ramaekers |
| --- | --- | --- |
| Lost SS earnings | $   45,089.00 | $  - 66,098.00 |
| Lost earning capacity | $ 100,000.00+ | |
| Lost enjoyment of life | $5,299,953.00 | $6,127,644.00 |
| Lost benefits to beneficiaries | $  900,000.00 | $  900,000.00 |
| Pain and suffering | $1,000,000.00 | $1,000,000.00 |
| **Total:** | **$7,345,042.00** | **$7,961, 546.00** |

15.     There is no comparative negligence on the part of Larry Beller.

16.     There is no comparative negligence on the part of Edward Ramaekers, Alice Ramaekers, or Rita Beller.

17.     There is no comparative negligence on the part of the State of New Mexico.

18.    No act or omission of the State of New Mexico proximately caused the collision,
       the wrongful deaths of the Ramaekers or any damages in this case.

19.    There is no comparative negligence on the part of Navajo Nation.

20.    No act or omission of the Navajo Nation, through its agents or employees,
       proximately caused the collision, the deaths of the Ramaekers or any damages in
       this case.

21.    There is no comparative negligence by the Smith's Supermarket, as it was not
       reasonably apparent to the Smith's employee that the person buying alcoholic
       beverages, Lloyd Larson, was intoxicated before he purchased the Bud-Light.
       NMSA § 41-11-1; NMSA § 41-11-1; *See Baxter v. Noce,* 107 N.M. 48, 752 P.2d
       240 (1988).


                                    Respectfully submitted,

                                    McGinn, Carpenter, Campbell, Montoya
                                    & Love, P.A.


                                    _____
                                    Randi McGinn
                                    Kathleen J. Love
                                    Attorneys for Plaintiff Terry Pfeifer
                                    420 Central, SW, Suite 200
                                    Albuquerque, New Mexico 87102
                                    Telephone: (505) 843-6161


I hereby certify that a copy of this pleading
was hand delivered to Elizabeth Martinez
and mailed to Traci Colquette on March 15,
2004.


_____
Kathleen J. Love

45